# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MAXWELL, | ) | CASE NO. 1:21-cv-318 |
| | ) | |
| | ) | |
| PETITIONER, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| TIMOTHY SHOOP, Warden, | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

## INTRODUCTION

Petitioner Charles Maxwell ("Maxwell") was convicted and sentenced to death in the Cuyahoga County Common Pleas Court for the aggravated murder of Nichole McCorkle ("Nichole"). Maxwell filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence. (Doc. No. 15 (Petition).) Respondent Warden Timothy Shoop ("Shoop") filed a return of writ. (Doc. No. 26 (Return of Writ.) Maxwell filed a traverse (Doc. No. 32 (Traverse)), to which Shoop replied (Doc. No. 35 (Reply)). For the reasons explained below, Maxwell's petition is denied.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Maxwell's convictions:

{¶ 1} This is an appeal as of right by defendant-appellant, Charles Maxwell, who has been sentenced to death for the aggravated murder of Nichole McCorkle.

# I.    Trial Evidence

{¶ 2} Evidence introduced at trial showed that McCorkle and Maxwell had a long-term relationship that began in 1999, living together on different occasions over the next few years. They had one child, C.M., nearly four years old. Nichole also had two other children, D.C. and D.K. In August 2005, she purchased a single-family home at 1046 East 146th Street in Cleveland and lived there with her father and two of the children. Maxwell had a key to the side door of the house and kept some clothes there.

***The underlying assault***

{¶ 3} The prosecution introduced evidence showing that on October 6, 2005, Nichole went to the hospital and received stitches for head injuries after Maxwell struck her. Police came to the hospital and took Nichole's report about the incident. On the same date, Maxwell told John Gregg, a friend and coworker, that he had pistol-whipped Nichole. On October 13, 2005, she obtained a temporary protection order against Maxwell.

{¶ 4} Afterward, prosecutors presented felonious-assault charges against Maxwell to the grand jury. Nichole was subpoenaed to testify before it on November 23, 2005.

{¶ 5} Maxwell told Gregg that he was concerned about receiving prison time for felonious assault. Maxwell knew about the temporary protection order and that a warrant had been issued for his arrest. He had also learned that Nichole was going to testify against him at the grand jury.

{¶ 6} At Maxwell's behest, Gregg contacted Nichole about her grand jury testimony in an effort to reduce the charges from felonious assault to a lesser offense. Gregg asked Nichole to "stick to the story that it was a simple domestic; she pushed him, he pushed her, she slipped and hit her head on the stove."

## A.  *Nichole's grand jury testimony*

{¶ 7} Following Nichole's testimony on November 23, 2005, the grand jury indicted Maxwell for felonious assault, abduction, and domestic violence. Brian Mooney, an assistant prosecutor for Cuyahoga County, informed Nichole that day that the grand jury had voted to indict and told her what the charges were. Because of the Thanksgiving holiday, the indictment was not signed by the grand jury foreman and filed with the clerk of court until November 28, 2005.

{¶ 8} The evening of the grand jury's decision, Maxwell called Gregg and said that he had been trying to talk to Nichole about her grand jury testimony but had been unable to contact her. Maxwell then called Nichole while Gregg remained on the line and heard their conversation. Maxwell asked Nichole what happened in court that day. Nichole told him, "I told the truth. I had to tell the truth." According to Gregg, Maxwell was very upset after the phone call and said that "the bitch was going to make him kill her." Maxwell also asked Gregg where he could get a gun.

### B.  The events of November 26 and 27, 2005

{¶ 9} The prosecution presented evidence that on the evening of November 26, 2005, Nichole and Willie Hutchinson met at a bar. Lauretta Kenney, Nichole's sister, had introduced Hutchinson to Nichole after the October 6 incident. Nichole and Hutchinson arrived at the bar in separate cars and had a few drinks. When they departed, although Nichole had told Hutchinson that she would call him when she got home, she did not. But Hutchinson called Nichole, and a man answered the phone. Hutchinson then called Lauretta and told her to check on Nichole.

{¶ 10} Near 2:30 a.m. on November 27, Lauretta called Nichole, and Maxwell answered the phone. Maxwell immediately gave the phone to Nichole. Lauretta asked Nichole why Maxwell was there and told her that he needed to leave. According to Lauretta, Nichole said that "she was confused and she didn't know what was going on."

{¶ 11} Lauretta then drove to Nichole's home and arrived around 2:40 a.m. but did not see Maxwell's car on the street or in the driveway. Lauretta called Nichole, saying she was outside. Nichole "mumbled something" and then hung up. Lauretta went onto the porch, and Nichole and Maxwell were standing next to each other when Lauretta opened the screen door.

{¶ 12} Lauretta told Maxwell that he was not supposed to be there and needed to leave. Maxwell said that he was just talking to Nichole. Lauretta testified, "I told him, there's no talking, that you needed to leave." He then called Lauretta "a bitch" and said, "[I]f anybody's leaving it's going to be you." Maxwell then stepped back and pulled a gun from his pants. Nichole screamed, "[O]h my God, Lauretta, he got a gun, run." Lauretta then jumped off the porch and started running. Lauretta heard two gunshots as she ran across the street and heard a third gunshot after she crossed the street. Lauretta then saw Maxwell kneeling down by Nichole.

3

{¶ 13} C.M., a day short of four years old, was standing near Maxwell and Nichole when Lauretta came to the door. Later, when asked what she had seen, C.M. testified, "He shoot my mommy."

{¶ 14} Maxwell ran from the house after shooting Nichole and fled down the street. Lauretta followed him for a short distance before he disappeared. Shortly afterwards, police officers and emergency medical personnel arrived on the scene. Nichole was taken to the hospital, where she died from her injuries.

{¶ 15} On the morning of November 27, Michelle Kenney, Nichole's other sister, called Gregg and told him that Maxwell had killed Nichole. Gregg said that he then called Maxwell and asked him if he had killed Nichole. Maxwell admitted killing her and recounted what happened. He said he had followed Nichole from her home to the bar. She went into the bar, and Maxwell waited outside in his car. He then went inside and saw Nichole and another man sitting in the back of the bar "making out." Maxwell then returned to his car and waited. After they left the bar, he followed Nichole and the man as they drove in separate cars to Nichole's house. Nichole kissed the man and went into her house, and the man drove away.

{¶ 16} Gregg also testified that Maxwell told him that he called Nichole after the other man drove away and asked if he could come over. Nichole said he could, and Maxwell went to her house. Maxwell answered the phone at Nichole's house, including repeated calls from a man who asked to speak to Nichole. He also answered a call from Lauretta. Maxwell told Gregg that "they started arguing and then he confronted her about that night." Lauretta then came to the front door, and Maxwell "opened the door[,] pointed the gun and fired but she had ran." Then, Maxwell told Gregg, "he just turned around, shot Nichole and she fell down and * * * she moved and then he shot her again."

### C. The police investigation

{¶ 17} Police investigators found two .25 caliber shell casings inside the house. Investigators looked inside and outside the house for a third shell casing, which they never found. Investigators also did not find any bullet holes inside or outside the house.

{¶ 18} Dr. David Dolinak, a medical examiner with the Cuyahoga County coroner's office, conducted Nichole's autopsy. Nichole suffered two gunshot wounds to the head. One gunshot in the middle of the right eyebrow broke the bones of the eye socket. The bullet did not enter the brain but lodged in the sinuses on the right side of the nose. The other gunshot went through the left side of the head into the right side of the brain. Dr. Dolinak

4

concluded that Nichole died from gunshot wounds to the head and that the death was a homicide.

{¶ 19} Detective James Ealey, a firearms examiner with the Cleveland Police Department, examined the two bullets recovered during the autopsy. Ealey testified that they had been fired from the same weapon. His written report stated that the bullets were "consistent with 25 auto type ammunition."

{¶ 20} The police sought to locate and arrest Maxwell following Nichole's death. On December 16, 2005, FBI Special Agent Robert Riddlebarger and other members of the Cleveland/Cuyahoga County Fugitive/Gang Task Force went to a Cleveland home to arrest him. After entering the home, they found Maxwell hiding in a crawl space behind a bed in a second-floor bedroom. As he was being handcuffed, Maxwell was asked whether he was armed or whether there were any weapons nearby. He replied, "I do not have a gun anymore." A few seconds later, Maxwell blurted out that he had gotten rid of the gun that he had.

{¶ 21} The defense presented no witnesses during the guilt phase of the trial.

*State v. Maxwell*, 9 N.E.3d 930, 941–44 (Ohio 2014). These factual findings "shall be presumed to be correct," and Maxwell has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998).

PROCEDURAL BACKGROUND

A.    State Court Proceedings

1.    Trial

A Cuyahoga County, Ohio, Grand Jury indicted Maxwell on January 4, 2006, for the aggravated murder of Nichole. (Doc. No. 10-1 (Trial Court Record), at 21–28.)[1] Count One charged him with aggravated murder with prior calculation and design under Ohio Rev. Code §

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

5

2903.01(A)(1). (*Id*. at 21.) Count Two charged him with aggravated murder while committing kidnapping and/or aggravated burglary under Ohio Rev. Code § 2903.01(B). (*Id*. at 22.) Both counts contained death-penalty specifications for a course of conduct involving multiple murders or attempted murders under Ohio Rev. Code § 2929.04(A)(5), murder while committing kidnapping or aggravated burglary under Ohio Rev. Code § 2929.04(A)(7), murder in retaliation for testimony in a criminal proceeding under Ohio Rev. Code § 2929.04(A)(8), and murder to escape accounting for a crime under Ohio Rev. Code § 2929.04(A)(3). (*Id*. at 21–22.)

Maxwell was also charged with six additional counts: Count Three, kidnapping; Counts Four and Five, aggravated burglary; Count Six, attempted murder of Lauretta Kenney; Count Seven, retaliation against Nichole for her grand jury testimony; and Count Eight, having a weapon while under disability. (*Id*. at 23–28.) Counts One through Seven each contained a firearm specification. (*Id*. at 21–27.)

Maxwell was arraigned on January 9, 2006. (*Id*. at 38.) He entered a plea of not guilty to all charges. (*Id*.) The court assigned Attorneys John Luskin and Thomas Rein to represent him. (*Id*.) On February 6, 2007, the trial court conducted a hearing on Maxwell's competency to stand trial. (Doc. No. 9-1 (Trial Transcript), at 44–162.) The court, after hearing the testimony of a psychologist who examined Maxwell and considering the report of a second psychologist, found him competent. (*Id*. at 151–58.) On February 7, 2007, the court held a hearing on Maxwell's motion to suppress a statement he made at the time of his arrest and denied the motion. (*Id*. at 197–232.) Also, that same day (February 7, 2007), the mass-murder specification attached to Count One was amended to a course-of-conduct specification. (Doc. No. 10-2 (Trial Court Record), at 158.) On February 8, 2007, Maxwell waived a jury trial as to Count Eight, having a weapon while under disability. (*Id*. at 161.)

6

Maxwell's trial began on February 7, 2007. (*See* Doc. No. 9-1, at 165.) At the close of the State's case, the trial court dismissed Count Two (aggravated murder while committing aggravated burglary and/or kidnapping), Count Three (kidnapping), and Counts Four and Five (aggravated burglary). (Doc. No. 9-2 (Trial Transcript), at 743.)  The court also dismissed the felony-murder specification to Count One, the remaining aggravated murder charge. (*Id*.) The defense did not present any testimony. (*Id*. at 744.)

On February 23, 2007, the jury reached the following verdicts: guilty of aggravated murder, along with the retaliation-for-testimony, murder-to-escape-accounting-for-crime, and firearm specifications; guilty of retaliation with the attached firearm specification; not guilty of the course-of-conduct specification attached to the aggravated murder charge; and not guilty of attempted murder. (Doc. No. 10-2, at 197.) The trial court found Maxwell guilty of having a weapon while under a disability. (*Id*.)

The mitigation phase of Maxwell's trial began on February 27, 2007. (Doc. No. 9-2, at 898–1128.) The retaliation-for-testimony and murder-to-escape-accounting-for-crime specifications were merged, and the jury was instructed to only consider the retaliation-for-testimony specification. (*See id*. at 1103–04.) The following day (February 28, 2007), the jury returned a verdict recommending a sentence of death. (Doc. No. 10-2, at 203.)

On March 21, 2007, the court conducted a sentencing hearing. (*See* Doc. No. 9-2, at 1130–61.)  After receiving Maxwell's allocution (*see id*. at 1144), the court imposed the following sentence: for Count One (aggravated murder), death plus three years' imprisonment for the attached firearm specification; for Count Seven (retaliation), five years' imprisonment plus three years' imprisonment for the attached firearm specification; and for Count Eight (having weapons

under disability), five years' imprisonment. (*Id.* at 1160.) All counts were to run concurrently, and the firearm specifications were to merge, resulting in one three-year prison term. (*Id.*)

Prior to sentencing, Maxwell filed a motion for a new trial, claiming that: (1) the guilty verdict was contrary to established law; (2) the prosecutor engaged in misconduct; and (3) the defense had discovered new material evidence that was not available at the time of the original trial. (Doc. No. 10-2, at 228–35.) On March 23, 2007, the trial court denied the motion. (*Id.* at 374.) Maxwell filed a second motion for a new trial, reasserting his prior claims and raising new claims, alleging: (1) irregularity in the grand jury proceedings; (2) insufficient evidence to support the verdict; and (3) an error of law committed during the trial. (*Id.* at 379–88.) The court denied the second motion for a new trial on February 13, 2008. (Doc. No. 10-4 (Post-Conviction Record), at 93.)

## 2.    Direct appeal

Maxwell, represented by Attorneys John Parker and David Doughten, timely appealed his convictions and sentences directly to the Ohio Supreme Court. (Doc. No. 10-3 (Direct Appeal Record), at 4–5.) In his merits brief, he presented nineteen propositions of law:

1. The failure of defense counsel to fully investigate and present all mitigation to the jury and object to improper evidence and argument during the penalty phase constitutes ineffective assistance of counsel.

2. A trial court may not accept trial counsel's acquiescence to allow the prosecutor to materially amend the indictment as to an essential element of the offense without directly engaging in a colloquy with the defendant to ensure the waiver was knowingly, intelligently and voluntarily entered.

3. A child witness under the age of ten years must be found incompetent to testify unless the record affirmatively establishes that the witness is able to distinguish right from wrong and the truth from a lie.

4. The failure to raise and preserve meritorious issues during a capital trial results in the denial of a defendant's right to effective assistance of counsel.

8

5. Where a party to a lawsuit displays a *prima facie* pattern of bias in its exercise of peremptory challenges against women, it is incumbent upon the trial judge to determine whether gender neutral reasons for the challenge exists.

6. The trial court's refusal to dismiss biased jurors from the panel deprives the defendant of his protections under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7. Evidence of a near instantaneous decision to purposely kill another is insufficient to sustain a conviction of prior calculation and design.

8. When circumstantial evidence that retaliation was the motive for a homicide is superceded (sic) by a greater, more contemporary motive, the evidence is insufficient to support an R.C. 2929.04(A[)](8) finding by the jury.

9. Testimony before a grand jury is not testimony in a "criminal proceeding" as defined in R.C. 2929.04(A)(8) until the indictment is returned and filed in the Clerk's office under Crim. R. 55 and Crim. R. 6 or a no bill is returned and filed.

10. Victim-impact evidence is irrelevant to the determination of guilt or nonguilt.

11. The prosecutor may not argue victim-impact considerations or that the lack of mitigation factors under R.C 2929.04(B) as a basis for the jury to consider death as the appropriate sentence. The misconduct of prosecutor penalty phase.

12. A trial court must grant defense experts to develop mitigation where counsel has established the need for such expert[s].

13. The public safety exception to the requirements of [*Miranda*] does not apply when one is arrested in a private home with no other occupants and the home has been secured.

14. The out of court statement of the decedent via a three way telephone call is inadmissible hearsay and the appellant's right to confrontation under the Sixth and Fourteenth Amendments of the federal Constitution was violated.

15. The admission of the autopsy report and testimony from a doctor who did not perform the autopsy violates the Sixth and Fourteenth Amendments of the federal Constitution.

16. In a capital trial, the only evidence that a penalty phase jury may consider from the culpability phase of trial are those that are relevant to a proven aggravating circumstance or mitigation for the defendant.

9

17. The death penalty may not be sustained where the cumulative errors occurring in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

18. A sentence of death is inappropriate where the aggravating factors proven at trial do not outweigh the mitigation beyond a reasonable doubt.

19. The death penalty is unconstitutional as presently administered in Ohio.

(*Id.* at 50–59.) Shoop also filed a merits brief. (*Id.* at 229–331.)

On March 20, 2014, the Ohio Supreme Court affirmed the trial court's judgment. *Maxwell*, 9 N.E.3d at 930. Maxwell filed a motion for reconsideration (Doc. No. 10-3, at 500–11), which the court denied (*id.* at 573). Maxwell timely petitioned the United States Supreme Court for a writ of certiorari. (*Id.* at 749.) The Supreme Court declined jurisdiction over the appeal on February 23, 2015. (*Id.* at 750.)

### 3.    Reopening application

Meanwhile, on September 9, 2014, Maxwell, represented by Rachel Troutman and Shawn Welch of the Ohio Public Defender's Office, filed an application to reopen his direct appeal under Ohio Supreme Court Practice Rule 11.06. (*Id.* at 668–79.) That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." Ohio S. Ct. Prac. R. 11.06(A); *see also State v. Murnahan,* 584 N.E.2d 1204, 1208–09 (Ohio 1992).

Maxwell raised the following claims in his application:

1. The evidence against Maxwell is insufficient to support a conviction for 2929.03(A)(3), because Maxwell was not convicted of the felonious assault for which he had sought to avoid detection, apprehension, trial, or punishment, and his conviction is unconstitutional.

10

2. Maxwell's due process rights were violated when direct appeal counsel failed to raise the issue that evidence against Maxwell is insufficient to support a conviction for 2929.03(A)(3).

3. The State committed misconduct by misrepresenting the evidence against Maxwell.

4. Direct appeal counsel were ineffective under *Strickland v. Washington* for failing to argue the State committed misconduct by misrepresenting the evidence against Maxwell.

5. The evidence against Maxwell is insufficient to support a conviction for aggravated murder, and his conviction is unconstitutional.

6. Maxwell's due process rights were violated when direct appeal [counsel failed to point out that] [t]he evidence against Maxwell is insufficient to support a conviction for aggravated murder, and his conviction is unconstitutional.

7. The trial court erred by denying Maxwell's Motions for a New Trial.

8. Direct appeal counsel failed to raise the issue that the trial court erred by denying Maxwell's Motions for a New Trial.

9. A defendant's Sixth Amendment and Fourteenth Amendment rights are violated when he is denied the effective assistance of counsel.

   A. Trial counsel failed to effectively argue State's Ex. 121.

   B. Trial counsel erred by failing to present the testimony of a witness qualified to testify about the phone records.

   C. Trial counsel failed to preserve the record for review.

   D. Trial counsel performed deficiently, to Maxwell's prejudice, when they failed to point out that there is insufficient evidence supporting Maxwell's conviction for the capital murder.

10. Direct appeal counsel failed to raise several instances of ineffective assistance of counsel, in violation of Maxwell's due process rights.

11. Maxwell's right to the effective assistance of counsel and his due process rights were violated when direct appeal counsel conceded a constitutional violation at argument.

12. The trial court violated its role as gatekeeper of the evidence, and Maxwell's Due Process rights were violated.

11

13. The trial court erred by not granting Maxwell's Rule 29 Motion, and Maxwell's Due Process rights were violated.

14. A trial court violates a capital defendant's rights to a fair trial and due process when it fails to record sidebars to ensure a complete record on appeal.

15. Direct appeal counsel failed to raise several instances of trial court errors, in violation of Maxwell's due process rights.

(Doc. No. 10-3, at 668–78.) The Ohio Supreme Court summarily denied the application on February 24, 2016. (*Id*. at 751.)

### 4. Post-conviction proceedings

On January 18, 2008, Maxwell, represented by Attorneys Rachel Troutman and Benjamin Zober of the Ohio Public Defender's Office, filed in the trial court an unopposed "Motion to Stay and Reset the Post-Conviction Filing Deadline" while his motion for new trial was pending. (Doc. No. 10-4, at 20–23.) The court granted the motion. (*Id.* at 25.)

Maxwell then initiated post-conviction proceedings in the state trial court on September 9, 2014, while his direct appeal was pending. He raised the following claims:

1. Maxwell's convictions and sentences are void or voidable because the trial court erred in not granting sufficient funds for a neuropsychologist.

2. Petitioner's sentence is void or voidable because his trial counsel failed to present mitigating evidence regarding Maxwell's brain dysfunction.

3. Petitioner's conviction is void or voidable because his trial counsel failed to investigate and present evidence during the trial phase of Maxwell's organic brain dysfunction.

4. Maxwell's conviction and sentence are void or voidable because his trial counsel failed to investigate the felonious assault that was used to prove the aggravating circumstance(s).

5. Maxwell's conviction is void or voidable because his trial counsel failed to investigate for the trial phase.

12

6. Maxwell's conviction and sentence are void or voidable because he is actually innocent of the aggravating circumstances.

7. Maxwell's convictions and sentences are void or voidable because defense counsel had Dr. Sandra McPherson act as both investigator and mitigation specialist.

8. [missing]

9. Maxwell's convictions and sentences are void and/or voidable because he was denied effective assistance of counsel during the trial phase of his capital trial.

10. Maxwell's sentence is void or voidable because his defense team did not provide effective assistance during the mitigation phase of his trial. Insufficient preparation of mitigation witnesses denied Maxwell his guaranteed Sixth and Fourteenth Amendment rights.

11. Maxwell's sentence is void or voidable because his defense team did not provide him with effective assistance during the mitigation phase of trial. Failure to provide evidence that he held a job amounted to ineffective assistance of counsel and he was accordingly prejudiced.

12. Maxwell's judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the [C]onstitution.

(*Id*. at 109, 112, 115, 118, 121, 124, 127, 130, 133, 136, 139.) The State filed a brief in opposition.

(*Id*. at 282–334.) Maxwell moved for leave to conduct discovery (*id*. at 260–69), which the court

denied (*id*. at 281). He also amended his petition to include two new exhibits. (*Id*. at 273.) On

September 2, 2016, the trial court denied Maxwell's petition. (*Id*. at 426.)

Maxwell timely appealed the trial court's judgment. (Doc. No. 10-5, at 43.) In his merits

brief, he asserted the following assignments of error:

1. The trial court erred by denying Maxwell's post[-]conviction petition without allowing him to conduct discovery.

2. Maxwell's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution were violated by the trial court failing to provide him the court's findings of fact and conclusions of law.

13

3. The trial court erred by applying the doctrine of res judicata to bar Maxwell's grounds for relief.

4. The trial court erred in dismissing Maxwell's post-conviction petition when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

(*Id.* at 109–10 (capitalization altered).) The State filed a response brief. (*Id.* at 187–206.)

On May 21, 2020, the appellate court affirmed the trial court's decision. *State v. Maxwell*, No. 107758, 2020 WL 2569833 (Ohio Ct. App. May 21, 2020). Maxwell timely appealed that decision to the Ohio Supreme Court. (Doc. No. 10-5, at 277–79.) On October 27, 2020, the Ohio Supreme Court declined jurisdiction. (*Id.* at 280.) Maxwell filed a petition for writ of certiorari in the United States Supreme Court (*id.* at 281), which was denied on April 8, 2021 (*id.* at 282).

### B. Federal Habeas Proceedings

On February 8, 2021, Maxwell filed a notice of intent to initiate a federal habeas action (Doc. No. 1 (Notice of Intent)) and requested the appointment of counsel and permission to *proceed in forma pauperis* on that same date. (Doc. Nos. 2 (IFP Motion), 3 (Motion for Counsel).) The Court granted the motions and appointed Attorneys Mary Kincaid and Stephen Kissinger of the Federal Defender Service of Eastern Tennessee, Inc. (*See* Order [non-document], 2/12/2021.)

On October 27, 2021, Maxwell filed his petition for a writ of habeas corpus. (Doc. No. 15.) On May 25, 2022, he filed a motion to stay these federal habeas proceedings and to hold the case in abeyance (Doc. No. 20 (Motion to Stay)), which Shoop opposed (Doc. No. 22 (Opposition to Motion to Stay)). The Court denied the motion to stay. (Doc. No. 25 (Order Denying Motion to Stay).)

On March 14, 2024, Maxwell filed a motion for discovery. (Doc. No. 37 (Motion for Discovery).) Shoop opposed the motion (Doc. No. 38 (Opposition)), and Maxwell replied. (Doc.

No. 39 (Reply)). The Court will address Maxwell's motion for discovery in this memorandum opinion and order.

## PETITIONER'S GROUNDS FOR RELIEF

Maxwell asserts twenty-five grounds for relief in his petition:

1. Trial counsel ineffectively failed to investigate and present evidence undermining the prosecution's case for guilt.

2. Trial counsel ineffectively failed to use State's Exhibit 121 to undermine the prosecution case for guilt; appellate counsel ineffectively failed to raise this issue.

3. The evidence against Maxwell is insufficient to support the aggravated murder conviction or specifications charged to the jury to support [a] death sentence.

4. The evidence is insufficient to support specification Ohio Rev. Code § 2929.04(A)(3) because Maxwell was never convicted of a felonious assault for which he would seek to avoid detection; appellate counsel ineffectively failed to raise this claim.

5. The prosecution failed to timely disclose exculpatory and impeaching evidence; appellate counsel failed to raise this claim.

6. Maxwell's conviction and death sentence were procured in denial of [d]ue [p]rocess of law; appellate counsel ineffectively failed to raise this claim.

7. The prosecution misleadingly bolstered Gregg's credibility and failed to disclose evidence that would have fueled a withering cross-examination of Gregg; appellate counsel ineffectively failed to raise this issue.

8. Trial counsel ineffectively failed to ensure a complete record of proceedings against Mr. Maxwell; appellate counsel ineffectively failed to raise this issue.

9. Victim[-]impact testimony rendered Maxwell's trial unfair in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.

10. The state court's admission of the autopsy report and testimony from a doctor that did not perform the autopsy violated Maxwell's rights under [t]he Fifth, Sixth, Eighth, and Fourteenth Amendments.

11. Preschooler [C.M.]'s unnecessary, inflammatory, prejudicial testimony violated Maxwell's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Trial counsel ineffectively failed to raise constitutional challenges to this testimony.

15

12. The trial court denied Maxwell his constitutional rights by allowing his unwarned statement to be admitted against him.

13. Defense counsel ineffectively failed to object to the late amendment of the indictment.

14. Trial counsel ineffectively failed to argue that the law of the case prohibited the court from reopening the issue of Gregg's credibility.

15. Maxwell's defense counsel failed to provide competent representation during plea negotiations.

16. Trial counsel failed to effectively investigate and present mitigating evidence.

17. Trial counsel ineffectively failed to investigate, discover and present evidence that Maxwell is intellectually disabled and thus ineligible for the death penalty.

18. Trial counsel ineffectively failed to object to improper argument at sentencing.

19. The prosecution misled the jury about the law governing mitigating and aggravating circumstances.

20. The trial court unconstitutionally diminished the jury's sense of responsibility for imposing a death sentence.

21. Maxwell's death sentence is arbitrary and capricious, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.

22. Trial counsel was ineffective in failing to protect Maxwell's right to be trial (sic) by a jury free from undue external influences.

23. The state court denied Maxwell his right to a fair and impartial jury.

24. Trial counsel ineffectively failed to protect Maxwell's right to a fair and impartial juror.

25. In violation of the due process clause, Maxwell was denied fundamentally fair state court proceedings due to the cumulative effect of multiple errors.

(Doc. No. 15, at 27–30.)

STANDARD OF REVIEW

### A. AEDPA Review

Maxwell's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997) (AEDPA governs federal habeas petitions filed after the Act's effective date). AEDPA, which amended Section 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L. Ed. 2d 363 (2003) (quoting *Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000)). AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

Most significantly, § 2254(d) forbids a federal court from granting habeas relief for a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either:

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

17

Habeas courts will presume a state court has adjudicated a federal claim "on the merits," and AEDPA deference therefore applies, regardless of whether the last state court to decide the claim provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (applying presumption to state court summary dispositions); *see also Johnson v. Williams*, 568 U.S. 289, 292–93, 133 S. Ct. 1088, 185 L. Ed. 2d 105 (2013) (applying *Richter* presumption to state court decisions that rule against a defendant and address some issues, but not expressly the federal claim in question).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court decision holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318, 135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015). Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

18

a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Taylor*, 529 U.S. at 412–13. The state court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are not inconsistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (per curiam). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).

Under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (citations omitted). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Id.* (citations omitted).

A state court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528–29, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state court factual determinations, which only can be overcome by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1).[2] The Supreme Court has cautioned, however, that "'a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010)).

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact under § 2254(d), a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims . . . .'" *Wilson v. Sellers,* 584 U.S. 122, 125, 138 S. Ct. 1188, 200 L. Ed. 2d 530 (2018) (quoting *Hittson v. Chatman*, 576 U.S. 1028, 1028, 135 S. Ct. 2126, 192 L. Ed. 2d 887 (2015) (Ginsburg, J., concurring in denial of certiorari). In cases in which the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, a habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.*[3] But when the last state court to adjudicate a federal claim on the merits issues an *unexplained* order upholding a lower court's *explained* judgment on a federal claim, the federal court "should 'look through' the unexplained decision to the last related state court decision that does provide a relevant rationale" and "then presume that

---

[2] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

[3] The Sixth Circuit has adhered to the directive in *Wilson. See, e.g.*, *Cassano v. Shoop*, 1 F.4th 458, 472 (6th Cir. 2021) ("this Court reviews only the Ohio Supreme Court's reasons for denying Cassano's claim" (citing *Wilson*, 138 S. Ct. at 1192)); *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied" (citing *Wilson*, 138 S. Ct. at 1192)); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) (following and quoting *Coleman*). But the Sixth Circuit has also acknowledged that "[i]n the wake of *Wilson*, courts have grappled with whether AEDPA deference extends only to the reasons given by a state court (when they exist), or instead applies to other reasons that support a state court's decision." *Thompson*, 981 F.3d at 480 n.1 (listing cases); *see also id*. at 483–85 (Nalbandian, J., concurring in result but emphasizing that "[f]ederal courts have never been required to confine their habeas analysis to the exact reasoning that the state court wrote, and neither [*Wilson* nor *Coleman*] compels us to change our analysis.").

the unexplained decision adopted the same reasoning." *Id.* (adopting the "look through" presumption in determining procedural default of federal habeas claims established in *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)). The state may then rebut this presumption "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued for the state supreme court or obvious in the record it reviewed." *Id*.

The Supreme Court has repeatedly emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state court adjudications of federal claims. A reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102–03 (internal quotation marks and citation omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a high standard, which the Supreme Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id*. at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g.*, *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g.*, *Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.  Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28, 102 S. Ct. 1558, 71. L. Ed. 2d 783 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

22

Procedural default is an "important corollary" to the exhaustion requirement. *Davila v. Davis,* 582 U.S. 521, 527, 137 S. Ct. 2058, 198 L. Ed. 2d 603 (2017) (internal quotation marks and citation omitted). The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules." *Edwards v. Carpenter*, 529 U.S. 446, 453, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000). It occurs when a habeas petitioner failed to either: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *Engle*, 456 U.S. at 125 n.28.

When a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732–33. To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009) (citation omitted).[4]

---

[4] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule: "First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it will not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161–62, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law'" (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

---

to review the claim would result in prejudice or a miscarriage of justice." *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst,* 501 U.S. at 805 (emphasis in original). If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted. *Id.* at 803; *see also Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" to result in procedural default). Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 803 (citation omitted).[5]

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (emphasis in original). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

---

[5] Also, where a later state court decision rests upon a prohibition against further state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3.

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

### C.   Cognizability

Federal habeas courts also must consider whether the petitioner's claims are cognizable. If a claim alleges violations of state law, it is not reviewable by a federal habeas court and must be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (citing *Estelle*, 502 U.S. at 67–68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

26

State court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## DISCUSSION

The Court addresses Maxwell's twenty-five grounds for habeas relief in nine groups based on subject matter rather than numerical order. Within some of these subject matter groupings, the Court refers to Maxwell's separate contentions as "sub-grounds," which correspond to one or more of the grounds for relief in Maxwell's habeas petition. To assist the reader, the Court provides the following table reflecting the organization of the opinion:

| I.  Ineffective Assistance of Counsel | |
|---|---|
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: Trial counsel failed present evidence undermining the State's theory that Maxwell feloniously assaulted Nichole and then murdered her in retaliation for testifying about the assault. | Habeas Ground One |
| Sub-Ground 2: Trial counsel failed use the State's Exhibit 121 to undermine the State's case. | Habeas Ground Two |
| Sub-Ground 3: Trial counsel failed to ensure there was a complete record of the proceedings. | Habeas Ground Eight |
| Sub-Ground 4: Trial counsel failed to object to the late amendment of the indictment. | Habeas Ground Thirteen |
| Sub-Ground 5: Trial counsel failed argue that the law of the case prohibited the trial court from reopening the issue John Gregg's credibility. | Habeas Ground Fourteen |
| Sub-Ground 6: Trial counsel provide competent representation during plea negotiations. | Habeas Ground Fifteen |

27

| Sub-Ground 7: Trial counsel failed to effectively investigate and present mitigating evidence. | Habeas Ground Sixteen |
| Sub-Ground 8: Trial counsel failed to investigate, discover, and present evidence that Maxwell was intellectually disabled and thus ineligible for the death penalty. | Habeas Ground Seventeen |
| Sub-Ground 9: Trial counsel failed to object to improper argument at sentencing. | Habeas Ground Eighteen |
| Sub-Ground 10: Trial counsel failed to protect Maxwell's right to be tried by an unbiased jury. | Habeas Ground Twenty-two |
| Sub-Ground 11: Trial counsel failed to protect Maxwell from a biased juror. | Habeas Ground Twenty-four |

| II.      Insufficiency of the Evidence | |
| --- | --- |
| | **Habeas Grounds** |
| The evidence against Maxwell is insufficient to support the aggravated murder conviction or specifications charged to the jury to support a death sentence. | Habeas Ground Three |
| The evidence against Maxwell is insufficient to support specification Ohio Rev. Code § 2929.04(A)(3) because Maxwell was never convicted of a felonious assault for which he would seek to avoid detection. | Habeas Ground Four |

| III.      Prosecutorial Misconduct | |
| --- | --- |
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: The prosecution improperly withheld exculpatory and impeaching evidence. | Habeas Grounds Five and Six |
| Sub-Ground 2: The prosecution improperly bolstered Gregg's credibility. | Habeas Ground Seven |
| Sub-Ground 3: The prosecution misled the jury on the law governing mitigating and aggravating circumstances. | Habeas Ground Nineteen |

| IV.      Trial Court Error/Sentencing | |
| --- | --- |
| | **Habeas Grounds** |
| Maxwell's conviction and death sentence were procured in denial of due process of law. | Habeas Ground Six |

| V.      Trial Court Error/Evidentiary Rulings | |
| --- | --- |
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: The trial court erred by admitting victim-impact testimony. | Habeas Ground Nine |
| Sub-Ground 2: The trial court erred by admitting testimony about the autopsy report. | Habeas Ground Ten |
| Sub-Ground 3: The trial court erred by admitting testimony of a child witness. | Habeas Ground Eleven |

| Sub-Ground 4: The trial court erred by admitting Maxwell's statements to police. | Habeas Ground Twelve |

| VI.  Trial Court Error/Reference to Jury's "Recommendation" of Death | |
|---|---|
| | **Habeas Grounds** |
| The trial court unconstitutionally diminished the jury's sense of responsibility for imposing a death sentence. | Habeas Ground Twenty |

| VII.  Constitutionality of Death Penalty | |
|---|---|
| | **Habeas Grounds** |
| Maxwell's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. | Habeas Ground Twenty-one |

| VIII.  Impartial Jury | |
|---|---|
| | **Habeas Grounds** |
| The state court denied Maxwell his right to a fair and impartial jury. | Habeas Ground Twenty-three |

| IX.  Cumulative Error | |
|---|---|
| | **Habeas Grounds** |
| The cumulative effect of multiple errors in this case amounts to a due process violation. | Habeas Ground Twenty-five |

For ease of reference, pertinent sections of the table are replicated under each subject matter heading. Finally, in Section X, the Court addresses Maxwell's motion to conduct discovery (Doc. No. 37) on eleven of his twenty-five grounds for relief.

### I.  First, Second, Eighth, Thirteenth through Eighteenth, Twenty-Second, and Twenty-Fourth Grounds for Relief: *Ineffective Assistance of Trial Counsel*

| Ineffective Assistance of Counsel | |
|---|---|
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: Trial counsel failed present evidence undermining the State's theory that Maxwell feloniously assaulted Nichole and then murdered her in retaliation for testifying about the assault. | Habeas Ground One |
| Sub-Ground 2: Trial counsel failed use the State's Exhibit 121 to undermine the State's case. | Habeas Ground Two |
| Sub-Ground 3: Trial counsel failed to ensure there was a complete record of the proceedings. | Habeas Ground Eight |
| Sub-Ground 4: Trial counsel failed to object to the late amendment of the indictment. | Habeas Ground Thirteen |

29

| Sub-Ground 5: Trial counsel failed argue that the law of the case prohibited the trial court from reopening the issue John Gregg's credibility. | Habeas Ground Fourteen |
| Sub-Ground 6: Trial counsel provide competent representation during plea negotiations. | Habeas Ground Fifteen |
| Sub-Ground 7: Trial counsel failed to effectively investigate and present mitigating evidence. | Habeas Ground Sixteen |
| Sub-Ground 8: Trial counsel failed to investigate, discover, and present evidence that Maxwell was intellectually disabled and thus ineligible for the death penalty. | Habeas Ground Seventeen |
| Sub-Ground 9: Trial counsel failed to object to improper argument at sentencing. | Habeas Ground Eighteen |
| Sub-Ground 10: Trial counsel failed to protect Maxwell's right to be tried by an unbiased jury. | Habeas Ground Twenty-two |
| Sub-Ground 11: Trial counsel failed to protect Maxwell from a biased juror. | Habeas Ground Twenty-four |

Maxwell asserts numerous grounds of ineffective assistance of trial counsel in his first, second, eighth, thirteenth through eighteenth, twenty-second, and twenty-fourth grounds for relief. Combined, he alleges that his trial counsel failed to:

- (sub-ground 1) present evidence undermining the State's theory that (a) he feloniously assaulted the victim and (b) then murdered her in retaliation for testifying about the assault (Ground One);

- (sub-ground 2) use the State's Exhibit 121 to undermine the State's case (Ground Two);

- (sub-ground 3) ensure there was a complete record of the proceedings (Ground Eight);

- (sub-ground 4) object to the late amendment of the indictment (Ground Thirteen);

- (sub-ground 5) argue that the law of the case prohibited the trial court from reopening the issue of John Gregg's ("Gregg") credibility (Ground Fourteen);

- (sub-ground 6) provide competent representation during plea negotiations (Ground Fifteen);

30

- (sub-ground 7) effectively investigate and present mitigating evidence of (a) domestic assault of Maxwell, (b) his traumatic brain injuries, (c) his low intellectual functioning, and (d) his delusional disorder (Ground Sixteen);

- (sub-ground 8) investigate, discover, and present evidence that Maxwell was intellectually disabled and thus ineligible for the death penalty (Ground Seventeen);

- (sub-ground 9) object to improper argument at sentencing (Ground Eighteen);

- (sub-ground 10) protect Maxwell's right to be tried by an unbiased jury (Ground Twenty-two); and

- (sub-ground 11) protect Maxwell from a biased juror (Ground Twenty-four).

(Doc. No. 15, at 45–70, 94–98, 124–88, 199–203, 206–08.)

### A. Procedural Posture

Shoop argues that all but two of these claims—sub-grounds 7 and 9, as listed above —are procedurally defaulted. Those two claims were fully adjudicated on the merits in state courts and are therefore preserved for federal habeas review. *See, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) (exhaustion of a claim under AEDPA entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"). The Court agrees with Shoop that the remaining sub-grounds listed above, with one exception (sub-ground 8), are procedurally defaulted. Thus, as explained below, sub-grounds 1–6, 10, and 11 are procedurally defaulted, while sub-grounds 7–9 are not.

### 1. Sub-ground 1

Shoop argues that sub-ground 1 (defense counsel's failure to present evidence undermining the State's theory that he committed felonious assault and then murdered the victim in retaliation

31

for testifying against him about that assault) is procedurally defaulted. (Doc. No. 26, at 40–41.) The Court agrees. Maxwell raised this argument in state court in post-conviction proceedings, and the last court to review it found it barred under Ohio's res judicata rule because it was based on the trial-court record and therefore should have been raised on direct appeal. *Maxwell*, 2020 WL 2569833, at *16 (¶¶ 81, 86); *see Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 226 N.E.2d 104 (Ohio 1967) (holding that res judicata bars a criminal defendant from raising claims that could have been raised on direct appeal in post-conviction proceedings).

Maxwell first responds that the sub-ground is not defaulted because the state court conducted an alternative merits analysis of the claim. (Doc. No. 32, at 24.) As Shoop points out, however, a state court's alternative merits review of a federal claim does not resurrect the claim's procedural default for purposes of federal habeas review. (Doc. No. 26, at 40–42.) *See, e.g.*, *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) ("The alternative [merits] holding thus does not require us to disregard the state court's finding of procedural bar." (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989))).

Maxwell next argues that the default should not preclude this Court's review because the state appellate court misapplied the *res judicata* doctrine. (Doc. No. 32, at 24–26.) Indeed, "an incorrect application of a state [procedural] rule does not constitute reliance on an adequate and independent state ground." *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (evaluating state court application of *res judicata* doctrine). Maxwell contends that the extra-record evidence he submitted with his post-conviction petition in support of this claim was sufficient to overcome the res judicata bar. (Doc. No. 32, at 24–26.) He specifically cites the affidavits of Andy Maxwell,

his brother (Doc. No. 10-4, at 176–79), and of La-Tonya Kindell (*id.* at 180–81), a friend of Maxwell's and Nichole's.

Generally, under Ohio law, "the introduction in a[ ] [post-conviction] petition of evidence *dehors* the record . . . is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata." *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982). But to fall within this exception to the res judicata doctrine, "it is not sufficient for the petitioner to simply present evidence outside the record, he must also demonstrate that the evidence was not available at the time of his trial, or at the time of his direct appeal." *State v. Jones*, No. 2001-A-0072, 2002 WL 31812945, at *3 (Ohio Ct. App. Dec. 13, 2002). Moreover, "[t]he outside evidence must meet a threshold level of cogency." *State v. Lynch*, No. C-010209, 2001 WL 1635760, at *3 (Ohio Ct. App. Dec. 21, 2001). It "must be 'competent, relevant and material' to the claim, be more than marginally significant, and advance the claim 'beyond mere hypothesis and a desire for further discovery.' . . . [I]t must not be cumulative of or alternative to evidence presented at trial." *State v. Fears*, No. C-990050, 1999 WL 1032592, at *3 (Ohio Ct. App. Nov. 12, 1999) (citations omitted). And as the state appellate court further explained:

> [I]f the submitted evidence outside the record consists of affidavits, the trial court should consider all the relevant factors when assessing the credibility of affidavits. These factors include whether (1) the judge reviewing the postconviction petition is the same judge who presided over the trial; (2) the affidavits submitted contain identical language or appear to have been drafted by the same person, (3) the affidavits contain or rely on hearsay, (4) whether (sic) the affiants are relatives of the petitioner or interested in the petitioner's success, and (5) the affidavits contradict evidence proffered by the defense or are inconsistent with or contradicted by the affiant's trial testimony.

*Maxwell*, 2020 WL 2569833, at *5 (¶ 28) (citing *State v. Calhoun*, 714 N.E.2d 905, 911–12 (Ohio 1999)). As explained in detail below, the state appellate court reasonably found the extra-record evidence Maxwell submitted in support of this claim insufficient to defeat the res judicata bar.

This sub-ground is procedurally defaulted. Finally, Maxwell asserts that he is excused from his default because he is actually innocent of the death penalty. But, as discussed below, the Court rejects that argument.

### 2. Sub-grounds 2 and 3

Maxwell raised sub-ground 2 (failure to use the State's Exhibit 121 to undermine the State's case) and sub-ground 3 (failure to ensure there was a complete record of the proceedings) as the underlying grounds for his claims of ineffective assistance of appellate counsel in an application to reopen his direct appeal, which the Ohio Supreme Court summarily denied. (Doc. No. 10-3 (Application for Reopening), at 676, 677–678.) Shoop correctly argues that, while Maxwell's appellate ineffective-assistance claims were fully adjudicated in state court and are ripe for habeas review, the trial counsel ineffective-assistance claims are procedurally defaulted because they were presented to state court only as the underlying claims to appellate counsel ineffective-assistance claims and were therefore not fairly presented. (Doc. No. 26, at 62, 70.)

The Sixth Circuit has made it clear that because claims of ineffective assistance of appellate counsel are based on a separate legal theory from their underlying claims, a reopening application does not preserve the underlying claims from procedural default. *See, e.g.*, *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("[B]ringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because 'the two claims are analytically distinct.'" (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005))). Maxwell therefore never properly raised sub-grounds 2 and 3 in state court, and because they were based on the state court record, it would be futile for him to do so now, as they are barred by *res judicata*. These sub-grounds are procedurally defaulted.

Maxwell appears to argue that these defaults were caused by his ineffective appellate counsel's failure to raise the claims on direct appeal. (Doc. No. 32, at 33–34, 69–70.) "Attorney error that constitutes ineffective assistance of counsel is cause." *Coleman*, 501 U.S. at 754. This includes the ineffective assistance of appellate counsel. *See Murray*, 477 U.S. at 492. As explained below, however, Maxwell's underlying claims have no merit and therefore cannot support a claim of ineffective assistance of appellate counsel: there can be no prejudice resulting from counsel's failure to raise a meritless claim on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (*Strickland*'s test of deficient performance and prejudice applies to claims of ineffective assistance of appellate counsel); *see also Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) ("only when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome" (internal quotation marks and citations omitted)).

Maxwell further contends that his actual innocence of the death penalty excuses these defaults, but as explained below, this claim also lacks merit.

### 3.  Sub-grounds 4, 5, 10, 11

Shoop asserts that sub-ground 4 (failure to object to the late amendment of the indictment), sub-ground 5 (failure to argue that the law of the case prohibited the trial court from reopening the issue of Gregg's credibility), sub-ground 10 (failure to protect Maxwell's right to be tried by an unbiased jury), and sub-ground 11 (failure to protect Maxwell from a biased juror) are also procedurally defaulted. (Doc. No. 26, at 42, 44, 56, 58.) The Court agrees. These arguments arise out of the record of proceedings in the trial court, and therefore could have been raised on direct appeal. But Maxwell failed to do so, and as discussed above, under Ohio law, res judicata now prohibits him from raising the issues in any post-conviction proceeding. With a return to state court

35

futile, Maxwell has defaulted these sub-grounds. Maxwell again argues that his actual innocence of the death penalty excuses the defaults (Doc. No. 32, at 97, 101, 140, 147), but as explained below, the Court rejects that argument.

### 4. Sub-ground 6

Shoop asserts that sub-ground 6 (failure to provide competent representation during plea negotiations) is also procedurally defaulted because Maxwell never raised the argument in state court and is no longer able do so. (Doc. No. 26, at 46–47.) Indeed, Maxwell cannot now raise this sub-ground in state court because of Ohio's filing deadlines, post-conviction procedures, and res judicata rules. *See Wong*, 142 F.3d at 322 ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of *res judicata*."); Ohio R. Crim. P. 33(B) (defendant may be entitled to new trial after deadline for filing motion for new trial if he was "unavoidably prevented" from filing motion or there is "newly discovered evidence"); Ohio Rev. Code § 2953.23(A)(1) (second, successive, or untimely post-conviction petition permitted if petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim, or the claim is based on a new federal or state right the Supreme Court has recognized that applies retroactively; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of offense or eligible for death sentence). And with no state court remedies still available, Maxwell has defaulted this sub-ground. *See Netherland*, 518 U.S. at 161–62 ("Because the exhaustion requirement refers only to remedies still available at the time of the federal petition . . . it is satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law" (internal quotation marks and citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be

procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

Maxwell counters that this default should be excused by the ineffective assistance of his post-conviction counsel. (Doc. No. 32, at 105–06.) Criminal defendants have no constitutional right to an attorney in state post-conviction proceedings, and an attorney's negligence in those proceedings, therefore, generally cannot establish cause to excuse a habeas petitioner's procedural default of claims in state court. *Coleman*, 501 U.S. at 756–57; *see also* 28 U.S.C § 2254(i). In 2012, however, the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), created a "narrow exception" to *Coleman*, holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 9. The Court recognized, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id*. at 14.

The following year, the Supreme Court expanded the *Martinez* exception in *Trevino v. Thaler*, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013). Under *Martinez*, federal habeas courts may find cause to excuse a petitioner's procedural default of a claim of ineffective assistance of trial counsel where: (1) the defaulted claim is "substantial"; (2) the "cause" consists of there being "no counsel" or "ineffective" counsel in the state collateral-review proceeding; (3) the state collateral-review proceeding was the "initial" review of the claim; and (4) state law required that ineffective-assistance-of-trial-counsel claims be raised in the first instance in a collateral-review proceeding. *Id*. at 423. The *Trevino* Court held that a Texan petitioner could satisfy *Martinez's* fourth prong even though Texas "does not expressly *require* the defendant to raise a claim of

37

ineffective assistance of trial counsel in an initial *collateral review* proceeding." *Id.* at 423 (emphasis in original). Indeed, because the "structure and design of the Texas system in actual operation . . . make[s] it 'virtually impossible' for an ineffective assistance claim to be presented on direct review[,]" the Court found that the Texan petitioner lacked a meaningful opportunity to raise such claims on direct appeal. *Id.* at 417, 425 (citing *Robinson v. State*, 16 S.W.3d 808, 810–811 (Tex. Crim. App. 2000)). "Were *Martinez* not to apply," the Court held, "the Texas procedural system would create significant unfairness[.]" *Id.* at 425.

In *White v. Warden*, 940 F.3d 270 (6th Cir. 2019), the Sixth Circuit applied the *Martinez-Trevino* doctrine to an Ohio case for the first time, because the petitioner in that case had lacked counsel during state post-conviction proceedings, which, under Ohio law, was his first chance to have his substantial claim assessed on the merits. *Id.* at 278. But, while "*White* illustrates that *Martinez* and *Trevino can* apply in an Ohio case, . . . it does not show that they apply to Ohio cases generally." *Mammone v. Jenkins*, 49 F.4th 1026, 1048 (6th Cir. 2022) (emphasis in original) (citing *Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014)). And Maxwell does not provide any argument on this issue. Regardless, even if the *Martinez-Trevino* rule does apply here, Maxwell would still have to show that his post-conviction counsel was ineffective for failing to raise this claim and that the claim is substantial. *Id.* at 1048–49. As explained below, he cannot meet this burden. Thus, this sub-ground also is procedurally defaulted.

### 5.  Sub-ground 8

On direct appeal to the Ohio Supreme Court, Maxwell previously raised an ineffective assistance claim based on *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), which established that persons who are intellectually disabled are not eligible for the death penalty. (Doc. No. 10-3, at 79–85.) Shoop argues that Maxwell's claim before the state court was

38

different from the sub-ground he now asserts (regarding trial counsel's failure to investigate, discover, and present evidence that Maxwell was intellectually disabled and thus ineligible for the death penalty), as the state court claim alleged that trial counsel failed to *develop* an *Atkins* claim, while the sub-ground here alleges counsel failed to *prove* he was intellectually disabled. (Doc. No. 26, at 50–51.) Thus, Shoop argued, Maxwell's habeas ground, therefore, was not fairly presented to the state court and is procedurally defaulted. (*Id*.) Maxwell does not address this defense to his sub-ground but asserts that this argument was exhausted in state court on direct appeal. (Doc. No. 32, at 129–30.)

Determining when a habeas ground has been "fairly presented" because of variations in legal theory or factual allegations "is contextual and individual to each case." *Houston v. Waller*, 420 F. App'x 501, 509 (6th Cir. 2011). "In some instances, simply presenting the facts, without also presenting 'the constitutional claim . . . inherent in those facts' is insufficient. . . . In others, however, 'the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support.'" *Id*. (quoting *Picard v. Connor*, 404 U.S. 270, 277, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (internal quotations and citations omitted)). Indeed, "[t]o present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support." *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008).

Maxwell's *Atkins* ineffective assistance claim in state court did focus on counsel's failure to develop the claim. This focus was reasonable, however, given that the claim was asserted on direct appeal and therefore was limited to the trial court record. He stressed to the state court that the information available to counsel at trial should have revealed to them that with further

39

development, they may have been able to prove Maxwell's intellectual disability and resulting ineligibility for the death penalty, the "ultimate question" posed here. The Court thus finds this sub-ground was fairly presented and is not procedurally defaulted.

### 6.  Actual innocence

Maxwell argues that if the Court finds sub-grounds 1 through 5, 10, and 11 procedurally defaulted, the default should be excused because he is actually innocent of the death penalty. Maxwell challenges his conviction for the capital specification of retaliation, which had the effect of enhancing the underlying offense to a capital offense and making him eligible for a death sentence. (Doc. No. 32, at 27–28, 34–40, 70–71, 97, 101–02, 140, 147.) To demonstrate "actual innocence" in this context, one must show by clear and convincing evidence that, but-for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law. *Sawyer v. Whitley*, 505 U.S. at 336; *see also Calderon v. Thompson*, 523 U.S. 538, 560, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998) ("To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the *Sawyer* "clear and convincing" standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or, as here, mere sentencing enhancers.").

Maxwell made virtually the same actual innocence argument on direct appeal to the Ohio Supreme Court in support of a claim that the State did not present sufficient evidence to support his conviction of the retaliation specification, *see supra* Section II, and on post-conviction review to the state appellate court in support of a freestanding claim of "actual innocence[.]" *See Maxwell*, 2020 WL 2569833, at *14. As explained below in reviewing Maxwell's habeas insufficiency-of-the-evidence claims, the Ohio high court reasonably rejected that claim because the prosecution cited ample evidence relating to Maxwell's November 23, 2005 phone call with Gregg where

Maxwell threatened to kill Nichole in retaliation for her refusal to change her grand jury testimony. *See Maxwell*, 9 N.E.3d at 966, 968 (¶¶ 150–51, 163). Further, Maxwell has not identified any factual findings that were clearly erroneous. This Court similarly finds reasonable the state appellate court's analysis of the merits of his post-conviction actual-innocence claim, which the court denied on other grounds. *See Maxwell*, 2020 WL 2569833, at *14 (¶ 74) (denying Maxwell's actual innocence claim for failing to raise "a denial or infringement of rights under the Ohio Constitution or the Constitution of the United States"). And for the same reasons, the Court finds Maxwell has not satisfied *Sawyer*'s clear and convincing standard.

But even if the Court found the state courts' analysis of Maxwell's insufficiency-of-the-evidence claims unreasonable, the procedural defaults would still not be excused. As the Sixth Circuit recently observed, "a petitioner may not pass through the equitable gateway [to excuse his procedural defaults] by simply undermining the state's case. Rather, he must demonstrate that he factually did not commit the crime." *Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024). Indeed, "'[a]ctual innocence' means factual innocence, not mere legal insufficiency[,]" and Maxwell has not demonstrated factual innocence. *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L.Ed.2d 828 (1998)). Further, the actual innocence "equitable gateway" requires a petitioner to present new, reliable evidence that "no reasonable juror would have convicted him in the light of[.]" *Id.* at 742–45 (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L.Ed.2d 808 (1995)). Maxwell presents no such evidence. Accordingly, sub-grounds 1 through 5, 10, and 11 remain procedurally defaulted.

### B. Merits Analysis

Although many of Maxwell's ineffective assistance grounds are procedurally defaulted, each of the grounds also lacks merit. The Supreme Court has long recognized the Sixth

Amendment right to the effective assistance of counsel at trial as a "bedrock principle in our justice system." *Martinez*, 566 U.S. at 12; *see also Gideon v. Wainwright*, 372 U.S. 335, 342–44, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. To determine whether counsel's performance was "deficient" under *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness." *Id*. at 688. It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Second, the petitioner must show that he was prejudiced by counsel's errors. He must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.*

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)). It has explained:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted).

Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Pinholster*, 563 U.S. at 195 (quoting *Strickland,* 466 U.S. at 689).

The Supreme Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Richter,* 562 U.S. at 105 (internal quotation marks and citations omitted). It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*.

### 1. Failure to present evidence in guilt phase (sub-ground 1)

Maxwell first argues that his defense counsel was ineffective for failing to investigate and present evidence undermining the State's theory that he was charged with felonious assault against the victim and then murdered her in retaliation for testifying against him before the grand jury in that case. (Doc. No. 15, at 45–64.)[6] The last state court to review the merits of this claim, the court of appeals on post-conviction review, opined:

---

[6] Maxwell also asserts that counsel should have cross-examined State witness Gregg on a certain comment he made, subpoenaed phone records, and investigated and presented evidence that he "may have been" unaware of the felonious assault charge and Nichole's grand jury testimony about them. (Doc. No. 15, at 56–59.) But these claims differ legally

{¶ 78} Grounds 4, 5, and 9 each contend that Maxwell's trial counsel were ineffective in investigating and presenting his case during the guilt phase of his trial. Respectively, in his fourth, fifth, and ninth grounds for relief, Maxwell contends that his sentence is void or voidable because trial counsel failed to (1) investigate the felonious assault charge that was the premise for the aggravating circumstance, (2) investigate the actual crime of felonious assault, and such investigation would have revealed that Maxwell did not act with prior calculation and design, and (3) present several necessary witnesses in his defense, specifically about Maxwell's tumultuous relationship with Nichole.

{¶ 79} Maxwell supports grounds 4, 5, and 9 of his petition with affidavits from (1) his brother, Andy Maxwell, (2) Andy's friend La-Tonya Kindell, (3) his sister Teresa McNear, and (4) his mother, Earnestine Brewer; and hospital records dated August 2001 when he was treated for injuries caused by his "girlfriend" during a "domestic assault." Maxwell maintains the investigation and presentation of witnesses regarding the felonious assault offense would have provided the jury with the complete story that the murder of Nichole was not in response to her grand jury testimony, but instead due to their tumultuous relationship and Maxwell's despair over Nichole's actions, including observing her with another man. Finally, Maxwell contends that counsel's strategy to maintain his innocence did not absolve them of their duty to investigate the felonious assault charge, and the supporting evidence presents sufficient operative facts to establish that his trial counsel were ineffective.

{¶ 80} The trial court found that the affidavits submitted in support of his petition do not set out sufficient operative facts that the victim was the aggressor and provoked Maxwell into committing felonious assault or aggravated murder. The court determined that if Andy Maxwell or La-Tonya Kindell would have testified similarly to what is stated in their affidavits, their testimony would have discounted the defense theory of actual innocence. Additionally, the court found that the evidence of past altercations between Nichole and Maxwell does not disprove that he acted with prior calculation and design, or that Nichole provoked him. The court found the affidavits marginally significant. Moreover, the court noted that the Supreme Court rejected Maxwell's argument that he acted spontaneously in killing Nichole. *Maxwell* at ¶ 149-151.

\* \* \*

{¶ 82} Even reviewing the merits of these grounds for relief, we find no abuse of discretion by the trial court. The affidavits and medical records Maxwell attached to his petition do not set forth sufficient operative facts to demonstrate that trial counsel was ineffective for failing to investigate the felonious assault offense.

---

and factually from the central claim posed here regarding defense strategy and were not raised to the state appellate court on post-conviction review, the only state court decision Maxwell addresses in his analysis of this claim. (*See* Doc. No. 10-4 (Post-Conviction Petition), at 118–23, 130–32.) Because these claims are not properly before the Court, the Court declines to address them further.

{¶ 83} The evidence Maxwell submits purportedly proves that he acted in self-defense when Nichole suffered the injury that prompted the underlying felonious assault charge, the two had a tumultuous relationship, and the murder was a spontaneous crime of passion. However, as the Ohio Supreme Court concluded, the state did not have to prove that Maxwell committed the act of felonious assault, only that Nichole was murdered in retaliation for giving grand jury testimony against Maxwell. *Maxwell* at ¶ 154-163. Whether Maxwell would have been found guilty of felonious assault in the subsequent indictment is irrelevant to whether Maxwell purposely killed Nichole for testifying before the grand jury or failing to change her testimony as he requested.

{¶ 84} Moreover, in his direct appeal, Maxwell challenged the sufficiency of the evidence, contending that the state failed to prove (1) that he acted with prior calculation and design, (2) his guilt on the witness-murder specification, and (3) that he killed Nichole to prevent her from testify in any criminal proceeding because the felonious assault charge was not pending at the time of the murder. *See Maxwell* at ¶ 145-164. (Propositions of Law No. 7, 8, and 9). In making these arguments, he asserted that the evidence showed that he spontaneously shot Nichole after observing her with another man, and kissing him goodnight, and receiving phone calls from the man at home. *Maxwell* at ¶ 149. In rejecting this argument, the Ohio Supreme Court focused on the evidence that showed that Maxwell shot Nichole in retaliation for her failure to change her grand jury testimony about the felonious assault. *Maxwell* at ¶ 150, 157.

{¶ 85} The record demonstrates that, Maxwell's theme at trial was that he was innocent of the charges. When this theme proved unsuccessful, his theme on direct appeal was that the murder of Nichole was not out of retaliation and thus, not based on prior calculation or design, but rather based on a crime of passion after seeing Nichole with another man. Maxwell now advances a theme of "self-defense" for the felonious assault charge with evidence that he and Nichole had a tumultuous relationship. This new evidence and theory are merely alternative theories to that presented at trial and on direct appeal. "'The mere existence of an alternative theory of defense, however, is insufficient to establish ineffective assistance of counsel.'" *State v. Tenace*, 6th Dist. Lucas No. L-05-1041, 2006-Ohio-1226, ¶ 26, quoting *Combs*, 100 Ohio App.3d at 103, 652 N.E.2d 205.

{¶ 86} Accordingly, we find that the trial court did not abuse its discretion in rejecting grounds 4, 5, and 9 of Maxwell's postconviction petition for relief because he did not set forth sufficient operative facts to establish that trial counsel's performance fell below an objective standard of reasonableness to prove that he was deprived of effective assistance of counsel during the guilt phase of his capital trial. Moreover, the issues raised were or could have been raised on direct appeal; thus, res judicata prohibits the claims made in the petition.

*Maxwell*, 2020 WL 2569833, at *15–17.

As the Ohio Supreme Court adjudicated the merits of this claim, it is entitled to AEDPA deference even though the court decided in the alternative that the claim was barred by res judicata. *See, e.g.*, *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008). Maxwell argues that the state appellate court's decision contravened or misapplied Supreme Court precedent and was based on unreasonable determinations of fact. (Doc. No. 15, at 53.)

First, he claims that the state court "oversimplified" Ohio law when it noted:

> [A]s the Ohio Supreme Court concluded, the state did not have to prove that Maxwell committed the act of felonious assault, only that Nichole was murdered in retaliation for giving grand jury testimony against Maxwell. *Maxwell* at ¶ 154-163. Whether Maxwell would have been found guilty of felonious assault in the subsequent indictment is irrelevant to whether Maxwell purposely killed Nichole for testifying before the grand jury or failing to change her testimony as he requested.

(Doc. No. 32, at 27 (citing *Maxwell*, 2020 WL 2569833, at *16 (¶ 83)).) But "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76 (citing *Estelle*, 502 U.S. at 67–68). And as the state court reasonably concluded, while the extra-record evidence that Maxwell presented to the post-conviction court—the affidavits of family members and friends attesting to Nichole's aggressive behavior toward him and hospital records relating to injuries he alleges he sustained as a result—may reveal that he and his victim had a violent relationship, it is irrelevant to whether Maxwell murdered Nichole in retaliation for her testimony in the felonious assault case. (*See* Doc. No. 10-4, at 176–81, 189–90, 245, 253–54, 257–59, 275–77 (Affidavits); 185–88 (Hospital Records).)

Nevertheless, Maxwell argues, as he did in state court, that even conceding the accuracy of the state courts' legal ruling, his trial counsel should have "changed the narrative" of his defense and investigated and presented two alternative theories to his innocence defense: one, that Nichole

46

was the aggressor and he acted in self-defense in the felonious assault at issue, and two, that Maxwell murdered Nichole not in retaliation for her grand jury testimony in the felonious assault case, but in a spontaneous jealous rage after seeing her out with another man. As the state court recognized, however, Ohio courts have rejected defendants' attempts to argue that trial counsel should have used alternative theories of defense. The same is true of federal habeas courts.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91. Trial counsel's decision as to which theory or theories to advance at trial is a strategic choice that is given a high level of deference. *Davis v. Lafler*, 658 F.3d 525, 538 (6th Cir. 2011) (en banc). As the *Strickland* Court observed, "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Maxwell presents no evidence that defense counsel failed to adequately investigate or consider the option of presenting a self-defense or crime-of-passion theory to undermine the State's case. Indeed, defense counsel expended considerable time and effort toward *excluding* any evidence about the felonious assault, as they viewed it as potentially extremely prejudicial evidence of Maxwell's past violence toward Nichole, to the point of requesting a mistrial when such evidence was admitted. (*See, e.g.*, Doc. No. 9-1, at 899–927.) Nor does Maxwell identify any factual finding of the state court in this decision that is clearly erroneous. Without such proof, the Court must assume that counsel duly considered the possibility of a different strategy—including alternate theories of self-defense and crime of passion—but ultimately decided that an innocence

47

defense was strongest, and the others risked opening the door to adverse evidence and evidence that conflicted with his innocence defense. *Davis*, 658 F.3d at 538; *see also Carter v. Mitchell*, 443 F.3d 517, 532 (6th Cir. 2006) (holding that the defendant did not meet his burden under *Strickland* where he failed to produce any evidence that his counsel declined to investigate the defendant's background before deciding not to call family members to testify during the sentencing phase); *Wong v. Belmontes*, 558 U.S. 15, 25, 27–28, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (rejecting petitioner's "'more-evidence-is-better' approach" where it would have opened door to evidence of past murders).

The Court concludes that the state appellate court's decision rejecting Maxwell's ineffective-assistance claim based on defense counsel's investigation and presentation of defense theories was neither contrary to, nor an unreasonable application of *Strickland* or its progenies. Further, the decision was not based on unreasonable determinations of fact.

### 2. Failure to "effectively" use State exhibit regarding phone records (sub-ground 2)

Maxwell next complains that his trial counsel did not "effectively" use a State exhibit that displayed information about phone calls between Nichole and Maxwell and between Nichole and her friend Will Hutchinson that occurred between November 23, 2005, and November 27, 2005. (Doc. No. 10-7, at 107–08 (State Ex. 121); Doc. No. 15, at 64.) As this claim was not reviewed in state court, this Court reviews it *de novo*.

Maxwell claims the exhibit "mischaracteriz[es] . . . the interactions between Maxwell and Nichole as stalking and premeditating her murder[,]" permitting the State to bolster key witness John Gregg's testimony about a crucial three-way phone call between Nichole, Maxwell, and John Gregg shortly before the murder. (Doc. No. 15, at 65.) He also asserts prosecutorial misconduct based on the same exhibit, alleging that the prosecutor presented the "deceptive" exhibit to

48

improperly vouch for Gregg's credibility by falsely implying that the exhibit proved that Gregg participated in the three-way call. *See supra* Section III.B.2. But, as this Court explains in the context of the prosecutorial misconduct claim, the exhibit was not false or misleading evidence. *Id*. Moreover, Maxwell's trial counsel squarely addressed the exhibit's limitations in closing argument. (Doc. No. 9-2. at 827–34, 1083–87.) Defense counsel, therefore, were not deficient in cross-examining Gregg regarding this exhibit, and Maxwell was not prejudiced by their performance. This sub-ground fails.

### 3. Failure to ensure recording of bench conferences (sub-ground 3)

Maxwell also argues that his trial counsel improperly failed to ensure a complete record of the trial proceedings. He claims that his counsel "allowed" more than 75 sidebars to proceed unrecorded, specifically citing about a dozen such instances in the record. (Doc. No. 15, at 94, 96–97.) The Court reviews this claim *de novo*.

Maxwell asserts that he has an "absolute right" to transcribed sidebars under Ohio law. (*Id*.) But "[f]ederal habeas corpus relief does not lie for errors of state law." *Lewis*, 497 U.S. at 780. He also cites to federal court decisions establishing that indigent defendants have a fundamental constitutional right of access to courts, and more specifically, the right to a sufficiently complete copy of the trial record. (Doc. No. 15, at 95–96 (citing *Bounds v. Smith*, 430 U.S. 817, 822, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977); *Entsminger v. Iowa*, 386 U.S. 748, 752, 87 S. Ct. 1402, 18 L. Ed. 2d 501 (1967); *Hardy v. United States,* 375 U.S. 277, 84 S. Ct. 424, 11 L. Ed. 2d 331 (1964); *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S. Ct. 585, 100 L. Ed. 891 (1956); *Mayer v. City of Chicago*, 404 U.S. 189, 195, 92 S. Ct. 410, 30 L. Ed. 2d 372 (1971); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3rd Cir. 1995).) But, as Shoop notes (Doc. No. 26, at 71), Maxwell does not

cite any federal law supporting his position that defense counsel is constitutionally ineffective for failing to instruct the trial court to record bench conferences.

Indeed, habeas courts have recognized that there is no federal constitutional right to have all trial proceedings recorded, with at least one rejecting a petitioner's ineffective-assistance claim based on trial counsel's failure to ensure that all sidebars were transcribed on that basis. *See Phillips v. Sheldon*, No. 3:12-cv-1609, 2014 WL 185777, at *14–15 (N.D. Ohio Jan. 16, 2014) (Helmick, J.) (denying habeas claim that petitioner's counsel should have instructed the court to record all bench conferences to protect the record and preserve issues for appeal as there is no such federal constitutional right); *see also Musselman v. Warden*, No. 3:09-cv-407, 2010 WL 1389610, at *8 (S.D. Ohio Mar. 30, 2010) (rejecting petitioner's argument that there was an inadequate record due to a recording system that failed to record any of the numerous sidebar conferences in part because "there is no federal constitutional right to an error-free record on appeal"); *Taylor v. Bradshaw*, No. 3:04-cv-154, 2006 WL 5430534, at *21 (S.D. Ohio July 14, 2006) (report withdrawn due to inmate death) (rejecting petitioner's complaint of unrecorded sidebar conferences because, "[w]hile Ohio R. Crim P. 22 requires recording all proceedings in a capital case, there is no federal constitutional right to that effect established by holding of the United States Supreme Court"); *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989) ("There is no Supreme Court . . . authority on the due process implications of a state court's failure to record portions of a criminal trial.").

Maxwell also makes no argument demonstrating prejudice under *Strickland*, or that something specific and prejudicial happened at one or more of the sidebar conferences. *See Drummond v. Houk*, 761 F. Supp. 2d 638, 693 (N.D. Ohio 2010) ("Drummond fails to set forth any evidence to support a finding that counsel were ineffective simply because they did not request

50

all sidebar conferences be placed on the record. Other than mere assertion, he does not provide this Court with specific information that would support a claim that he was prejudiced by trial counsel's failure to request these recordings."), *reversed on other grounds*, 747 F.3d 400 (6th Cir. 2015); *Lundgren*, 440 F.3d at 770 (citing *Strickland*, 466 U.S. at 697) (noting that if a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail). Accordingly, this sub-ground lacks merit.

### 4. Failure to object to the amended indictment (sub-ground 4)

Maxwell also claims that his trial counsel should have objected to the amended indictment when the trial court permitted the prosecutor to amend the indictment without engaging in a colloquy with him. (Doc. No. 15, at 124–27.) He did not raise this ineffective assistance of counsel claim in state court, and this Court therefore reviews it *de novo*.

On direct appeal to the Ohio Supreme Court, Maxwell raised this claim as one of trial court error. The court denied the claim based on Ohio law, first explaining its factual context:

{¶ 66} Maxwell argues that the trial court erred by allowing the prosecutor to amend the indictment without engaging in a colloquy with the defendant to ensure that he knowingly, intelligently, and voluntarily waived his right to a grand jury.

{¶ 67} At the beginning of trial, the prosecutor sought to amend pursuant to Crim.R. 7(D) the specification that accompanied Counts One and Two that the murder occurred to escape the accounting for a crime. The specification stated, "The offender committed the offense presented above for the purpose of escaping punishment for another offense committed by him, to-wit: Rape." The prosecutor stated that there was a typographical error and that the specification should state "felonious assault" instead of "rape."

{¶ 68} The defense did not object to amending the specifications. Defense counsel stated, "The prosecutor raised this issue with me * * * several pretrials ago. I had an opportunity to speak to Mr. Maxwell with regards to this. I explained to him certainly we have no objection to this, and he agrees with me in terms of that, and certainly the county prosecutor can, of course, take this back to the Grand Jury to correct the typographical error, if he wishes to do so." The prosecutor was then allowed to amend the specification.

*Maxwell*, 9 N.E.3d at 952. The court then decided that under Ohio law, the amended indictment was not defective, but even if it were, it did not prejudice Maxwell because the trial court merged the retaliation specification with the murder-in-retaliation specification before the jury considered its penalty-phase verdict. *Id*. at 952–53.

"Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (citing *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986) ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense. Any other deficiencies in the indictment alleged by petitioner are solely matters of state law and so not cognizable in a federal habeas proceeding.")). Maxwell does not assert that he lacked sufficient notice of the charges against him. Indeed, the prosecutor moved to amend the indictment about six months before jury selection began. (Doc. No. 9-1, at 15–16.) He cannot demonstrate, therefore, that his counsel's failure to object to the amended indictment prejudiced him, and this sub-ground fails.

### 5. Failure to prevent reopening the issue of Gregg's credibility (sub-ground 5)

Maxwell additionally argues that his trial counsel was ineffective for failing to argue that the law of the case doctrine prohibited the trial court from reopening the issue of the State's key witness, John Gregg's, credibility. (Doc. No. 15, at 127–30.) The Court reviews this claim *de novo*.

Law of the case doctrine provides that a finding made at one point during the course of litigation becomes the binding law of the case for subsequent stages of that same litigation. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) (citing *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993)); *see GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 339 (6th Cir. 2016) (quoting *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) ("[t]he purpose of the law-of-

the-case doctrine is to ensure that the same issue presented a second time in the same case in the same court should lead to the same result.")) Maxwell bases his argument on the trial court judge's remark about Gregg's untruthfulness in a different case, *State v. John Gregg*, Case No. 47674, in which Gregg was being sentenced for fraud. (Doc. No. 15, at 127–28; Doc. No. 10-2, at 238.) During the sentencing hearing in *State v. John Gregg,* the judge said to Gregg, "You testified in the [Maxwell] case and I went on the record in that case after voir diring some of your testimony indicating that I would have to look at my own birth certificate and driver's license to confirm if you told me my name . . . because you are that unbelievable." (Doc. No. 10-2, at 252.) But this comment does not constitute a judicial "finding," and it was not made during proceedings in Maxwell's murder case. Even assuming law of the case doctrine is a proper basis for habeas relief, it does not apply to Maxwell's claim. This sub-ground is meritless.

### 6. Failure to provide competent representation during plea negotiations (sub-ground 6)

Maxwell also asserts his trial counsel provided deficient representation during plea negotiations. (Doc. No. 15, at 130–34.) The Court reviews this claim *de novo* as well. A defendant's right to effective assistance of counsel extends to the plea-bargaining process. *See, e.g.*, *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); *Missouri v. Frye*, 566 U.S. 134, 132 S. Ct. 1399, 1407, 182 L. Ed. 2d 379 (2012). Defense counsel has the "duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri*, 566 U.S. at 145. They must advise clients of offered plea bargains promptly and explain them fully. *Id.* at 145–46 (holding that defense counsel provided ineffective assistance by allowing a plea offer to expire without advising the defendant or allowing him to consider it). The American Bar Association (ABA), in its guidelines for defense counsel in death penalty cases, fleshes out this obligation, advising:

> Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision. . . . Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies.

ABA, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 Hofstra L. Rev. 913, 1035 (2003); *see also Frye*, 566 U.S. at 145 (noting that standards of professional practice, such as the ABA guidelines, "can be important guides" to courts in evaluating ineffective-assistance cases).

Maxwell contends that his trial counsel were "ineffective in building sufficient rapport to be able to communicate the plea effectively, especially given Maxwell's severe mental illness and cognitive and intellectual limitations." (Doc. No. 15, at 130.) He provides no case law for the proposition that capital defense counsel have a duty to achieve a "sufficient rapport" with every client. Rather, he cites to the ABA's commentary on its guideline for establishing and maintaining relationships with death penalty clients. The commentary includes this observation:

> Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information, the lawyer must understand the client and his life history. To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.

ABA, *supra* at 1009. The guideline on client relationships does not mention "rapport." It advises:

> Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

* * *

> Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material

54

> impact on the case, such as: 1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it; 2. current or potential legal issues; 3. the development of a defense theory; 4. presentation of the defense case; 5. potential agreed-upon dispositions of the case; 6. litigation deadlines and the projected schedule of case-related events; and 7. relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

*Id*. at 1005–06. There is a good reason attaining rapport with a client is discussed in the commentary and not the guideline: achieving strong rapport with clients is not always within an attorney's control.

The record sheds some light on Maxwell's relationship with his trial counsel. On February 6, 2007, the day before the start of trial, one of Maxwell's attorneys informed the court at a pretrial hearing that they had visited Maxwell 13 to 15 times but were "still not able to have a meaningful discussion dialogue of communication with Mr. Maxwell in terms of his – in terms of any possible defenses either from the guilt phase or penalty phase of the trial." (Doc. No. 9-1, at 50–51.) He continued,

> Your Honor, as an officer the Court, I have never had an individual whereby I have done everything in my power along with Mr. Luskin present to try to get through to them to try to come up with some sort of meaningful defense in terms of defending this crime either from the guilt and/or penalty phase standpoint.
>
> Your Honor, again we've met with Mr. Maxwell on numerous occasions. Those conversation[s] are nonproductive to say the least, and it's my understanding that he's unable to understand even what is going on.
>
> The responses from Charles again even today are more of, even the Court saw, it's more of a grunt than anything else. We spent three hours, as this honorable Court knows, Mr. Luskin and myself, here in lock-up again trying to again explain to him his options, his choices, begging him to come up with some sort of meaningful defense or anything along those lines.
>
> Your Honor, I'm at a loss as to what to do in terms of that. It's my opinion that based upon my lack of communication with Mr. Maxwell that we're unable to come up with any viable defense.

(*Id*. at 51–52.)

At the end of that hearing, the trial judge addressed Maxwell directly, stating:

> Mr. Maxwell, the State is willing to talk about a sentence of something less than the death penalty. I have spoken to both counsel for the State of Ohio and your counsel.
>
> If you choose not to participate in your defense during this trial, or to participate in any plea negotiations, you are making a very bad mistake. . . .
>
> But, so to speak, Mr. Maxwell, the train is at the station and it's leaving tomorrow and you're going to be on it whether you like it or not. Refusing to talk to your attorneys never helps a defendant's cause. We're adjourned for the evening.

(*Id*. at 157–58.)[7]

In addition, as explained below in detail, *see supra* Section I.B.7, 8, various mental health experts evaluated Maxwell before trial and reported diagnoses including alcohol dependence, "a differential between paranoid personality disorder and paranoid psychosis which was unresolved," adjustment disorder with depression, and borderline intellectual functioning. *Maxwell*, 9 N.E.3d at 984. But they ultimately concluded that he was competent to stand trial and was neither severely mentally ill nor intellectually disabled. *Id*. Notably, Dr. Cook, a clinical psychologist who evaluated him for competency, testified:

> Well, it was clear that he did understand what he was being charged of. He understood that he was facing a death penalty. He understood that all of his charges were felonies. He comprehended the reality of the situation in which he found himself. His vocabulary included terms that people familiar with the Court would use, for instance, volunteering the phrase death penalty and those expressions such as that.
>
> He understood the roles of the various courtroom personnel. He simply understood the various plea options available to him and how they might apply to his situation. He gave me information about the day of the alleged offense.

---

[7] For his part, Maxwell filed a *pro se* motion to disqualify his counsel in September 2006. (Doc. No. 10-2, at 61–65.) But he withdrew that motion at his February 6, 2007 pretrial hearing, so the contents of the motion are not altogether reliable. (Doc. No. 9-1, at 44.)

. . . He was clearly motivated for a good outcome. He did not want to see the death penalty. He wanted to work to attain his freedom. He communicated with me clearly. His thinking appeared fine. There appeared no obstacles in his communication.

He did express some concerns about his relationship with his attorney. He expressed his desire to have a trial. He expressed his desire to have more contact with his attorneys. And when I looked at all of this, my opinion was that he was understanding the proceedings and able to assist in his defense.

(Doc. No. 9-1, at 80–81.)

This record shows a strained relationship between Maxwell and his trial counsel. (Doc. No. 9-1, at 50–52.) But it does not show that counsels' performance was deficient during plea negotiations. There is no evidence, nor does Maxwell allege, that counsel failed to convey any plea offers from the State, failed to discuss with Maxwell negotiation strategies, or failed to keep Maxwell apprised of the status of plea discussions. The record also does not show that Maxwell would have even been willing to accept a plea under any circumstances, nor does it demonstrate that counsel neglected Maxwell's case or did anything to undermine the attorney-client relationship to the extent that it compromised or impeded the plea negotiations. Because Maxwell has failed to demonstrate that he received constitutionally ineffective representation from his trial counsel during the plea process and that he was prejudiced by such representation, this sub-ground fails.

### 7. Failure to investigate and present mitigation evidence (sub-ground 7)

Maxwell also contends his trial counsel were ineffective for failing to investigate and present mitigation evidence of (1) possible brain injuries; (2) intellectual disability; (3) substance abuse; and (4) domestic violence. (Doc. No. 15, at 134–76.) His claim regarding mitigation evidence of his intellectual functioning will be addressed in the following section on Maxwell's ineffective-assistance claim based on counsel's failure to investigate and present evidence of his

alleged intellectual disability. Maxwell presented these claims to state courts on both direct and post-conviction review.

*Brain injuries*. The last state court to adjudicate Maxwell's claim that his counsel were ineffective for failing to investigate and present evidence during the mitigation phase of trial regarding his alleged brain injuries was the state appellate court on post-conviction review. It reasoned:

> {¶ 30} Grounds 1, 2, and 3 of Maxwell's petition for postconviction relief focus on the lack of evidence obtained and presented during both phases of his capital trial regarding Maxwell's purported organic brain dysfunction.

> **Procedural History and Facts**

> {¶ 31} On January 19, 2007, trial counsel requested the trial court to allow Dr. John Fabian to perform a neurological evaluation of Maxwell and to allow expert fees. The request was based on information obtained during evaluations by Dr. Michael Aronoff at the court psychiatric clinic and by Dr. Alice Cook at Northcoast Behavioral Healthcare System that revealed that Maxwell was rendered unconscious during a 1999 motorcycle accident. Based on his independent psychiatric evaluation, Dr. Fabian preliminarily concluded that Maxwell suffered from mental health issues and recommended that neurological testing be performed to ascertain Maxwell's condition.

> {¶ 32} Following the February 2007, competency hearing, the trial court denied the request for a neurological evaluation based, in part, upon the competency reports offered by Drs. Aronoff and Cook. As explained by the Ohio Supreme Court in discussing the issue of whether the court should have appointed a neurologist,

>> Trial counsel then stated that they were requesting a neurological evaluation because Maxwell had told them that his life and the way he looks at things were different since that motorcycle accident. Thus, counsel requested a neurological evaluation to provide "objective medical findings in terms of an MRI or a CAT scan as per Dr. Fabian's recommendation."

>> During the competency hearing, Dr. Cook testified that she had talked to Maxwell about the motorcycle accident, and he told her that he had received no treatment and had not been hospitalized as a result of the accident.

>> Dr. Aronoff testified that he had reviewed Maxwell's medical records that showed he was treated at Meridia-Huron Hospital on March 29, 1999, after the motorcycle accident. Dr. Aronoff quoted findings from the medical records that reported that

58

Maxwell was "sitting on motorcycle which was struck from behind by a car at low speed. He was thrown off the bike on to the right side. No loss of consciousness. Was wearing a helmet. Right shoulder, right hip, right elbow, right ankle are painful. No headache or neck pain." Dr. Aronoff also stated that x-rays were taken of Maxwell's shoulder, elbow, ankle, and hip, and they were all unremarkable. However, Dr. Aronoff testified that Maxwell told him that he was rendered unconscious in the motorcycle accident.

*Maxwell* at ¶ 216–218.

{¶ 33} In finding no abuse of discretion in denying the request for a neurological evaluation, the Supreme Court explained

Maxwell's medical records showed that he suffered no loss of consciousness and reported no headache or neck pain as a result of that motorcycle accident. Thus, Maxwell's request merely raised the possibility that he had suffered a brain injury as a result of a motorcycle accident. It was not supported by anything in his medical records. Moreover, the medical records contradicted Maxwell's story about what happened after the accident. Maxwell told Dr. Aronoff that he was rendered unconscious, and he told Dr. Cook that he received no medical treatment.

*Id.* ¶ 225.

{¶ 34} The Supreme Court concluded further that trial counsel were not ineffective for failing to request a neurologist to assist in the development of mitigation. *Maxwell* at ¶ 229. The court began its discussion by reviewing "Dr. [Sandra] McPherson's testimony to determine whether she provided counsel with additional information about Maxwell's head injuries from the motorcycle accident that required counsel to conduct a further investigation." *Id.* ¶ 230.

Dr. McPherson administered the Bender-Gestalt test during her evaluation of Maxwell. She described the Bender-Gestalt as a "copying task" that serves as a low-level screening test. She testified that there was "some indication [that] his hand might not have been steady, but there were distortions that didn't make a lot of sense, so the question remained as to whether or not there was some kind of organically based anomaly, something that affects how his brain processes information."

Dr. McPherson testified about past injuries that Maxwell reported suffering. Maxwell stated that he had been briefly unconscious after falling off a horse but that he did not receive any medical treatment for that incident. Dr. McPherson also discussed the motorcycle accident and said, "[H]e may have been briefly unconscious. He was certainly conscious when he was seen at the hospital for that one." Dr. McPherson also stated that there was nothing in Maxwell's medical records showing that he had suffered a traumatic head injury in the motorcycle accident.

In discussing her final diagnosis, Dr. McPherson stated that Maxwell suffered from an adjustment disorder with depression and probable alcohol dependency. Dr. McPherson testified that she could not determine whether Maxwell had had a traumatic brain injury and advised that "whoever is working with him next should continue to be aware that this may be there and try to come up with information to either rule it in or out." She also testified that Maxwell has "some type of cognitive difficulty. He may have some underlying organic problems and these may have rendered him more likely to react with irritability since that's one of the known things that can occur with certain kinds of organicity making him more prone to act out in a stressful situation such as a relationship that was flawed."

*Maxwell* at ¶ 231–233.

{¶ 35} The Supreme Court determined that Dr. McPherson's testing results raised "only the possibility of brain impairment," which the court found was insufficient to find error that his defense team was ineffective for failing to further investigate that Maxwell may suffer from a brain dysfunction.

Dr. McPherson's testimony about the need for further testing to rule out possible brain impairment appears to be based upon Maxwell's performance on the Bender-Gestalt test. She testified that the Bender-Gestalt test indicated some distortions, but she did not indicate that these results were conclusive as to brain damage. Thus, the Bender-Gestalt results raised only the possibility of brain impairment.

Maxwell fails to establish that counsel were deficient by failing to request a neurologist for mitigation purposes based on Dr. McPherson's testimony. First, the record does not show that trial counsel failed to investigate the need to request a neurologist after reviewing Dr. McPherson's findings. We cannot infer a defense failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on Maxwell. *See* [*State v.*] *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244.

Second, the trial court could have properly denied a motion for a neurologist because Maxwell would have been unable to make a particularized showing of a reasonable probability that the requested expert would aid in his defense. [State v.] Mason, 82 Ohio St.3d 144, 1998-Ohio-370, 694 N.E.2d 932, syllabus. Dr. McPherson reiterated that Maxwell's medical records did not show that he had suffered a traumatic head injury during the motorcycle accident. Indeed, Dr. McPherson's information about a possible head injury resulted from Maxwell's self-reporting.

Finally, Maxwell has failed to show that the absence of a neurological evaluation resulted in an unfair trial. Id. Dr. McPherson testified that there might be "some underlying organic problems and these *may have* rendered him more likely to react with irritability * * * in a stressful situation." (Emphasis added.) The evidence showed that Maxwell murdered Nichole in retaliation for her testimony. Accordingly,

60

this was a planned murder rather than a sudden encounter involving a stressful situation. Thus, we reject this ineffectiveness claim.

*Maxwell* at ¶ 234–237.

### Brain Dysfunction Evidence — Mitigation Phase

{¶ 57} The trial court found that Maxwell's claim in his second ground for relief regarding counsel's ineffectiveness in presenting mitigation evidence about any purported brain dysfunction is barred by res judicata because the Ohio Supreme Court held that the trial court properly denied Maxwell's request for a neurological evaluation, and because the information regarding the mid-1980s parking lot incident that caused Maxwell to allegedly suffer a "traumatic brain injury" was available before trial.

{¶ 58} The trial court also considered the merits of Maxwell's claim and determined that Maxwell's "mitigation strategy depended on calling his relatives and acquaintances to testify as to his general history of good character, that he was a versatile and dependable worker, an upstanding neighbor, a positive role model, and a good family member, as well as providing residual doubt" about whether Maxwell actually committed the offense as charged.

{¶ 59} On appeal, Maxwell contends that evidence of an organic brain dysfunction would have been a significant mitigating factor.

{¶ 60} We find that res judicata bars Maxwell's second ground for relief because this issue was addressed on direct appeal, and the evidence attached to Maxwell's petition is irrelevant and immaterial to warrant relief. The Supreme Court found that counsel was not ineffective for failing to request a neurologist for mitigating purposes because (1) the record was silent regarding whether counsel failed to further investigate the need for a neurological evaluation after reviewing Dr. McPherson's findings; (2) Maxwell was unable to make a particularized showing of a reasonable probability that the requested expert would have aided in his defense; and (3) Maxwell failed to demonstrate that the absence of a neurological evaluation resulted in an unfair trial. *Maxwell* at ¶ 235-237.

{¶ 61} Maxwell attempts to remedy these deficiencies with the affidavits of his cousin and Dr. Layton. However, as previously discussed, the parking lot incident was known at the time of trial because it is referenced in Dr. McPherson's report. Despite this notation, Dr. McPherson did not rely on it when evaluating any potential brain dysfunction.

{¶ 62} Additionally, Maxwell could have reported this 1980s parking lot incident to Drs. Aronoff, Cook, and Fabian. The focus of the request for a neurological evaluation was based on a motorcycle accident that occurred in 1999. As previously discussed,

any organic brain dysfunction would have manifested or become apparent during Maxwell's evaluations with the other medical experts.

{¶ 63} Finally, Dr. Layton's opinion is based partly on speculation — i.e., the destroyed medical records from the Arkansas hospital. Maxwell again places much emphasis on the fact that Dr. Layton was able to determine that Maxwell suffered from an organic brain dysfunction based solely on his examination of Maxwell — "the examination alone definitively demonstrates brain impairment, particularly in the anterior of the brain (the frontal cerebrum)." However, the record clearly demonstrates that at least four other physicians interviewed and evaluated Maxwell, and none were able to definitively diagnosed (sic) Maxwell with an organic brain dysfunction. Accordingly, we cannot say that trial counsel was ineffective for not further investigating and presenting mitigating evidence regarding brain dysfunction based on the evidence available to counsel at the time of trial.

{¶ 64} Notwithstanding our conclusion, we note that this is not a case where no evidence of Maxwell's psychological or mental status was presented during mitigation. Dr. McPherson testified as a defense mitigation witness about Maxwell's mental status, including test results that showed his low intelligence, and possible neurological problems. In fact, she testified "that Maxwell has come (sic) cognitive difficulty. He may have some underlying organic problems, and these may have rendered him more likely to react with irritability in a stressful situation such as a flawed relationship." *Maxwell* at ¶ 273. Dr. McPherson further testified about Maxwell's background and his drug and alcohol problems, opining that he suffered from alcohol abuse and probably dependency. Finally, she testified about Maxwell's prison records that showed compliance with authority and that he had the skills to adjust to prison life and was thus amenable to a life sentence.

{¶ 65} The presentation of mitigating evidence is a matter of trial strategy. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 74. Nothing in the record indicates that counsel failed to investigate any further indication of an organic brain dysfunction. Furthermore, the mitigation evidence presented was a matter of strategy to maintain consistency with the evidence and the defense theory presented during the guilt phase of trial.

{¶ 66} Much like the Ohio Supreme Court found in his direct appeal when addressing lack of mitigation, we also find that Maxwell has failed to show prejudice or that there was a reasonable likelihood of a different outcome had defense counsel presented additional evidence that Maxwell may suffer from an organic brain dysfunction. Maxwell attempts to establish prejudice by providing an affidavit from a trial juror that information of a brain injury "may have made a difference" during mitigation. The affidavit is purely based on speculation, which is insufficient to grant relief under R.C. 2953.21. *See Jackson*, 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, ¶ 63. Moreover, because Evid.R. 606(B) would prohibit Maxwell from using the juror's statement to impeach a verdict, the juror's testimony at an evidentiary hearing would

have been inadmissible. *See State v. Jones*, 9th Dist. Summit No. 28063, 2019-Ohio-289, ¶ 76, citing *State v. Morgan*, 10th Dist. Franklin No. 95APA03-382, 1995 WL 694489, *3, 1995 Ohio App. LEXIS 5130, *3 (Nov. 21, 1995) (concluding that although it was necessary for appellant to submit affidavits in order for the trial court to determine whether he was entitled to a hearing, once the trial court granted that hearing, it became necessary for him to produce admissible evidence under the rules of evidence). Accordingly, Maxwell has failed to cure the prejudicial impediment for this court to find that he was deprived his constitutional right to effective assistance of counsel.

{¶ 67} Even without applying the principles of res judicata, we find that Maxwell has not set forth sufficient operative facts to establish that counsel's performance fell below an objectively reasonable standard in its presentation of evidence during the mitigation phase of trial. Accordingly, we find no abuse of discretion by the trial court in rejecting this ground for relief without an evidentiary hearing.

*Maxwell*, 2020 WL 2569833, at *5–13 (footnote omitted).

*Substance abuse history*. The last state court to adjudicate Maxwell's claim that his trial attorneys should have investigated and presented evidence of his substance abuse history was the Ohio Supreme Court on direct appeal, which stated that:

{¶ 196} * * * Maxwell argues that trial counsel failed to develop evidence about his alcohol dependency. Dr. McPherson diagnosed Maxwell with alcohol abuse, probable dependency, currently in remission in a controlled setting. She testified that Maxwell has "a history that included blackouts, that included high use and tolerance" of alcohol that met "the criteria for an alcoholism or alcohol dependence diagnosis."

{¶ 197} Maxwell argues that trial counsel were deficient by failing to ask any of his family members about his drinking problems. Maxwell asserts that this omission undermined Dr. McPherson's diagnosis, since she acknowledged during cross-examination that her diagnosis of alcohol dependency was based on Maxwell's self-reporting. Maxwell also asserts that the lack of family testimony allowed the prosecutor to argue during closing argument that his drinking was not that serious, since "the people that see him every single day" said nothing about his alcoholism. But Maxwell's claims about family testimony are speculative because it is unknown what they would have said about his drinking problems. Thus, we reject this claim.

*Maxwell,* 9 N.E.3d at 973.

*Domestic violence*. The last state court to litigate Maxwell's claim that his trial counsel were ineffective for failing to investigate and present evidence of Nichole's alleged abuse of Maxwell was the state appellate court on post-conviction review. It opined:

{¶ 95} * * * Maxwell contends that he was denied effective assistance of counsel because counsel failed to investigate and present several necessary witnesses to support the R.C. 2929.04(B)(1) and (2) mitigating factors; respectively, whether the victim of the offense induced or facilitated the murder, and whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion, or strong provocation.

{¶ 96} In its sentencing opinion, the trial court specifically found:

> In my independent weighing process, I do not agree with the defense's contention that Nichole McCorkle's behavior on the night of the murder had anything to do with Mr. Maxwell's actions. I specifically find that she did not induce the offense. Further, I find that the aggravated murder conviction by Mr. Maxwell was not done while the defendant was acting under duress, coercion, or strong provocation. Therefore, I find that the mitigatory factors listed in R.C. 2929.04(B) (1) and (2) do not apply. Additionally, it should be noted that the defense did not request the court to instruct the jury to consider these two mitigatory factors.

*State v. Maxwell*, Cuyahoga C.P. No. 05-CR-475400, Opinion of the Court, Findings of Fact and Conclusions of Law Regarding Imposition of Death Penalty, dated March 23, 2007.

{¶ 97} Notwithstanding that this issue could have been raised on direct appeal, we note that Maxwell's defense strategy at trial consisted of him maintaining his innocence. Accordingly, it can only be viewed as strategy that these two factors were not presented. It is well established that the presentation of mitigating evidence is a matter of trial strategy and "'[t]he decision to forgo the presentation of additional mitigating evidence does not itself constitute ineffective assistance of counsel.'" *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 240, quoting *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997). The introduction of evidence mitigating and explaining that it was Nichole who induced or facilitated the murder, or that Maxwell was acting under duress or strong provocation when he shot her, would have been inconsistent with the defense's trial strategy and theory of the case. Because trial strategy cannot form the basis of an ineffective assistance claim, the trial court did not abuse its discretion in rejecting this claim for relief without an evidentiary hearing. *See, e.g.*, *State v. Ellison*, 2d Dist. Montgomery No. 25638, 2013-Ohio-5455, ¶ 30.

*Maxwell*, 2020 WL 2569833, at *18.

64

Maxwell argues that the state courts contravened or misapplied *Strickland* in these decisions and based them upon unreasonable factual determinations under AEDPA's § 2254(d). (Doc. No. 32, at 116.) Yet, of the 65 pages of his habeas briefs that he devotes to this sub-ground, few contain any argument about that specific issue—whether the state courts were unreasonable in their legal analysis or factual findings. As explained above, the Supreme Court has made clear that in "[d]eciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to "'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims[.]'" *Wilson,* 584 U.S. at 125 (quoting *Hittson*, 576 U.S. 1028 (Ginsburg, J., concurring in denial of certiorari).) The Court, therefore, will not relitigate these claims, but will address only arguments that fall within the bounds of its AEDPA deferential review.

As the state courts observed, counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Taylor*, 529 U.S. at 396 (2000). A trial attorney's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations." *Strickland*, 466 U.S. at 690–91.

But this duty "does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). *Compare Wiggins*, 539 U.S. at 525 (counsel ineffective where petitioner had an "excruciating life history," yet counsel focused exclusively on his direct responsibility for murder), *and Rompilla*, 545 U.S. at 389–93 (counsel ineffective where he failed

65

to examine court file of defendant's prior conviction that contained a range of vital mitigation leads regarding defendant's childhood and mental health problems), *and Frazier v. Huffman*, 343 F.3d 780, 795–99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury), *with Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"), *and Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

As the Supreme Court has explained:

> [T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.... This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 11–12, 130 S. Ct. 13, 175 L. Ed. 2d 255 (2009) (internal citations omitted).

Maxwell makes two principal arguments challenging the state court decisions. First, he claims that the state post-conviction court "unreasonably refused to consider evidence outside the record." (Doc. No. 32, at 124.) He asserts that "[i]t is an unreasonable application of, and is contrary to, *Strickland* to discount all of the evidence post-conviction counsel offered in support of" this claim. (*Id.* at 125.) The state court found the claim barred under Ohio's res judicata rule because "this issue was addressed on direct appeal, and the evidence attached to Maxwell's petition [was] irrelevant and immaterial to warrant relief." *Maxwell*, 2020 WL 2569833, at *12 (¶ 60).

66

Nevertheless, the court conducted a merits review of the claim "without applying the principles of res judicata," including an evaluation of the extra-record evidence Maxwell submitted in support of the claim. (*See id*. at \*12–13 (¶¶ 61–67).) The state court therefore did not refuse to consider Maxwell's submitted evidence, and this argument is unavailing.

Second, Maxwell argues that the state post-conviction court "unreasonably gave minimal weight to the unpresented evidence." (Doc. No. 32, at 126.) He claims the court's analysis was "truncated" and placed "undue reliance on the assumed reasonableness" of counsel's efforts, unreasonably applying *Strickland*. (*Id*. (citing *Sears v. Upton*, 561 U.S. 945, 955, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010)).) The Court disagrees. The state court carefully and thoroughly set forth the facts and its analysis of Maxwell's trial attorneys' efforts in collecting and presenting mitigation evidence. Maxwell has failed to show that any of the court's factual determinations were clearly erroneous. Nor has he shown that its conclusion about counsel's performance was unreasonable. In fact, the record demonstrates that counsel were diligent in their efforts and succeeded in persuading the court to consider several mitigating factors. (*See* Doc. No. 9-2, at 1152–59.) Maxwell also makes no argument contesting the court's ultimate conclusion that he failed to prove prejudice or that there was a reasonable likelihood of a different outcome "had defense counsel presented additional evidence that Maxwell may suffer from an organic brain dysfunction." *Maxwell*, 2020 WL 2569833, at \*13 (¶ 66).

Nor does Maxwell offer any criticism of the state courts' decisions regarding counsel's treatment of mitigation evidence involving substance abuse or domestic violence. The record shows that counsel were aware of Maxwell's history of substance abuse, as they addressed it during closing argument in the penalty phase. (*See* Doc. No. 9-2, at 1084–85.) And there is nothing in the record to suggest that counsels' decision not to focus on Maxwell's allegations of abuse by Nichole

was anything other than sound trial strategy. The state courts' decision finding no ineffective assistance for failing to investigate or present this evidence at the penalty phase of trial, therefore, also was reasonable. Accordingly, the state courts did not contravene or misapply *Strickland* or other Supreme Court precedent in rejecting these claims.

### 8. Failure to present an intellectual disability claim[8] (sub-ground 8)

Maxwell further claims that his trial counsel were ineffective for failing to investigate and present evidence that he is intellectually disabled, both to establish that he is ineligible for the death penalty and for mitigation purposes. (Doc. No. 15, at 176–86.) He raised this claim in the Ohio Supreme Court on direct appeal. In rejecting this claim, the court reasoned:

{¶ 165} Maxwell argues that his counsel failed to develop and present evidence of his mental retardation, failed to investigate and present mitigating evidence, and committed other errors during the penalty phase.

{¶ 166} Maxwell argues that trial counsel failed to properly develop evidence showing that he was mentally retarded and failed to request a hearing to determine whether he was mentally retarded pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). He also argues that trial counsel failed to present such evidence during mitigation. Maxwell relies on evidence presented during his competency proceedings and testimony presented during the penalty phase.

**(1) Facts**

{¶ 167} During the competency hearing, Dr. Michael Aronoff, a psychologist at the Court Psychiatric Clinic, testified that he had evaluated Maxwell and administered the Wechsler Abbreviated Scale of Intelligence. These test results showed that Maxwell had a full-scale IQ score of 72, which is in the borderline range. He also had a verbal IQ score of 68, which is in the range of mild mental retardation, and a performance IQ score of 83, which is in the low average range. Dr. Aronoff testified that earlier IQ test scores were not found in Maxwell's school records or any other records.

{¶ 168} Dr. Aronoff administered other tests, including the Competency Assessment to Stand Trial for Defendants with Mental Retardation ("CAST*MR"). Dr. Aronoff testified that Maxwell's low score on that test was significant "because he didn't come up with a mentally retarded IQ score and he's had prior experience with the legal system."

---

[8] Since the time of Maxwell's trial, the term "intellectual disability" has been substituted for "mental retardation."

Due to the possibility of malingering on the CAST*MR, Dr. Aronoff recommended that Maxwell be referred to the court evaluation unit of the North Coast Behavioral Health Care System for a 20–day inpatient competency evaluation. The trial court ordered that Maxwell be referred for such treatment.

{¶ 169} Dr. Alice Cook, a clinical psychologist, evaluated Maxwell during his inpatient treatment at North Coast. During the competency hearing, Dr. Cook testified that she performed no additional testing but was aware that Maxwell had attained a verbal IQ score of 68 during earlier testing. But Dr. Cook indicated that Maxwell was not mentally retarded. She stated, "In order to have a diagnoses of mental retardation, it needed to be identified prior to the age of 18, and there was no indication of any records from anyplace that he had been identified prior to age 18 as being mentally retarded."

{¶ 170} During the competency proceedings, defense counsel mentioned that Dr. John Fabian, a board-certified psychologist, had also met with Maxwell to assess his condition. Dr. Fabian was not called as a witness, and his assessment of Maxwell was never introduced. Following the competency hearing, the trial court ruled that Maxwell was competent to stand trial. Defense counsel presented no argument that Maxwell was mentally retarded and did not request an *Atkins* hearing.

{¶ 171} During the penalty phase, Dr. Sandra McPherson, a clinical psychologist, testified as a defense mitigation witness. Dr. McPherson evaluated Maxwell and administered the Wechsler Adult Intelligence Scale and wide-range achievement test. Dr. McPherson testified that Maxwell attained a full-scale IQ score of 84, which placed him in the low average range. Maxwell also attained a performance IQ score of 95 and a verbal IQ score of 77.

**(2) Analysis**

{¶ 172} On June 20, 2002, the Supreme Court of the United States ruled that the execution of a mentally retarded criminal violates the Eighth Amendment's ban on cruel and unusual punishments. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. *Atkins* left to the states " 'the task of developing appropriate ways to enforce the constitutional restriction' " on executing the mentally retarded. *Id.* at 317, 122 S.Ct. 2242, quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

{¶ 173} In *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, this court developed procedures and substantive standards for resolving *Atkins* claims. *Lott* adopted a three-part test, which had been cited with approval in *Atkins*, 536 U.S. at 308, 122 S.Ct. 2242, fn. 3, that defined mental retardation as (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. *Lott* at ¶ 12. *Lott* went on to state:

Most state statutes prohibiting the execution of the mentally retarded require evidence that the individual has an IQ of 70 or below. * * * While IQ tests are one of many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. * * * We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.

*Id.*

{¶ 174} First, Maxwell argues that trial counsel were ineffective by failing to request an Atkins hearing because IQ testing administered by Dr. Aronoff showed that he had a verbal IQ score of 68.

{¶ 175} In order for counsel's inadequate performance to constitute a Sixth Amendment violation, Maxwell must show that counsel's performance was deficient and prejudiced him. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Strickland requires that courts "apply[ ] a heavy measure of deference to counsel's judgments" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 691 and 689, 104 S.Ct. 2052.

{¶ 176} Maxwell fails to establish that trial counsel were deficient in failing to request an *Atkins* hearing. The results of two full-scale IQ tests showed that Maxwell's IQ was above 70. Dr. McPherson testified that Maxwell's IQ score was 84, which is significantly higher than the Lott cutoff level. There is also no evidence that Maxwell suffered "significant limitations in two or more adaptive skills." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 2. Finally, Dr. Cook testified that Maxwell is not mentally retarded, because there was "no indication" of "any records from anyplace that he had been identified prior to age 18 as being mentally retarded." *Id*.

{¶ 177} Maxwell argues that trial counsel were ineffective by allowing Maxwell to be retested after earlier testing had potentially excluded him from death eligibility. But Maxwell has not shown how Dr. McPherson's testing amounted to deficient performance. Dr. McPherson was an expert in this area, and she determined which tests to administer. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 150.

{¶ 178} Moreover, if trial counsel had requested an *Atkins* hearing, the trial court would have conducted a de novo review of the evidence in determining whether the defendant was mentally retarded. *See Lott* at ¶ 18. *Lott* states, "The trial court should rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary in deciding this matter." *Id*. Thus, it is very likely that the trial court would have appointed other experts to evaluate Maxwell and further testing would have been administered to determine whether he was mentally retarded. Such testing would have likely included the use of more definitive tests, like the Wechsler Adult Intelligence scale, which Dr. McPherson administered.

{¶ 179} Maxwell also argues the additional test results were invalid because they failed to take into account the "Flynn effect." The Flynn effect postulates that IQ scores rise over time and that IQ tests that are not renormed to adjust for rising IQ levels will overstate a testee's IQ. *Walker v. True*, 399 F.3d 315, 322 (4th Cir.2005). However, nothing about Maxwell's Flynn-effect adjusted IQ scores was presented during the trial or appears in the record. "A reviewing court cannot add matter to the record before it, which was not part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Thus, these speculative claims are rejected.

{¶ 180} Second, Maxwell argues that trial counsel were ineffective in failing to present evidence of his low intelligence during the penalty phase. Maxwell claims that counsel were deficient by failing to call Dr. Aronoff as a mitigation witness to testify about Maxwell's borderline intellectual functioning and his low IQ scores. "The defense decision to call or not call a mitigation witness is a matter of trial strategy. * * * Likewise, the scope of questioning is generally a matter left to the discretion of defense counsel. Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

{¶ 181} While it is unclear why trial counsel did not call Dr. Aronoff as a witness, trial counsel could have legitimately decided not to call Dr. Aronoff as a witness in order to avoid further discussion about Maxwell's possible malingering when taking the CAST*MR test. Moreover, Dr. McPherson discussed Dr. Aronoff's evaluations and findings that documented Maxwell's "borderline intellectual functioning * * * at the time based on the WASI, a shorter form of the Wechsler Adult Intelligence Scale." The decision to present Dr. McPherson's summary of Dr. Aronoff's findings instead of calling Dr. Aronoff as a witness was a matter of trial strategy and does not constitute ineffective assistance. *See State v. Keith*, 79 Ohio St.3d 514, 530, 684 N.E.2d 47 (1997) ("the presentation of mitigating evidence is a matter of trial strategy").

{¶ 182} In addition, the record shows that the decision not to call Dr. Aronoff as a witness did not result from a lack of investigation. Maxwell's lawyers knew that Dr. Aronoff existed and what his testimony would be. Because Maxwell's counsel knew what Dr. Aronoff had to say, counsel's decision not to call him as a witness during the penalty phase is " 'virtually unchallengeable.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 158, quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 183} Maxwell cites the ABA guidelines, which state, "Counsel's duty to investigate and present mitigating evidence is now well established." Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, comment, 80 (Rev.Ed.2003). Maxwell argues that these guidelines required trial counsel to present Dr. Aronoff's testimony about Maxwell's low IQ scores. But the ABA guidelines are not "inexorable demands" with which all capital defense counsel must fully comply. *Van Hook*, 558 U.S. at 8, 130 S.Ct. 13, 175 L.Ed.2d 255. Moreover,

71

"[a]ttorneys are not expected to present every potential mitigation theory, regardless of their relative strengths." *Fears v. Bagley*, 462 Fed.Appx. 565, 576 (6th Cir.2012). Thus, trial counsel were not duty-bound to present Dr. Aronoff's testimony.

{¶ 184} Third, Maxwell argues that trial counsel were ineffective by failing to request instructions that would have allowed the jury to make an Atkins finding. But trial counsel were not ineffective by failing to request such instructions, because the jury does not decide whether a capital defendant is mentally retarded. *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 187.

{¶ 185} Finally, Maxwell argues that trial counsel were ineffective by failing to make a penalty-phase closing argument that discussed his low intelligence as a mitigating factor. During the penalty-phase opening statements, trial counsel told jurors that the defense mitigation would consist of testimony from family members, friends, and coworkers about Maxwell's life, and testimony from Dr. McPherson about mitigating factors that she had found. During closing arguments, trial counsel did not make an argument about Maxwell's low intelligence. Rather, trial counsel argued residual doubt, a sole juror's ability to prevent the death penalty, Maxwell's alcohol abuse, testimony that Maxwell is a kind and good-hearted man, and the reality of a life sentence as a sentencing option.

{¶ 186} Trial counsel's argument appears to reflect a decision to downplay Maxwell's mental deficiencies as a mitigating factor while emphasizing other factors, such his family background and the realities of serving life in prison as punishment. Maxwell has failed to demonstrate that trial counsel's argument was professionally unreasonable. *See Bobby v. Bies*, 556 U.S. 825, 836, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009), quoting *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (" '[R]eliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury'"). Moreover, Maxwell fails to show prejudice, as it cannot be said that there was a reasonable likelihood of a different outcome had defense counsel argued Maxwell's low intelligence as a mitigating factor**.**

*Maxwell*, 9 N.E.3d at 968–972.

Maxwell claims that the Ohio Supreme Court's decision was contrary to, or an unreasonable application of *Atkins* and *Strickland* and was based on unreasonable factual determinations. (Doc. No. 15, at 186–96.) He contends that he is intellectually disabled, and his counsel performed deficiently for failing to discover "compelling evidence" of his disability that they could have used to support a request for an *Atkins* hearing and to present at the mitigation phase of trial. (*Id*. at 182–86.)

As to the request for an *Atkins* hearing, Maxwell argues that his attorneys should have discovered and established that he met Ohio's three-part test for intellectual disability under *Atkins*, established in *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002): (1) significantly subaverage intellectual functioning, with a rebuttable presumption of no intellectually disabled if an overall IQ score is above 70; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction; and (3) onset before the age of 18.[9]

Maxwell first contends that counsel should have requested an *Atkins* hearing based on the IQ testing of Dr. Aronoff, who evaluated him for competency to stand trial. (Doc. No. 15, at 183–84.) Dr. Aronoff reported Maxwell earned a full-scale IQ score of 72, over *Lott*'s 70 cutoff level, and he concluded that Maxwell fell within borderline range of intellectual functioning, not intellectual disability. *Maxwell*, 9 N.E.3d at 968 (¶ 167). Yet Maxwell argues that Dr. Aronoff's 72 IQ score would have met the *Lott* cutoff of 70 if counsel applied the standard error of measurement, which posits that an individual's score is best understood as a range of scores on either side of the recorded score. (Doc. No. 15, at 185.) He cites *Hall v. Florida*, 572 U.S. 701, 712–13, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014), for the proposition that the medical community recognizes the standard error of measurement. (*Id.*) But that case was decided after the Ohio Supreme Court issued its opinion and is not controlling here. *See Andrade*, 538 U.S. at 71–72 (2003) ("[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").

---

[9] The Ohio Supreme Court overruled *Lott* and modified the test for intellectual disability in 2019 in *State v. Ford*, 140 N.E.3d 616 (Ohio 2019).

Maxwell also argues, as he did in state court, that counsel should not have permitted Dr. McPherson to test his IQ again or testify at the mitigation phase of trial, due to the practice effect and Flynn effect, which adjust for rising IQ scores over time and "artificially inflated [his] score." (Doc. No. 15, at 184–85.) As the state court reasonably noted, however, there is no evidence in the record that the Flynn effect theory of IQ score adjustments was presented at Maxwell's trial or even accepted in 2007. *See Maxwell*, 9 N.E.3d at 970 (¶ 179). Moreover, as the state court correctly observed, Dr. McPherson was an expert in this field, and she decided which tests to administer. *Id.* at 49 (¶ 177). "It is 'not unreasonable' for counsel, 'untrained in the field of mental health,' to rely on the professional opinions of expert witnesses." *Haight v. Jordan*, 59 F.4th 817, 839 (6th Cir. 2023) (quoting *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir. 2005)).

Maxwell further argues that counsel should have presented stronger evidence to meet *Lott*'s second and third prongs of adaptive skills and onset of intellectual disability before age 18. He cites to an affidavit of a family member attached to his federal habeas petition and school records submitted at state post-conviction proceedings, and he criticizes the Ohio Supreme Court for limiting its consideration to evidence in the record. (Doc. No. 15, at 179–80, 184–85.) But just as the state court's review on direct appeal was limited to the record before it, this Court's review on habeas is limited to the record that was available to the state court. *Pinholster*, 563 U.S. at 181. This sub-ground, therefore, also fails.

### 9. Failure to object to State's sentencing argument (sub-ground 9)

Maxwell asserts that counsel should have objected to an argument the prosecution made regarding the law governing mitigating and aggravating circumstances in its closing argument in the sentencing phase of trial. (Doc. No. 15, at 186–88.) As this Court will explain below in relation to Maxwell's nineteenth ground for relief, the prosecution's argument at issue was not improper.

74

*See supra* Section III.B.3. It follows, therefore, that Maxwell cannot show that he was prejudiced by his counsel's conduct in this respect, and the sub-ground fails. *See Henness*, 644 F.3d at 319 (finding that because the petitioner had not demonstrated that an underlying Fourth Amendment claim had merit, his related ineffective-assistance-of-trial-counsel claim failed, along with the ineffective-assistance-of-appellate-counsel claim) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)).

### 10.  Failure to ensure an unbiased jury (sub-ground 10)

Maxwell further argues that his trial counsel were ineffective for not protecting Maxwell's right to an impartial jury, because after the verdict but before the sentencing hearing, several jurors viewed a local television news story and read a local newspaper article about the case. (Doc. No. 15, at 199–203.) He alleges that counsel should have known about the publicity before it was brought to the court's attention, adequately questioned jurors about it during the court's voir dire of jurors on the subject, made "proper objections" to it, and moved for a mistrial on the ground that the jury was unduly influenced. (*Id*. at 202.)

The record does not support Maxwell's claim. The trial court described the newspaper article at issue as "just a paragraph squib under Law and Order and I don't think there was anything in that that was in any way to be concerned about that would influence this jury." (Doc. No. 9-2, at 907–08.) One juror who saw the television segment in question told the court it "was about a 30 second clip of [the judge] reading the verdict." (*Id*. at 906.) And the judge stated that the other juror who saw it "said there was no sound so [he didn't] think that would have influenced her in any due process harming way." (*Id.* at 908.)

Moreover, defense counsel strenuously objected to the jurors remaining on the panel who were exposed to the television segment and article and moved to dismiss the entire panel. (*See id*. at 908–09, 922–24.) The trial court conducted individual voir dire of the jurors. (*Id*. at 909–22.) And each of the questioned jurors indicated they did not learn any new information about the case and assured the trial court that they would decide the case only on the evidence admitted in the case. (*Id*.) The judge found no bias in the jurors questioned. He ruled:

> I did not hear one individual juror report anything that they heard on TV that was not part of evidence presented in this courtroom.
>
> Additionally, and the one thing I was looking for was anybody who would mention that their verdict would be a mere recommendation. That was not said by any of the jurors.
>
> I am satisfied that none of the jurors who witnessed any stories on TV or Plain Dealer have been influenced in any way That would affect their deliberations on this case.

(*Id*. at 924.)

Maxwell has failed to demonstrate that the minimal publicity his case received rose to the level of a "circus atmosphere[,]" such that a presumption in favor of prejudice would have been appropriate. *See United States v. Jamieson*, 427 F.3d 394, 413 (6th Cir. 2005) (No basis to apply a presumption in favor of prejudice where the publicity was not pervasive or unduly inflammatory (quoting *Murphy v. Florida*, 421 U.S. 794, 798–99, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963))). Moreover, given the trial court's findings—following counsels' objections—that the jurors remained capable of laying aside whatever publicity they may have viewed and deciding the case based on the evidence presented in the courtroom, there was no basis upon which defense counsel could have moved for a mistrial from the publicity. *See also Irvin*, 366 U.S. at 723 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) (noting that "[t]he relevant

76

question is 'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence[]"). Maxwell has failed to demonstrate how pretrial investigation of the scant pretrial publicity this case received, or more vigorous voir dire of the jury panel, would have changed the result at trial.

Ultimately, the Court finds that Maxwell has not identified any evidence that would establish that defense counsel performed deficiently, or that Maxwell was prejudiced by counsel's performance *See also Campbell v. Bradshaw*, 674 F.3d 578, 594 (6th Cir. 2012) (On a death penalty habeas petition, the Sixth Circuit ruled that "[a]s Campbell has not demonstrated any presumptive or actual prejudice based on pretrial publicity, he suffered no prejudice from his counsel's failure to move for a change in venue" and cannot sustain an ineffective assistance of counsel claim on this basis). Having failed to establish either prong of the *Strickland* standard, Maxwell is not entitled to relief on this sub-ground.

### 11. Failure to challenge a juror for cause (sub-ground 11)

Maxwell next complains that his trial counsel were ineffective for failing to challenge a juror for cause who expressed views demonstrating that "she would not have been able to consider a life sentence because she believed Maxwell would be released early." (Doc. No. 32, at 147.) The Court reviews this claim *de novo*.

In *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), the Supreme Court held that a juror "who will automatically vote for the death penalty in every case" is not impartial as required by the Sixth and Fourteenth Amendments, and a capital defendant may challenge for cause any prospective juror who holds such views. It then turned to what procedures in voir dire are needed to identify that specific bias. *Id*. at 729–36. The Court held that the "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who" would always

impose a death sentence following conviction. *Id*. at 736. And in that case, it concluded, general questions about "fairness" and ability to "follow the law" that were asked during voir dire were inadequate. *Id.* at 735–36. "'As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning*, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper.'" *Id*. at 733 (emphasis in original) (quoting Wa*inwright v. Witt*, 469 U.S. 412, 423, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)).

Here, the judge questioned the juror at issue during voir dire about a response on her juror questionnaire stating that she believes "the justice system is too fair." (Doc. No. 9-1, at 407.) She explained she thinks that because "sometimes . . . when you put somebody—when you have a trial and you sentence them to so many years and then they get out before that, I don't think that's fair." (*Id*.) The judge did not follow up after this answer but asked her if she could consider one of three non-death sentences, and she said she could. (*Id*. at 406–07.) Maxwell's counsel also queried the juror about her statement on the questionnaire about the justice system's fairness. She explained again that "sometimes, you know, you read in the papers that somebody is sentenced for maybe ten years and they get out in five or less. And I don't feel that they should serve—if that's, you know, if they're sentenced for eight years or ten years, that's what they should be sentenced for." (*Id*. at 411.) Defense counsel then asked her a series of questions related to the sentencing process, which she stated she understood. (*Id.* at 411–12.) He then asked, "We're going to ask you – all of this stuff that we're doing here is because the law requires us to be here. Okay? You can't make any presumptions right now or have you made any presumption? (*Id*. at 412.) She replied, "No, because I don't know anything about this." (*Id*.)

78

Maxwell cites *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) and *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001), as support for his argument that this juror was biased. In those cases, defense counsel was found ineffective for failing to further question "obviously biased jurors," *Johnson,* 961 F.2d at 756, and a potential juror's "express admission of bias," *Hughes*, 258 F.3d at 462, on voir dire. That is not the case here. Maxwell's counsel carefully questioned the juror about her understanding of the various life-sentencing options in the case and her concern that some prisoners are released before their sentence expires. In response to this questioning, the juror insisted that she would consider all sentences as instructed despite her reservations that "sometimes" prisoners are released early. Accordingly, there was nothing about the juror's answers that could have been characterized as obvious bias or an express admission of bias and provided no support for a challenge for cause. There is therefore no basis upon which to find that counsels' performance was deficient for failing to challenge the juror for cause or that Maxwell was prejudiced by it. This sub-ground is without merit.

## II.  Third and Fourth Grounds for Relief: *Insufficiency of the Evidence*

| Insufficiency of the Evidence | |
|---|---|
| | **Habeas Grounds** |
| The evidence against Maxwell is insufficient to support the aggravated murder conviction or specifications charged to the jury to support a death sentence. | Habeas Ground Three |
| The evidence against Maxwell is insufficient to support specification Ohio Rev. Code § 2929.04(A)(3) because Maxwell was never convicted of a felonious assault for which he would seek to avoid detection. | Habeas Ground Four |

In his third and fourth grounds for relief, Maxwell asserts that the State failed to present sufficient evidence at trial to prove aggravated murder or the attached specifications of retaliation and murder to escape accounting for a crime. (Doc. No. 15, at 71–78.)

### A.  Procedural Posture

Shoop concedes that Maxwell raised his third ground for relief—regarding insufficient evidence to support the aggravated murder and retaliation specification—on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits. (Doc. No. 26, at 72.) Ground Three is therefore ripe for federal habeas review.

Shoop argues that Maxwell did not present his fourth ground for relief—regarding insufficient evidence to support the murder to escape accounting for crime specification—to the state courts, rendering it procedurally defaulted. (*Id.* at 63.) Maxwell responds that he raised the claim in his application to reopen his direct appeal. (Doc. No. 32, at 43–44.) As discussed above, raising an ineffective-assistance claim in state court based on appellate counsel's failure to raise a claim does not preserve the underlying claim for federal habeas review. *Davie*, 547 F.3d at 312. Because this claim is record-based, as explained above, Maxwell procedurally defaulted the claim by failing to raise it in state court. Maxwell counters that the default should be excused because he is actually innocent of the death penalty. (Doc. No. 32, at 44–45.) But this Court has already rejected this argument. *See infra* Section I.A.6.

### B.  Merits Analysis

Both grounds fail on the merits. The Due Process Clause of the Fourteenth Amendment requires the state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). When reviewing a claim of insufficient evidence, habeas courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence

80

determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (emphasis in original).

Because both *Jackson* and AEDPA apply to Maxwell's insufficiency claims, federal habeas review requires deference at two levels: first, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; and second, deference should be given to the state trial court's consideration of the trier-of-fact's verdict, in accordance with AEDPA. *Davis*, 658 F.3d at 531; *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). The court has further observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

### 1.  Aggravated murder and retaliation specification

The Ohio Supreme Court, in rejecting Maxwell's claim regarding his conviction for aggravated murder and the retaliation specification, opined:

### a. Evidence of prior calculation and design

{¶ 145} Maxwell argues that the state failed to prove that he murdered Nichole with prior calculation and design as charged in Count One.

{¶ 146} When a court reviews a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the

syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 147} Maxwell was convicted of one count of aggravated murder under R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶ 148} No bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997). However, when the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus.

{¶ 149} Maxwell argues that the evidence shows that he spontaneously shot Nichole after observing her with another man, kissing him goodnight, and receiving phone calls from him at home. Thus, Maxwell asserts that the evidence is insufficient to support a conviction of prior calculation and design.

{¶ 150} Maxwell's argument overlooks the evidence showing that he shot Nichole in retaliation for her failure to change her grand jury testimony about the felonious assault. Gregg testified that at Maxwell's behest, he had contacted Nichole and asked her to "stick to the story that it was a simple domestic" incident when she testified before the grand jury. Nichole later told Maxwell that she had told the truth during her grand jury testimony. Maxwell then told Gregg that "the bitch was going to make him kill her" and asked Gregg where he could get a gun. Maxwell went to Nichole's home and killed her four days later.

{¶ 151} We have previously held that a defendant's threat to obtain a weapon and kill his victim and his later actions carrying out that threat are enough to prove prior calculation and design. *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 45; *State v. Sowell*, 39 Ohio St.3d 322, 333, 530 N.E.2d 1294 (1988). Maxwell announced his intention to kill Nichole, and he never abandoned that plan. Moreover, according to Gregg's testimony, Maxwell told Gregg that when he shot Nichole "she fell down and * * * she moved and then he shot her again." The second gunshot belies Maxwell's argument that the murder was spontaneous, and his actions show that he was carrying out his stated intention to kill Nichole for testifying against him.

{¶ 152} In *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, we addressed a similar fact situation. On July 18, 2005, Fry and Tamela Hardison had a fight in the apartment where they lived. *Id.* at ¶ 7. Hardison then filed charges against Fry for assault

and aggravated menacing. *Id.* at ¶ 148. While in pretrial custody, Fry told Hardison to go to court and drop the charges. On July 21, Fry told Hardison that he had received paperwork that she had signed saying that he had assaulted and threatened her. During that conversation, Fry told Hardison, "I got two of them under my belt * * * toe tags," meaning that he had killed two people. He then told Hardison, "Fix this." *Id.* at ¶ 150. Fry was released from jail on July 25 and killed Hardison on July 31. We upheld the sufficiency of the evidence and stated that there was sufficient time, reflection, and activity involved in Hardison's murder to show that Fry killed her with prior calculation and design. *Id.* at ¶ 157.

{¶ 153} Just as in *Fry*, Maxwell demanded that Nichole lie to the grand jury to have his charges reduced. Maxwell later learned that Nichole had told the truth during her grand jury testimony, and he then expressed his intent to kill Nichole. As in *Fry*, several days elapsed, and then Maxwell went to Nichole's house and killed her. Construing the evidence in a light most favorable to the prosecution, a rational juror could have concluded beyond a reasonable doubt that Maxwell had formulated a plan to kill Nichole. Thus, we hold that there was sufficient time, reflection, and activity involved in Nichole's murder to show that Maxwell killed her with prior calculation and design.

### b. Evidence proving witness-murder specification (Proposition of law VIII)

{¶ 154} Maxwell argues that the state failed to prove his guilt on the witness-murder specification.

{¶ 155} Maxwell was convicted of the R.C. 2929.04(A)(8) death-penalty specification that the victim "was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding."

{¶ 156} Maxwell continues to argue that the evidence showed that he killed Nichole because he was upset with her for socializing with another man and kissing him goodnight. Maxwell asserts that this motive superseded evidence that he murdered Nichole in retaliation for her grand jury testimony. Thus, he argues that the evidence is insufficient to support an (A)(8) finding.

{¶ 157} As discussed in proposition of law VII, the evidence shows that Gregg, at Maxwell's behest, contacted Nichole and attempted to persuade her to change her grand jury testimony to obtain a charge reduction against Maxwell. Upon learning that Nichole did not change her testimony, Maxwell stated his intent to kill Nichole and asked Gregg where he could get a gun. Maxwell shot and killed Nichole four days later.

{¶ 158} Although the evidence supports a finding that Maxwell killed Nichole for testifying against him, the state was not required to prove that that was Maxwell's sole reason for killing Nichole. *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 153. Even assuming that jealousy was also a motive for the murder, we hold that the state presented sufficient evidence to prove the R.C. 2929.04(A)(8) specification.

### c. Elements of witness-murder specification (Proposition of law IX)

{¶ 159} Maxwell maintains that the state failed to present sufficient evidence to prove the R.C. 2929.04(A)(8) specification, that he killed Nichole to prevent her "testimony in any criminal proceeding."

{¶ 160} Nichole testified before the grand jury on Wednesday, November 23, 2005. According to Brian Mooney, Cuyahoga County assistant prosecutor at the time of the murder, the grand jury returned a true bill against Maxwell for felonious assault, abduction, and domestic violence on November 23. Because the next day was Thanksgiving, the indictment was not filed with the clerk of court until Monday, November 28, 2005.

{¶ 161} Maxwell argues that the (A)(8) specification is inapplicable because the indictment for felonious assault was not filed until the day after the murder and no criminal proceeding was underway. In support of this argument, Maxwell cites R.C. 2901.13(E), which states, "A prosecution is commenced on the date an indictment is returned or an information filed * * *." He also cites Crim.R. 55(A), which states: "An action is commenced for purposes of this rule by the earlier of, (a) the filing of a complaint, * * * indictment, or information with the clerk, or (b) the receipt by the clerk of the court of common pleas of a bind over order under Rule 5(B)(4)(a)."

{¶ 162} R.C. 2929.04(A)(8) does not require that a criminal action be pending when the defendant kills the witness. Indeed, a defendant can be charged with the witness-murder specification in situations in which no criminal proceeding has been initiated at the time the victim was murdered. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 55. The statute requires only (1) that the victim was a witness to an offense and (2) that the purpose of killing the witness was to prevent the victim from testifying in a criminal proceeding. *Id.*

{¶ 163} As discussed above, the evidence established that Maxwell killed Nichole because she testified against him before the grand jury. Accordingly, we hold that Maxwell's guilt of the R.C. 2929.04(A)(8) specification was established by proof beyond a reasonable doubt even though the indictment for felonious assault was not filed until the day after Nichole's murder.

{¶ 164} Based on the foregoing, we reject propositions VII, VIII, and IX.

*Maxwell*, 9 N.E.3d at 965–68.

Maxwell claims that the Ohio Supreme Court's decision misapplied *Jackson* and was based

on unreasonable findings of fact under AEDPA's § 2254(d). (Doc. No. 32, at 36–37.) He argues

that the state court's decision was unreasonable because the evidence showed "a spontaneous

cascade of events" in which he shot Nichole in a jealous rage, not a planned act to retaliate against her because she testified to a grand jury about his assault of her. (Doc. No. 15, at 72.) As he did in state court, he contends the evidence showed that he murdered Nichole "impulsively" because that evening, he saw her out drinking with another man and kissing that man, and later heard her talking to the man on the phone. (*Id*.)

Maxwell notes that Gregg never explicitly testified that he killed Nichole in retaliation for testifying against him before a grand jury. (Doc. No. 32, at 38.) And he offers a post-judgment affidavit from Gregg, obtained in these habeas proceedings, which supports the defense's description of the events the night of the murder, and that the killing was a crime of passion. (*Id*. at 37–38 (citing Doc. No. 32-5, at 3).) But this Court may not consider Gregg's affidavit because, as the state court adjudicated this claim on the merits, the Court only may review evidence included in the state court record. *Pinholster*, 563 U.S. at 181 (2011).[10] He also cites evidence the jury never heard, and is therefore irrelevant to a *Jackson* analysis, such as remarks Gregg and the trial judge made during a hearing outside the jury's presence (*id*. at 38–39 (citing Doc. No. 9-1, at 929, 974)); and Gregg's statement to the police, a trial exhibit that was not shown to the jury (*id.* (citing Doc. No. 10-7, at 116–18 (Gregg Statement); Doc. No. 15, at 73–74.)

Maxwell further argues that Gregg's testimony was unreliable. (Doc. No. 15, at 74.) He notes that Gregg was held in contempt for lying under oath in a separate 2003 civil case, and Gregg entered into a plea agreement with the State in which he received immunity for his actions related to Nichole's murder and reduced charges in a different case against him in return for his testimony

---

[10] Maxwell contends, without providing apposite authority, that there is an exception to *Pinholster*'s rule if new evidence is used to prove actual innocence or an unreasonable determination of fact. (Doc. No. 32, at 36.) The Court is unaware of such an exception. In the absence of authority to support this proposition, the Court declines to consider it further.

against Maxwell. (*Id.*) Defense counsel, however, extensively cross-examined Gregg about these issues. (*See* Doc. No. 9-2, at 573–93).

But the question before the Court is not whether there was evidence supporting Maxwell's new theory of his crime as one of passion, but rather, whether the Ohio Supreme Court's decision finding sufficient evidence to support Maxwell's convictions for aggravated murder and the retaliation specification was reasonable. *Stewart*, 595 F.3d at 653. The state court cited ample evidence showing that, during a phone call with Gregg shortly before Nichole's murder, Maxwell: (1) threatened to kill Nichole in retaliation for her refusal to change her grand jury testimony about his assault of her; (2) asked Gregg where he could get a gun; and (3) carried out his threat four days later by shooting her not just once, but twice. *See Maxwell*, 9 N.E.3d at 966, 968 (¶¶ 150–51, 163).

Maxwell has not identified any factual findings that were clearly erroneous or demonstrated that the Ohio Supreme Court misapplied the standard in *Jackson* that requires a reviewing court to consider whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of [intentional murder and retaliation] beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. This ground for relief is without merit.

### 2. Murder-to-escape-accounting specification

Maxwell also claims that his conviction for the capital specification of murder to escape accounting for another crime under Ohio Rev. Code § 2929.04(A)(3) was not supported by sufficient evidence because he was never convicted of the prior offense of felonious assault for which he allegedly sought to avoid responsibility. (Doc. No. 32, at 40–41.) As no state court has

adjudicated the merits of this claim, the Court reviews it *de novo*. 28 U.S.C. § 2254(d); *see also Rice*, 660 F.3d at 252.

This specification was merged with the retaliation specification under Ohio Rev. Code § 2929.04(A)(8) before sentencing. (*See, e.g.*, Doc. No. 9-2, at 1145.) And as the jury did not consider that specification in its sentencing, this claim is moot. *Prince v. United States*, 352 U.S. 322, 328, 77 S. Ct. 403, 1 L. Ed. 2d 370 (1957) (holding a count charging the entering of a bank with the intent to steal was included in and was merged into another count charging the robbing of a bank by force and could not be the subject of a separate sentence). Maxwell speculates that the jury must have weighed the conviction under § 2929.04(A)(3) into their sentencing decision. (Doc. No. 32, at 42.) But juries are presumed to follow the instructions of the court, and the trial court clearly and explicitly instructed this jury that they were to consider "only" one aggravating circumstance, that of retaliation for testimony, in their sentencing decision. (Doc. No. 9-2, at 1103–04); *see also CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841, 129 S. Ct. 2139, 173 L. Ed. 2d 1184 (2009) ("in all cases, juries are presumed to follow the court's instructions"). Maxwell has pointed to nothing in the record to overcome this presumption or otherwise support his sufficiency argument. This ground, therefore, is without merit.

### III.    **Fifth through Seventh and Nineteenth Grounds for Relief:** *Prosecutorial Misconduct*

| Prosecutorial Misconduct | |
|---|---|
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: The prosecution improperly withheld exculpatory and impeaching evidence. | Habeas Grounds Five and Six |
| Sub-Ground 2: The prosecution improperly bolstered Gregg's credibility. | Habeas Ground Seven |
| Sub-Ground 3: The prosecution misled the jury on the law governing mitigating and aggravating circumstances. | Habeas Ground Ninteteen |

87

In his fifth, sixth, seventh, and nineteenth grounds for relief, Maxwell argues that the prosecution violated his due process rights. He specifically alleges that the prosecution:

- (sub-ground 1) improperly withheld the following exculpatory and material evidence: (a) a transcript of State witness John Gregg's testimony to the grand jury involving his Fifth Amendment right to remain silent (Ground Five), (b) the complete phone records of Maxwell, Gregg, and Nichole (Ground Five), and (c) the fact that it granted Gregg immunity in exchange for testifying against Maxwell (Ground Six);

- (sub-ground 2) bolstered Gregg's credibility (Ground Seven); and

- (sub-ground 3) misled the jury on the law governing mitigating and aggravating circumstances (Ground Nineteen).

(Doc. No. 15, at 79, 83, 90, 188.)

## A. Procedural Posture

Shoop argues that sub-ground 1 (the prosecution improperly withheld exculpatory and material evidence) and sub-ground 2 (the prosecution bolstered Gregg's credibility), as listed above, are procedurally defaulted because Maxwell did not raise them in state court as independent claims, and he no longer may do so. (Doc. No. 26, at 64.) The Court agrees. Maxwell again mistakenly contends that he preserved the claims by asserting them as the underlying claims of claims of ineffective assistance of appellate counsel in an application to reopen his direct appeal. (Doc. No. 32, at 52–54, 57–58, 66–67.) But as explained previously, the claims were not properly preserved. *See infra* Section I.A.2.

Maxwell next argues that even if the claims are procedurally defaulted, he can demonstrate cause through the ineffective assistance of appellate counsel or actual innocence. (Doc. No. 32, at 53–54, 58–59, 67–68.) As will be established below, however, these claims lack merit and

therefore do not support a claim of ineffective assistance of appellate counsel, as there can be no prejudice in failing to raise a meritless claim on appeal. Additionally, as previously explained, this Court rejects his claim of actual innocence. *See infra* Section I.A.6.

Shoop also argues that sub-ground 3 (the prosecution misled the jury on the law governing mitigating and aggravating circumstances) is procedurally defaulted. (Doc. No. 26, at 92.) The Court agrees. Maxwell raised this claim on direct appeal to the Ohio Supreme Court, but that court found it waived because defense counsel failed to object to the conduct at issue and reviewed the claim only for plain error. *Maxwell*, 9 N.E.3d at 980 (¶ 245–246). Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected. *State v. Mason*, 694 N.E.2d 932, 951 (Ohio 1998); *State v. Glaros*, 166 N.E.2d 379, 380 (Ohio 1960). Failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted. *See, e.g.*, *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006). And the Ohio Supreme Court's plain-error review does not constitute a waiver of the state's procedural default rules and, thus, does not resurrect the issue. *Id*. This claim also is procedurally defaulted.

Maxwell further maintains that the default should be excused because of the ineffective assistance of his trial counsel for failing to object to the prosecutor's conduct. (Doc. No. 32, at 134.) Maxwell, however, cannot establish cause for the default through the ineffective assistance of his trial counsel, because he did not assert that record-based prosecutorial misconduct claim on direct appeal and no longer is able to do so. This claim, too, is procedurally defaulted. *Edwards*, 529 U.S. at 453 (claims of ineffective assistance of counsel cannot provide cause for the procedural

89

default of another claim if the ineffective-assistance claim itself is procedurally defaulted); *see infra* Section I.A.[11]

### B. Merits Analysis

These claims would fail on the merits even if they had been properly preserved for habeas review. Sub-grounds 1 and 2 are reviewed *de novo*, as Maxwell never raised them in state court. Sub-ground 3 is entitled to AEDPA deference even though the state court reviewed it only for plain error. *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (holding AEDPA applies to a state court's plain-error analysis if it "conducts any reasoned elaboration of an issue under federal law").

### 1. Suppression of exculpatory evidence (sub-ground 1)

In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses favorable evidence that is material to the defendant's guilt or punishment. *See Brady*, 373 U.S. at 87. This duty to disclose applies even though there has been no request by the accused and encompasses impeachment as well as exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). To establish a *Brady* violation, therefore, a petitioner must demonstrate that: (1) the evidence at issue is favorable to the accused, either

---

[11] Maxwell, in conclusory fashion, asserts that this ineffective-assistance claim's default can in turn be excused by the ineffective assistance of his post-conviction counsel for failing to raise that claim in post-conviction proceedings. (Doc. No. 32, at 105.) He cites *Martinez* as support, but he fails to offer any argumentation showing how the facts of his case fit within the "narrow exception" announced in *Martinez* to the rule in *Coleman* that an attorney's ignorance or inadvertence in postconviction proceedings does not qualify as cause for a procedural default. *Martinez*, 566 U.S. at 9. Perfunctory and undeveloped arguments, "unaccompanied by some effort at developed argumentation[,]" are waived. *Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) (citation omitted); *see, e.g.*, *United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006))).

because it is exculpatory or impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice ensued. *Strickler,* 527 U.S. at 281–82

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control. *Coe,* 161 F.3d at 344. There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Id.* (internal quotation marks and citations omitted). Additionally, *Brady* typically "does not apply to delayed disclosure, but only to a complete failure to disclose," unless there is prejudice arising from the delay. *McNeill v. Bagley*, 10 F.4th 588, 600 (6th Cir. 2021) (quoting *United States v. Spry*, 238 F. App'x 142, 147 (6th Cir. 2007) (additional citations omitted)). As for prejudice, a petitioner must show that the improperly withheld (or the untimely disclosed) evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *see Jells*, 538 F.3d at 501–02 (prejudice is demonstrated where there is a "reasonable probability . . . that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

### a. Transcript of Gregg's grand jury testimony

Maxwell asserts that the prosecution violated *Brady* by failing to "timely disclose" a transcript of Gregg's testimony to the grand jury in which he invoked his Fifth Amendment right to remain silent (Doc. No. 15, at 79–83). The record on this matter is unclear, but regardless, Maxwell has not met *Brady*'s suppression requirement for this evidence.

One of Maxwell's trial attorneys, Thomas Rein, stated in an affidavit supporting Maxwell's second motion for a new trial, filed shortly after the trial ended, that the prosecution never informed

defense counsel that Gregg was summoned to the grand jury in Maxwell's case. (Doc. No. 10-2, at 389.) He averred that he first learned of Gregg's grand jury testimony from Gregg's attorney at Gregg's sentencing hearing in his case related to Nichole's murder, which took place while the jury was deliberating in Maxwell's case. (*Id*.)

Shoop disputes this account. He points to the affidavit of Assistant Prosecutor Saleh Awadallah, which was submitted with an opposition brief to Maxwell's first motion for a new trial. (Doc. No. 10-2 (Awadallah Affidavit), at 273.) In it, Awadallah stated that he informed defense counsel during "pretrial discussions" that Gregg was summoned to the grand jury and refused on counsel's advice to answer questions about "the statement that he made" about Maxwell's conversations with him about the murder. (*Id*.) He also notes that during his closing argument at Maxwell's sentencing hearing, defense counsel cited Gregg's assertion of his Fifth Amendment rights during his grand jury testimony as one reason the court should find Gregg's trial testimony untrustworthy. (Doc. No. 9-2, at 1138.)

Maxwell does not refute the prosecutor's affidavit, but argues that he is not challenging a failure of the prosecution to disclose the grand jury testimony at issue. (Doc. No. 32, at 47.) Rather, he challenges the prosecution's failure to produce the physical transcript of that testimony, which, he claims, would have permitted more effective impeachment of Gregg through cross-examination. (*Id*.) The transcript itself, however, was not in the prosecution's exclusive control. *Coe*, 161 F.3d at 344. Ohio law, like federal law, authorizes trial courts to permit defendants, upon proper motion, access to grand jury transcripts when a defendant shows a "particularized need" for them, including when they contain evidence that could be used to impeach a prosecution's

92

witnesses. Ohio R. Crim. P. 6(E);[12] *State v. Greer*, 420 N.E.2d 982, 989 (Ohio 1981); *see Wilson v. Sheldon*, 874 F.3d 470, 479 (6th Cir. 2017) (noting that "Ohio law, like federal law, provides defendants access to the transcripts when a defendant shows a 'particularized need' for them. Defendants may access grand jury testimony in Ohio if it contains evidence that could be used to impeach a prosecution's witness." (citation omitted)). As Maxwell could have filed such a motion with the trial court, this evidence was not suppressed by the State for purposes of a *Brady* claim.

Moreover, even if the State had a duty to produce the transcript, Maxwell cannot show that he was prejudiced by the prosecution's failure to do so. As observed, to establish prejudice, Maxwell must show that "there is a reasonable probability that the result of the [proceeding] would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289. Maxwell argues that if his counsel had possessed the transcript, they could have impeached Gregg's testimony by showing that Gregg "was only interested in securing a deal for himself" and refused to cooperate with the prosecution until he was given a favorable plea agreement. (Doc. No. 32, at 47.) But it is not reasonably probable that testimony about Gregg's assertion of his right to remain silent after conferring with counsel, when there were serious charges still pending against him relating to his role in Nichole's murder, would have so undermined his credibility that the result of the trial would have been different. As set forth more fully below, defense counsel thoroughly explored Gregg's bias, including his grant of immunity in the present case and the reduced charges he received in another case, on cross-examination.

---

[12] Ohio Criminal Procedure Rule 6(E) provides that matters before the grand jury may be disclosed "only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Ohio R. Crim. P. 6(E).

Additional testimony on bias would not have altered the result. *See Wilson*, 874 F.3d at 478 (rejecting, on a federal death penalty habeas petitioner, a *Brady* claim premised on the State's failure to produce grand jury testimony, noting that the petitioner "had plenty of opportunities to challenge the credibility of [his wife's] testimony at trial on other grounds"). In any event, having been informed by the prosecution during pretrial discussions, Maxwell's defense counsel were aware of Gregg's refusal to answer questions before the grand jury. (Doc. No. 10-2, at 273.) This claim lacks merit.

### b.  Phone records

Maxwell next argues that the prosecution should have produced the complete phone records of Maxwell, Gregg, and Nichole, which he claims would have undermined Gregg's testimony about phone calls he had with Maxwell and Nichole that helped establish retaliation. Maxwell has failed to demonstrate that these records were suppressed by the State. First, Maxwell concedes that the "state did disclose [Nichole's] phone records." (Doc. No. 32, at 50.) Second, there is no dispute that the State produced a portion of Maxwell's own cell phone and home phone records. (*Id*. at 48 (citing Doc. No. 10-1 (produced phone records), at 219–97); *see also* Doc. No. 10-3, at 691 (state's appellate brief contending prosecutors produced records for one of Maxwell's phone numbers between November 23 and 28, 2005 and records for Maxwell's other number between November 26, 2005, and December 1, 2005.)

To the extent that Maxwell maintains that the State should have produced a complete set of his own phone records, Maxwell's argument lacks merit. Defense counsel presumably had access to Maxwell's own phone records: therefore the records were not in the exclusive control of the State. *See Shepherd v. Metz*, 453 F. Supp. 3d 924, 936 (E.D. Mich. 2020) ("*Brady* does not apply to evidence that plaintiff could have discovered himself 'through the exercise of reasonable

94

diligence.'") (citing *Woods v. Smith*, 660 F. App'x 414, 436 (6th Cir. 2016).) Third, Maxwell admits that he can point to nothing in the record to suggest that the prosecution ever obtained Gregg's phone records. (Doc. No. 32, at 50; *see also* Doc. No. 9-2, at 861 (Awadallah explaining the State "[doesn't] have Gregg's [phone] records" for November 23, 2005.)) "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (quotation marks and citation omitted)). In short, Maxwell has failed to demonstrate that the State suppressed any phone records in its possession that were favorable to him.

Nor has Maxwell demonstrated any prejudice from the State's failure to produce Gregg's phone records.[13] Maxwell alleges that the State should have obtained Gregg's phone records because they would have undermined Gregg's trial testimony that he listened in on the call on November 23, 2005, between Maxwell and Nichole, wherein Nicole discussed with Maxwell her grand jury testimony.[14] Maxwell speculates that Gregg's phone records would show that he did not participate on any such call on November 23, 2005. (*See* Doc. No. 32, at 50.) In support, he cites the fact that Nichole's phone records do not show she *received* a phone call from Gregg on that date. (*Id.*) But Gregg did not testify that he placed a call to Nichole on November 23, 2005; instead, he testified that Maxwell placed the call to him and then added Nichole, which would not

---

[13] The Court notes that, pursuant to Ohio Crim. R. 17, defense counsel had the same subpoena power as the State to obtain Gregg's phone records yet chose not to do so.

[14] Likewise, Maxwell argues that the State should have produced November 23, 2005 phone records for his phone number ending in 3333 because they would have proved that Gregg did not participate in a three-way call with Maxwell and Nichole. (Doc. No. 32, at 48–49.) But the record reveals that the only incoming calls Nichole received from Maxwell on November 23, 2005, came from Maxwell's phone number ending in 3200, not his phone number ending in 3333. (Doc. No. 10-7 at 107 (State Exhibit 121).) Accordingly, the 3333 records would not have disproved Gregg's testimony. As Maxwell notes (*Id.* at 48–49), the State never obtained Maxwell's 3333 records for November 23, 2005 (*see* Doc. No. 10-1, at 247–274 (compiled phone records)). This is fatal to his *Brady* argument. *See Graham*, 484 F.3d at 417 (*Brady* poses no affirmative duty on the government to discover information it does not possess). But in any event, defense counsel had the same subpoena power as the State to obtain Maxwell's phone records and chose not to do so.

have been evident from Nichole's phone records. (Doc. No. 9-2 (Trial Testimony), at 539; *see* Doc. No. 10-7 (State Exhibit 121), at 107 (showing that, at 8:10 PM on 11/23/05, Nichole received a call from Maxwell lasting 9 minutes and 32 seconds.) Even assuming the State had a duty to obtain Gregg's phone records (which the Court finds it did not), Maxwell's speculation as to the contents of Gregg's phone records has failed to satisfy his burden of demonstrating that the evidence was material, such that "result of [his] trial would have been different." *United States v. Fields*, 763 F.3d 443, 459 (6th Cir. 2014) (quotations marks and citation omitted).

### c.  Gregg's plea agreement

Maxwell also claims that the State improperly delayed disclosing Gregg's plea agreement, in which Gregg was granted immunity for his involvement in the Nichole murder and reduced charges in another, unrelated criminal case in exchange for his testimony against Maxwell. He concedes that prosecutors divulged the information to the defense but argues that it was not done in a timely manner. (Doc. No. 32, at 55–57.) The Court disagrees.

Maxwell's trial counsel averred in his affidavit that he did not learn of the plea deal until Gregg testified at a hearing on the admissibility of his testimony on February 13, 2007, the second day of trial. (Doc. No. 10-2, at 389; Doc. No. 9-2, at 559.) But the record shows that the prosecution disclosed the information on February 2, 2007—ten days before trial—in a supplemental discovery response stating:

> Plea Agreements – in Case CR 476741, Co-defendant John Gregg, under indictment for Insurance Fraud R.C. 2913.47[,] a felony of the third degree; Attempted Theft R.C. 2923.02/2913.02, a felony of the fifth degree; and Perjury R.C. 2921.11, a felony of the third degree; as part of a plea agreement, plead guilty to a reduced charge of Insurance Fraud, R.C. 2913.47, a misdemeanor of the first degree, in exchange for testifying truthfully and consistently with previously written statement.

(Doc. No. 10-2, at 99.) A federal habeas court need not accept post-judgment affidavits that contradict the state court record. *See Pinholster*, 563 U.S. at 437 ("[F]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.").

Moreover, *Brady* generally does not apply to the delayed disclosure of exculpatory or impeachment evidence, but only to a complete failure to disclose. *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). "If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984); *see also United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992), *vacated and remanded on other grounds*, 507 U.S. 956, 113 S. Ct. 1378, 122 L. Ed. 2d 754 (1993) ("Delay only violates *Brady* when the delay itself causes prejudice."). Maxwell argues that his attorneys lacked sufficient time to conduct a thorough investigation and effectively impeach Gregg through cross-examination about the plea deal. But the record does not support that argument either. The prosecution raised the plea deal on direct examination of Gregg (Doc. No. 9-2, at 554–55), and defense counsel vigorously cross-examined Gregg regarding the plea deal (*id.* at 590–94, 608–09, 613, 619–20). Maxwell has demonstrated no prejudice from any purported delay in the disclosure of Gregg's plea agreement. *See O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir. 2007) ("Delay . . . violates *Brady* [only] when the delay itself causes prejudice." (bracketed language in original) (quoting *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992))). This ground also fails.

### 2. Presenting false evidence and improper vouching (sub-ground 2)

Maxwell further claims that the prosecution improperly presented false evidence and used it to vouch for Gregg's credibility. (Doc. No. 32, at 63–68.)[15] Shoop does not address this claim.

A state may not knowingly use false evidence, including false testimony, to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). To establish a due process violation based on the knowing use of perjured testimony, the petitioner must demonstrate that "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Id.* at 271; *see also Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility, "'thereby placing the prestige of the [government] behind that witness.'" *Wogenstahl*, 668 F.3d at 328 (quoting *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008)). It generally involves "either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.* (internal quotation marks and citations omitted). "'It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying.'" *Id.* (quoting *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005)).

Maxwell argues that during his closing argument, the prosecutor presented a "deceptive" exhibit that vouched for Gregg's credibility by falsely implying that the exhibit proved that Gregg participated in a pivotal phone call, and "[t]he absence of this phone call would [have]

---

[15] Maxwell also "raises the question of whether the prosecution selectively obtained only records that it knew would not undermine Mr. Gregg's factitious testimony," and requests discovery. (Doc. No. 32, at 65.)

demonstrate[d] the falsity of Gregg's testimony." (Doc. No. 32, at 63.) The exhibit at issue, Exhibit 121, is a partial compilation of phone calls that took place between Nichole, Maxwell, and Will Hutchinson, among others, between November 23 and December 5, 2005. (Doc. No. 10-7, at 107–10.)

The testimony at issue, provided by Gregg, concerned a three-way phone call between Gregg, Maxwell, and Nichole, with Gregg listening on without Nichole knowing. (Doc. No. 32, at 63–68.) Gregg testified that Maxwell added him to the call that took place between himself and Nichole on the evening of November 23, 2005, the day Nichole testified before the grand jury about Maxwell's assault, and four days before she was murdered. (*Id*.) The only data in Exhibit 121 documenting this call is an incoming one-way call to Nichole from Maxwell's number ending in 3200.[16] (Doc. No. 10-7, at 107–10 (Exhibit 121 revealing that Nichole received a roughly nine-minute call from Maxwell at 8:10 PM on 11/23/2005).)

Gregg testified that on this call, Nichole informed Maxwell that she told the grand jury the truth about his assault, and that after Nichole hung up, Maxwell told Gregg that "the bitch was going to make him kill her" and asked him where he could get a gun. (Doc. No. 9-2, at 537–42.) In the prosecutor's closing argument, he pointed out the November 23, 2005 call on the exhibit and noted, "We don't have Gregg's records at that point, okay? But you have – and he's on that three-way. Okay? There it is right there." (*Id*. at 861–62.) Maxwell claims that this portion of the prosecutor's argument constitutes the use of false evidence and improper vouching.

---

[16] The record includes complete phone records for Nichole on November 23, 2005, but does not include records for Maxwell's phone number ending in 3200, the number he called Nichole from that night. (*See* Doc. No. 10-1, at 247–274 (compiled phone records).) Thus, it appears that the data relating to the November 23, 2005 call in Exhibit 121 was derived from Nichole's, rather than Maxwell's, phone records. (Doc. No. 10-7, at 107.)

The record shows, however, that the exhibit did not include false information and the prosecutor did not attempt to mislead the jury to vouch for Gregg's credibility. In the prosecutor's closing argument, he recounted for the jury the many phone calls that took place between Nichole and Maxwell a few days before and the day of her murder, including the November 23, 2005 call, and asked the jurors to closely examine the phone records that document these calls. (Doc. No. 9-2, at 802–05.) The defense, in its closing argument, spoke directly and extensively about Exhibit 121 and the calls listed on it. (*Id*. at 827–34.) Defense counsel called the exhibit "the most compelling piece of evidence as to what happened here" and noted that the defense had stipulated to its admission. (*Id*. at 827–28.) He argued that "[t]here's not one bit of phone records that would substantiate anything that Mr. Gregg allegedly told us." (*Id*. at 828.) And he told the jury that "if Gregg made those phone calls, I'd suggest to you that we'd have them here in State's Exhibit 121. It's not there." (*Id.* at 830.)

In rebuttal, the prosecutor addressed the exhibit and pointed out the November 23, 2005 call. He acknowledged that "[w]e don't have Gregg's records at that point, okay?" (*Id*. at 861.) But he stressed that Exhibit 121 established that the November 23, 2005 call between Maxwell and Nichole took place just as Gregg testified. He said, referring to Gregg, not his phone number, "But you have – and he's on that three-way. Okay? There it is right there." (*Id*. at 861–62.) The prosecutor did not suggest that Gregg's phone number was included in the log of the November 23, 2005 call in the actual exhibit. In fact, he clarified defense counsel's error in describing the calls highlighted in green on Exhibit 121 by explaining that "the green here is Maxwell's other [] phone number, okay? It's not Gregg's number. It's Maxwell's [] phone number." (*Id*. at 864.) And he repeated for emphasis, "Again these aren't Gregg's numbers." (*Id*.)

100

There is nothing false about the State's Exhibit 121, nor did the prosecution use that exhibit in a deceptive or improper manner to vouch for Gregg's credibility. Thus, this ground lacks merit and does not entitle Maxwell to any relief.

### 3. Improper statements in closing argument (sub-ground 3)

Finally, Maxwell argues that the prosecutor made two improper remarks during his closing argument in the sentencing phase of trial that misled the jury about the law governing mitigating and aggravating circumstances. (Doc. No. 15, at 188–92.)[17] Maxwell raised this claim in the Ohio Supreme Court on direct appeal, which conducted a plain-error review, opining:

> {¶ 243} Whether a prosecutor's remarks constitute misconduct depends upon (1) whether the remarks were improper and, if so, (2) whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).
>
> * * *
>
> {¶ 245} Second, Maxwell argues that the prosecutor improperly argued that his ability to adapt to prison life was not a mitigating factor. During arguments, the prosecutor stated:
>
> > You must engage in that weighing process and * * * with that aggravating circumstance, the retaliation[,] think what have you heard in this case that mitigates against that * * *. What mitigating factors have you heard? He's capable of conforming to prison life? That's a mitigating factor? Is that—really? You assign the weight that you think each of these deserve.
>
> {¶ 246} "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson,* 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996). The prosecutor was not arguing that Maxwell's

---

[17] Maxwell also asserts in conclusory fashion that the prosecution improperly "insinuated that statutory mitigating circumstances are weightier that the 'catch-all' mitigating circumstance." (Doc. No. 15, at 188–89.) But because Maxwell did not raise that issue in state court (*see* Doc. No. 10-3, at 128) and does not provide any supporting argumentation or caselaw here, the claim is waived. *See Hall*, 549 F.3d at 1042 ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *Johnson,* 440 F.3d at 846 (6th Cir. 2006)).

ability to adapt to prison was not a mitigating factor. Rather, the prosecutor was responding to Dr. McPherson's testimony that Maxwell could conform his conduct to the highly structured setting of a prison. He was arguing that such evidence was not entitled to significant weight. Nothing in this argument resulted in plain error.

{¶ 247} Finally, Maxwell contends that the prosecutor misbehaved by arguing the absence of mitigating factors the defense never raised. The prosecutor argued:

> You've had good people come up here and tell you about Mr. Maxwell, try to mitigate against this aggravating circumstance. We didn't hear bad childhood, abusive situations, * * * wanting for anything in life. We just didn't hear it. We heard he had support. We heard he was raised correctly. He went to church. You know and the Judge—the doctor said no mental defect or disease. Did you hear any remorse? I mean I don't—those are the things that you have to consider, folks.

{¶ 248} "A prosecutor can respond to issues raised by an accused." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101. The prosecutor was responding to extensive testimony presented by Maxwell's friends and family members, stating that Maxwell was kind-hearted, a good man, and a family man. Ernestine Brewer, Maxwell's mother, testified that he was "a great kid" and was raised in the church. The prosecutor's comments about remorse responded to Maxwell's unsworn statement: "I would like to say that I'm sorry to the victim's family and my family for going through this. I wouldn't want nobody's family to go through this." The prosecutor's comments about defense testimony and Maxwell's unsworn statement represented fair comment and did not constitute plain error.

*Maxwell*, 9 N.E.3d at 980–82.

Maxwell argues that this decision contravened or unreasonably applied *Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), because the state court did not consider the cumulative effect of the comments, which "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (Doc. No. 32, at 133–34 (quoting *Darden*, 477 U.S. at 181 (further quotation marks and citation omitted).) Maxwell is correct that "a prosecutorial misconduct claim requires evaluation of the cumulative effect of *improper* comments made during the course of an entire trial." *Slagle v. Bagley*, 457 F.3d 501, 515 (6th Cir. 2006) (citing *Berger v. United States*, 295 U.S. 78, 84–89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)

102

(considering the trial as a whole when determining whether improper statements by the prosecutor mandated a new trial) (emphasis added)). But the comments must be improper before that step is required. And, here, this Court finds nothing unreasonable in the Ohio Supreme Court's conclusion that the two remarks Maxwell challenges, when viewed individually or cumulatively, were not improper. There is no merit to this ground for relief.

## IV.    Sixth Ground for Relief: *Trial Court Error/Sentencing*

| Trial Court Error/Sentencing | |
|---|---|
| | **Habeas Grounds** |
| Maxwell's conviction and death sentence were procured in denial of due process of law. | Habeas Ground Six |

In his sixth ground for relief, Maxwell asserts that the trial court erred in relying on evidence outside the record in sentencing him. (Doc. No. 15, at 83–84.)

### A.  Procedural Posture

Shoop argues, and Maxwell concedes, that this claim is procedurally defaulted because Maxwell did not raise it in state court and may no longer may do so. (Doc. No. 26, at 67–68; Doc. No. 32, at 59.) Maxwell counters that he can demonstrate cause through the ineffective assistance of appellate counsel or actual innocence. (Doc. No. 32, at 59.) As will be established below, however, this ground lacks merit and therefore does not support a claim of ineffective assistance of appellate counsel, as there can be no prejudice in failing to raise a meritless claim on appeal. And this Court has already rejected his claim of actual innocence. *See infra* Section I.A.6.

### B.  Merits Analysis

Maxwell maintains that the trial court erred in considering the testimony of Gregg (the State's key witness) at a sentencing hearing and deposition in a civil case before another judge on his court. He claims the trial court violated his due process right under two cases: *Turner v.*

103

*Louisiana*, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), in which the Supreme Court held that a defendant was denied a fair trial by an impartial jury when two deputy sheriffs who gave key testimony against the defendant fraternized with the jury outside the courtroom while performing their duties, and under *Garner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), which held that a petitioner was denied due process when a death sentence was imposed partly on the basis of confidential information from a presentence report that was not disclosed to petitioner or his counsel. Maxwell also claims his due process and Sixth Amendment rights were violated under two additional cases: *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), which established that a jury must find the existence of aggravating factors necessary to impose the death penalty.

*Apprendi* and *Ring* do not apply here, because, as Maxwell concedes (Doc. No. 32, at 61), the jury here did find an aggravating factor: retaliation. And *Turner* and *Garner* do not apply, because, as Shoop points out, Maxwell was not prejudiced by the trial court's consideration of Gregg's testimony in another case. (Doc. No. 26, at 68–69.) The trial court was evaluating whether residual doubt existed and concluded that Gregg "clearly lied during that civil deposition" when he implied that "Maxwell was a stranger to him at the time of his alleged fall in the McDonald's restaurant"—an effort that benefited Maxwell. (Doc. No. 9-2, at 1156–57.)

Maxwell counters that the information was "not viewed in [his] favor if [its] weight contributed to a finding of Mr. Gregg's credibility and later, a sentence of death." (Doc. No. 32, at 62.) But the trial court explicitly stated the opposite:

> Lastly, this Court has considered the issue of residual doubt. Though not considered by the jury, the Court felt it appropriate to compare Mr. Gregg's two statements (sic).

The law casts a suspicious eye towards the testimony of those whose testimony is accompanied by a quid pro quo from the State.

Let us be clear here, Mr. Gregg did receive a deal from the State of Ohio in exchange for his testimony against Mr. Maxwell. Without Mr. Gregg's testimony, the State would have had a very difficult time in proving the aggravating circumstance of retaliation.

I have not been shy in expressing my opinion of Mr. Gregg as an individual. His testimony should be viewed with a very jaundice eye. He is a felon and perjurer.

I reviewed his testimony in his civil case against McDonald's. It is clear that he was fast and lose (sic) with the truth during his deposition. Specifically in that deposition he implied that Mr. Maxwell was a stranger to him at the time of his alleged fall in the McDonald's restaurant.

The defense attorney in the civil case during the deposition asked Mr. Gregg whether he knew of the telephone number of Mr. Maxwell, then considered to be an independent witness. Mr. Gregg testified under oath that he did not know it but that it could be obtained through his attorney.

It should be noted that Gregg testified in this trial that Mr. Maxwell was his best friend and that he spoke to him by telephone daily. He clearly lied during that civil deposition.

(*Id*. at 1156–57.) Thus, this ground lacks merit.

### V.  Ninth through Twelfth Grounds for Relief: *Trial Court Error/Evidentiary Rulings*

| Trial Court Error/Evidentiary Rulings | |
|---|---|
| **Sub-Grounds** | **Habeas Grounds** |
| Sub-Ground 1: The trial court erred by admitting victim-impact testimony. | Habeas Ground Nine |
| Sub-Ground 2: The trial court erred by admitting testimony about the autopsy report. | Habeas Ground Ten |
| Sub-Ground 3: The trial court erred by admitting testimony of a child witness. | Habeas Ground Eleven |
| Sub-Ground 4: The trial court erred by admitting Maxwell's statements to police. | Habeas Ground Twelve |

In his ninth through twelfth grounds for relief, Maxwell contends that the trial court made numerous erroneous evidentiary rulings. Specifically, he alleges the trial court erred by admitting:

- (sub-ground 1) victim-impact testimony (Ground Nine);

- (sub-ground 2) testimony about the autopsy report (Ground Ten);

- (sub-ground 3) testimony of a child witness (Ground Eleven); and

- (sub-ground 4) Maxwell's statements to police (Ground Twelve).

(Doc. No. 15, at 98, 102, 113, 122.)

### A. Procedural Posture

Shoop concedes that sub-ground 2 (the trial court erroneously admitted testimony about the autopsy report) and sub-ground 4 (the trial court erroneously admitted Maxwell's statements to police), were adjudicated in state court and are therefore preserved for habeas review. (Doc. No. 26, at 81, 91.) He argues, however, that sub-ground 1 (the trial court erroneously admitted victim-impact testimony) and sub-ground 3 (the trial court erroneously admitted testimony about the autopsy report) are procedurally defaulted. (*Id.* at 78, 86.)

Maxwell raised sub-ground 1 regarding the admission of victim-impact evidence on direct appeal to the Ohio Supreme Court, which found it waived due to Maxwell's failure to object at trial to the alleged error. *Maxwell*, 9 N.E.3d at 964 (¶ 134). Maxwell agrees that it is defaulted but contends he can demonstrate cause through the ineffective assistance of trial counsel. (Doc. No. 15, at 100.) As will be explained below, the Court finds no error in the admission of this evidence, so there was no prejudice to him and therefore no ineffective assistance of counsel. *See Henness,* 644 F.3d at 319.[18] Maxwell also maintains that he can show that he is actually innocent to excuse

---

[18] Maxwell also asserts in conclusory fashion that this claim's default should be excused due to the ineffective assistance of his post-conviction counsel for failing to raise that claim in state post-conviction proceedings, citing *Martinez* as support. (Doc. No. 32, at 78.) But he fails to develop this argument, and it is waived. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief).

the default. (Doc. No. 32, at 78.) But as explained above, *see infra* Section I.A.6, the Court rejects that argument.

Shoop further asserts that sub-ground 3 is procedurally defaulted because Maxwell did not previously raise this claim in state court on federal constitutional grounds. (Doc. No. 26, at 86.) Maxwell argues that he did assert a federal claim in his merits brief to the Ohio Supreme Court on direct appeal by citing "the Fifth, Sixth, Eighth and Fourteenth Amendments to United States Constitution" at the end of his argument. (Doc. No. 32, at 81 (citing Doc. No. 10-3, at 100).)

As Maxwell correctly observes, "[a] petitioner need not cite 'chapter and verse' of constitutional law" to fairly present a federal constitutional claim to state court. *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)). But "'[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'" *Id*. (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). A petitioner must either: (1) rely upon federal cases that use a constitutional analysis; (2) rely upon state cases using a federal constitutional analysis; (3) phrase the claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) allege facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

In his argument to the Ohio Supreme Court, Maxwell focused almost exclusively on Ohio evidentiary rules and caselaw. (*See* Doc. No. 10-3, at 96–100.) His only reference to federal law was the citation to several amendments to the U.S. Constitution. (*Id*. at 100.) He did not couch his analysis in terms of federal constitutional rights, nor did he cite any supporting federal cases or

state court cases applying federal constitutional law. And, not surprisingly, the Ohio Supreme Court also based its decision entirely on state law. *See Maxwell*, 9 N.E.3d at 957–59.

Maxwell "failed to develop any cogent arguments regarding [his federal constitutional] rights beyond the naked assertion that they were violated." As such, this claim was not fairly presented to state court. *Blackmon*, 394 F.3d at 401 (holding claim not fairly presented where petitioner's only citation to federal authority appeared in a section heading); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation). It is procedurally defaulted.

Maxwell argues that the ineffective assistance of his appellate counsel provides cause for the default. (Doc. No. 32, at 89.) As shown below, however, this claim lacks merit, and Maxwell was not prejudiced by the failure to raise the claim.

### B. Merits Analysis

Regardless of any procedural default, each of these claims is either not cognizable on habeas review or lacks merit. To the extent that Maxwell's claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas review. *See, e.g.*, *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review"). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76 (citing *Estelle*, 502 U.S. at 67–68). Federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005). Their review of state court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a

108

violation of his federal constitutional rights." *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

State court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana*, 518 U.S. at 43). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512. Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright*, 999 F.2d at 178).

### 1.  Victim-impact evidence

Maxwell claims that the trial court erred by permitting prejudicial victim-impact testimony of Nichole's young daughter, C.M., and her sisters, Lauretta and Michelle Kenney. (Doc. 15 at 98–102.) He presented this claim on direct appeal to the Ohio Supreme Court, which evaluated the claim for plain error, deciding:

{¶ 134} Maxwell argues that the trial court erred in admitting victim-impact testimony during the guilt phase of the trial. Except where noted, defense counsel failed to object to such evidence and thus waived all but plain error. *See State v. Reynolds*, 80 Ohio St.3d 670, 679, 687 N.E.2d 1358 (1998).

{¶ 135} "Evidence relating to the facts attendant to the offense is 'clearly admissible' during the guilt phase, even though it might be characterized as victim-impact evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 98, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

{¶ 136} First, Maxwell complains that Nichole's sister, Michelle Kenney, provided improper victim-impact testimony about family history and other personal matters. Michelle mentioned the names and ages of Nichole's children and her siblings and stated that Nichole had been married and divorced but kept her married name. Michelle also described the inside of Nichole's home at 1046 East 146th Street. Maxwell also complains that Michelle testified that Nichole wanted the women's biological father, Heinz Kenney, to move into her house after he was released from prison in July 2005 "because he was sick and everything."

109

{¶ 137} The testimony about Nichole's family and her divorce provided background information about Nichole's relationship with Maxwell and the witnesses who testified. Testimony about family members living at the house and information about the layout of the house showed the people who had access to the house and described where the shooting occurred. Moreover, none of this testimony was overly emotional. Thus, we hold that no plain error occurred.

{¶ 138} Second, Maxwell contends that Michelle and Lauretta Kenney improperly testified about their frequent phone contact with Nichole. Michelle testified that she had daily contact with Nichole and talked with her on the phone every day. Lauretta also testified that she had daily contact with Nichole and spoke to her on the phone "[f]our or five times a day."

{¶ 139} Maxwell also asserts that Michelle improperly testified that after the shooting, she went to the hospital and saw Nichole "laying on an ambulance gurney * * * and she had all these tubes in her and she had a hose in her head and it was just blood everywhere." Michelle also mentioned that family members discussed the possibility that they might have to decide whether to continue Nichole on life support. However, Nichole died before that decision was necessary.

{¶ 140} Michelle's and Lauretta's frequent phone contact with Nichole was relevant in explaining their awareness of and involvement in the events leading up to Nichole's murder. Michelle's graphic description of Nichole's medical condition at the hospital and her testimony about the family discussion on discontinuing life support were of more questionable relevance. But we hold that no plain error resulted from admitting this testimony.

{¶ 141} Third, Maxwell argues that the prosecutor improperly had C.M. identify a photograph of her mother. However, Maxwell is incorrect. C.M. identified a photograph of the bloodstained carpet where her mother was lying after she had been shot. Nichole's body was not in the picture. Thus, we reject this claim.

*Maxwell*, 9 N.E.3d at 964–65.

AEDPA deference applies to this claim even though the state court reviewed it only for plain error. *Trierweiler*, 867 F.3d at 638. Maxwell, however, makes no argument about how the state court's conclusion here violates § 2254(d). Nor does he provide more than a conclusory assertion about the merits of this claim that the evidence was "irrelevant," "inadmissible," and "inflammatory" and its admission "violated [his] rights to due process." (Doc. No. 15, at 99–100.)

110

The Court finds the state court's decision neither contravened nor misapplied the clearly established law set forth by the Supreme Court in *Payne v. Tennessee,* 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). In *Payne*, the Supreme Court removed any per se constitutional bar to a prosecutor's use of evidence and argument relating to the victim and the effect of the victim's death on the victim's family. *Id.* at 827. If such "victim-impact evidence" is introduced, the Supreme Court explained, and it "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause . . . provides a mechanism for relief." *Id.* at 825. "[E]xcessive or prejudicial references to victim-impact evidence," therefore, "might 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Beuke v. Houk*, 537 F.3d 618, 648 n.9 (6th Cir. 2008) (citations omitted).

The evidence of which Maxwell complains was not unduly prejudicial. *See Payne,* 501 U.S. at 826 ("the [victim-impact] testimony illustrated quite poignantly some of the harm that Payne's killing had caused; there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant"). And as the state court found, it was also neither irrelevant nor overly emotional and was therefore admissible. This claim lacks merit.

### 2.  Autopsy report

Maxwell next claims that the trial court violated his Sixth Amendment right to confrontation by admitting the autopsy report on Nichole and permitting Dr. Felo, who did not conduct the autopsy, to testify about the autopsy results. (Doc. No. 15, at 102–13.) Maxwell raised this claim before the Ohio Supreme Court, which reasoned:

{¶ 28} In proposition of law XV, Maxwell argues that the trial court erred by admitting the autopsy report on Nichole McCorkle and by allowing Dr. Felo, who did not conduct

111

the autopsy, to testify about the autopsy results in violation of his Sixth Amendment right to confrontation and *Crawford*.

{¶ 29} Dr. David Dolinak conducted Nichole's autopsy on November 28, 2005. The prosecution called Dr. Joseph Felo to testify about the autopsy instead of Dr. Dolinak, who at the time of trial had become the medical examiner for Austin, Texas. Maxwell objected to Dr. Felo's testimony, citing *Crawford* and the best-evidence rule. The trial court cited *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, and allowed Dr. Felo to substitute as a witness. Dr. Dolinak's autopsy report was also admitted into evidence over defense objection.

{¶ 30} Dr. Felo testified that he had reviewed the autopsy report and the autopsy photographs and x-rays of the victim and looked at tissue slides under the microscope. He discussed the external examination of Nichole that was conducted during the autopsy. He testified that there were two gunshot wounds to the head and a bruise in the midportion of the chest. He referred to the autopsy report in stating that this injury "was interpreted to be because of medical therapy, CPR, doing chest compressions." He testified that the internal examination of the skull revealed a tear going through the right eyeball and into the brain. There was also some bleeding and bruising caused by bullets going through the brain.

{¶ 31} Dr. Felo referred directly to the autopsy report in discussing the victim's wounds. He testified, "Gunshot wound number one is *described* as being in the right eyebrow" (emphasis added), and he referred to the autopsy report in describing the trajectory of the gunshot. He also testified that the bullet from the other gunshot traveled "through the scalp and through the brain and skull from the left side going towards her right side." He used autopsy photographs to illustrate this testimony.

{¶ 32} Dr. Felo testified that microscopic examination showed the tears and bleeding caused by the bullets going through the brain, that microscopic evaluation of swabs taken from the victim's mouth, vagina, and rectum revealed no evidence of sperm, and that stippling was found around both entrance wounds. He expressed his opinion that stippling is generally found when "it's within 18 inches of the end of the muzzle to the target."

{¶ 33} Although Dr. Felo testified that the Cuyahoga County coroner had established the cause and manner of death, he also provided his own opinion, stating, "The cause of Nichole Anna Maria McCorkle's death is gunshot wounds of [the] head * * *. The manner of death is a homicide."

## DISCUSSION

{¶ 34} The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The United States Supreme Court has interpreted this to mean that admission of an out-of-court statement of a witness who does not appear at trial is

prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 35} *Crawford* did not define the word "testimonial" but stated generally that the core class of statements implicated by the Confrontation Clause includes statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id*. at 52, 124 S.Ct. 1354, quoting the amicus brief of the National Association of Criminal Defense Lawyers. The *Crawford* opinion announced a "fundamentally new interpretation of the confrontation right." *Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 2232, 183 L.Ed.2d 89 (2012).

{¶ 36} We have already considered the distinction between testimonial and nontestimonial statements. In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88, we held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6). We held that there was no Sixth Amendment violation in admitting the autopsy report because *Crawford* had indicated that "business records are, 'by their nature,' not testimonial" and were therefore admissible. *Id*. at ¶ 81, quoting *Crawford*, 541 U.S. at 56, 124 S.Ct. 1354. We stated, "An autopsy report, prepared by a medical examiner and documenting objective findings, is the 'quintessential business record.'" *Id*. at ¶ 82, quoting *Rollins v. State*, 161 Md. App. 34, 81, 866 A.2d 926 (2005).

{¶ 37} After our decision in *Craig*, the United States Supreme Court decided that analysts who had performed laboratory tests were required to testify. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). While the dissent states that the reasoning in Craig has been undone by *Melendez–Diaz*, we do not agree. In *Melendez–Diaz*, the court held that three notarized certificates of analysis showing that a forensic analysis identified cocaine were inadmissible. Being "quite plainly affidavits," they constituted testimonial statements because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id*. at 310–311, 129 S.Ct. 2527, quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The affidavits were also "'made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial.'" *Id.* at 311, 129 S.Ct. 2527, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting the amicus brief of the National Association of Criminal Defense Lawyers. Thus, the analysts who had provided the affidavits were witnesses for Confrontation Clause purposes, and the defendant had the right to confront them. *Id*. at 311, 129 S.Ct. 2527.

{¶ 38} Shortly afterwards, we considered how foundational testimony is to be presented for DNA analysis. *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745. In *Crager*, a DNA expert from the Bureau of Criminal Identification

and Investigation ("BCI") had testified about a DNA analysis performed by another agent. *Id*. at ¶ 8. We held that the DNA report was a nontestimonial business record and that its introduction without the testimony of the BCI agent who prepared it did not violate *Crawford*. *Id*. at ¶ 78–79. Relying upon our earlier opinion, we stated, "The autopsy report at issue in *Craig* is not distinguishable from the DNA reports in this case." *Id*. at ¶ 51. "As in *Craig*, the scientific-test reports in this case were prepared in the ordinary course of regularly conducted business and so were not testimonial." *Id*. at ¶ 54. The United States Supreme Court vacated the judgment in *Crager* and remanded the case for further consideration in light of *Melendez–Diaz*. *Crager v. Ohio*, 557 U.S. 930, 129 S.Ct. 2856, 174 L.Ed.2d 598 (2009). Thereafter, without deciding whether Crager's right to confront witnesses had been denied, we "vacat[ed] the judgment of the trial court and remand[ed] the cause to the trial court for a new trial consistent with *Melendez–Diaz v. Massachusetts*." *State v. Crager*, 123 Ohio St.3d 1210, 2009-Ohio-4760, 914 N.E.2d 1055, ¶ 3.

{¶ 39} Next, the Supreme Court decided *Bullcoming v. New Mexico*, 564 U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). In *Bullcoming*, instead of calling the analyst who signed and certified the forensic report for blood-alcohol concentration in a DWI case, the prosecution introduced the lab report through the testimony of another analyst who had not performed or observed the analysis but was familiar with the testing procedures of the laboratory. Although the witness was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report," *id*. at 2723 (Kennedy, J, dissenting), the majority held that the surrogate witness was not a proper substitute for the analyst who had conducted the test. The court concluded, "The accused's right is to be confronted with the analyst who made the certification * * *." *Id*. at 2710.

{¶ 40} *Bullcoming* also held that the blood-alcohol analysis reports were testimonial. The court stated, "In all material respects, the laboratory report in this case resembles those in *Melendez–Diaz*. Here, as in *Melendez–Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations. * * * Like the analysts in *Melendez–Diaz*, [the certifying analyst] tested the evidence and prepared a certificate concerning the result of his analysis." *Id*. at 2717. Thus, while the *Crawford* court declined to define "testimonial," later decisions seem to explain the meaning of the word by stating that testimonial statements are those made for "a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, ——U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011); see also *Bullcoming* at 2714, fn. 6, quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing]' past events potentially relevant to later criminal prosecution' "). If a statement's primary purpose is anything else, the statement is nontestimonial. Its admissibility is "the concern of state and federal rules of evidence, not the Confrontation Clause." *Id*.

114

{¶ 41} Most recently, five justices held that expert testimony from a forensic specialist did not violate a defendant's right to confrontation. *Williams v. Illinois,* —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). The expert witness testified that a DNA profile produced by an outside laboratory (Cellmark) from a rape victim's vaginal swabs matched the defendant's DNA profile produced by a state police lab from the defendant's blood sample. *Id.* at 2229–2230. The Cellmark report itself was neither admitted into evidence nor shown to the fact-finder. The expert witness also did not quote or read from the report or identify the report as the source of any of her opinions. *Id.* at 2230.

{¶ 42} Four of the five justices reasoned that the statements in the Cellmark report were nontestimonial because, first, the out-of-court statements were related by the expert solely for the purpose of explaining the assumptions on which the expert's opinion relied and were not offered for their truth. *Id.* at 2240–2241. And second, even if the Cellmark report had been admitted into evidence, it was not a testimonial document, because it was not prepared for "the primary purpose of accusing a targeted individual," which distinguished this report from the forensic reports in *Melendez–Diaz* and *Bullcoming*. *Id.* at 2242. Justice Thomas agreed that the expert's testimony did not violate the Confrontation Clause, but only because the Cellmark report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." *Id.* at 2255 (Thomas, J., concurring in judgment), quoting *Bryant* at 1167, (Thomas, J., concurring in judgment).

{¶ 43} The admission of the autopsy report and Dr. Felo's testimony must now be considered in light of the foregoing cases.

### Maxwell's arguments

{¶ 44} Maxwell argues that *Bullcoming* prohibited Dr. Felo's surrogate testimony about Nichole's autopsy even though he was a "knowledgeable representative" who could explain the lab's processes and the details of the autopsy report. Maxwell emphasizes that Dr. Felo's testimony was introduced to prove a key fact at trial and was offered for the truth of the hearsay. Thus, Maxwell argues that he was entitled to confront and cross-examine the medical examiner who actually performed Nichole's autopsy and wrote the report.

{¶ 45} Maxwell argues that *Williams*, a decision resulting from a bench trial, should be distinguished from his case, which was tried before a jury without any limiting instructions regarding the purpose for which the report could be considered. He emphasizes that the *Williams* plurality indicated that the DNA testimony might not have been admissible if that defendant had elected to have a jury trial.

{¶ 46} Maxwell also argues that unlike the purpose in *Williams*, the primary purpose of the autopsy and the related report was to establish that Nichole's death resulted from a crime rather than an accident, suicide, or other means. Thus, Maxwell argues that Dr. Felo's testimony and the introduction of the autopsy report resulted in a Confrontation

Clause violation because the purpose was "'to establish or prove past events potentially relevant to later criminal prosecutions,'" quoting *Williams,* – U.S. –, 132 S.Ct. at 2251, 183 L.Ed.2d 89 (Breyer, J., concurring), quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

### *The state's arguments.*

{¶ 47} The state advances three main arguments for the admissibility of the autopsy report and the deputy coroner's testimony. First, the state argues that this court should continue to apply *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88, in which we held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6). Second, the state argues that the coroner has a duty to conduct autopsies and maintain reports and that this duty exists entirely independent of any potential criminal prosecution that might later occur. The state also asserts that autopsy reports are not created for the purpose of litigation, because they do not identify suspects and are not accusatory in nature. Third, the state also points out that the passage of time can easily lead to the unavailability of the medical examiner who conducted an autopsy and that requiring the medical examiner who conducted the autopsy to testify would be equivalent to placing a statute of limitations on murder prosecutions.

{¶ 48} Finally, even if admission of the autopsy report and Dr. Felo's testimony violated Maxwell's right to confrontation, the state argues that the error was harmless beyond a reasonable doubt.

### Analysis

{¶ 49} A key element in evaluating the admissibility of the coroner' testimony and the autopsy report in light of the recent United States Supreme Court cases is the primary-purpose test, which examines the reasons for and purpose of the record in question. To determine the primary purpose, a court must "objectively evaluat[e] the statements and actions of the parties to the encounter" giving rise to the statements. *Bryant,* ──U.S. ──, 131 S.Ct. at 1162, 179 L.Ed.2d 93; *see also Williams*, ──U.S. ──, 132 S.Ct. at 2243, 183 L.Ed.2d 89 (plurality opinion of Alito, J.).

### *Coroner's testimony*

{¶ 50} Although Maxwell relies on *Bullcoming*, which disallowed surrogate testimony and held that the blood-alcohol reports admitted during the surrogate's testimony were testimonial, the majority of jurisdictions that have examined this issue have concluded that a substitute examiner, on direct examination, may at least testify as to his or her own expert opinions and conclusions regarding the autopsy and the victim's death. *E.g., Commonwealth v. Avila*, 454 Mass. 744, 762, 912 N.E.2d 1014 (2009) ("the expert witness's testimony must be confined to his or her own opinions and, as to these, the expert is available for cross-examination"); *Commonwealth v. Phim*, 462 Mass. 470, 479, 969 N.E.2d 663 (2012) (a substitute medical examiner may not testify on direct examination as to facts and conclusions stated in an autopsy report without personal knowledge or having independently reached the same conclusion); *State v.*

116

*Joseph,* 230 Ariz. 296, 298, 283 P.3d 27 (2012) (as long as the substitute expert reaches his or her own conclusions, the Confrontation Clause is satisfied).

{¶ 51} The Supreme Court of California, however, expanded the scope of admissible opinion testimony by a substitute examiner. The court allowed the substitute medical examiner to testify regarding his "independent opinion" as an expert witness as to the cause of the victim's death, when that opinion was based solely on a review of the autopsy report. *People v. Dungo*, 55 Cal.4th 608, 618, 147 Cal.Rptr.3d 527, 286 P.3d 442 (2012). Because the expert witness did not describe the conclusions reached by the nontestifying examiner, and the expert's descriptions were limited to objective facts, such as the condition of the victim's body at the time of the autopsy, these types of statements were not testimonial in nature. *Id.* at 619, 147 Cal.Rptr.3d 527, 286 P.3d 442.

{¶ 52} We agree. Maxwell's argument is also not persuasive because the *Williams* plurality stated that the forensic report (the Cellmark report) could have been admitted into evidence without violating the Confrontation Clause. *Williams*, ─── U.S. ───, 132 S.Ct. at 2242, 183 L.Ed.2d 89.

{¶ 53} Dr. Felo testified that he reached his own independent judgment on the cause and manner of Nichole's death based upon his analysis of the evidence in the autopsy report, which itself was admitted. His conclusions were the same as those in the report. But after reviewing the forensic evidence, Dr. Felo also provided some opinions that were not included in the autopsy report. For example, he provided his own conclusions about muzzle-to-target distance based on stippling around the entrance wounds on Nichole's head. Such testimony constituted Dr. Felo's original observations and opinions and did not violate the Confrontation Clause, because he was available for cross-examination regarding them.

**Autopsy report**
{¶ 54} In 2006, this court concluded that an autopsy report was a nontestimonial business record and that its admission did not impinge on a defendant's confrontation rights. *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81–88 (applying *Crawford v. Washington*). Although the United States Supreme Court has decided several confrontation cases since our decision, they do not require departure from our holding in *Craig*.

{¶ 55} Maxwell invokes the primary-purpose test that the *Williams* plurality discussed. The *Williams* plurality stated that the Cellmark report could have been admitted into evidence because it "was not prepared for the primary purpose of accusing a *targeted* individual" of engaging in criminal conduct. (Emphasis added.) *Williams*, ─── U.S. ─── ───, 132 S.Ct. at 2243, 183 L.Ed.2d 89. In contrast, Maxwell argues that the primary purpose of the autopsy and the related report was to establish that Nichole's death was a crime. However, Maxwell fails to mention that five justices in *Williams* rejected the plurality's narrowed definition of the primary-purpose test (the targeted-individual

test). *Id.* at 2273 (Kagan, J., dissenting). Thus, Maxwell's reliance on the plurality's narrowed definition of the primary-purpose test is not helpful to our resolution of this issue.

{¶ 56} Meanwhile, the state urges us to continue to adhere to *Craig*'s holding that an autopsy report is admissible as a nontestimonial business record. But an otherwise inadmissible testimonial statement may not be admitted into evidence based upon the business-and-official-records hearsay exception. *Melendez–Diaz*, 557 U.S. at 324, 129 S.Ct. 2527, 174 L.Ed.2d 314. Although documents kept in the regular course of business are ordinarily admitted into evidence under the hearsay exception, they are inadmissible "if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321, 129 S.Ct. 2527. When a statement is "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" it is considered testimonial. *Id.* at 311, 129 S.Ct. 2527, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. Thus, labeling autopsy reports as "business records" does not end the inquiry.

{¶ 57} An analysis of the primary-purpose test bears out *Craig*'s conclusion that autopsy reports are nontestimonial. Autopsy reports are not intended to serve as an "out-of-court substitute for trial testimony." *Bryant*, —— U.S. ——, 131 S.Ct. at 1155, 179 L.Ed.2d 93. Instead, they are created "for the primary purpose of documenting cause of death for public records and public health." Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Cal.L.Rev. 1093, 1130 (2008); *see also People v. Leach*, 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570, ¶ 129 (a medical examiner is "charged with protecting the public health by determining the cause of a sudden death").

### Ohio statutes
{¶ 58} Ohio coroners conduct autopsies pursuant to the authority granted to them by R.C. Chapter 313. Coroners must "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under [their] jurisdiction." R.C. 313.09. The death certificate also must indicate the "manner and mode in which the death occurred." R.C. 313.19. If the cause and manner of death are not apparent—as when someone "dies as a result of criminal or other violent means, by casualty, by suicide, or in any suspicious or unusual manner" or "when any person * * * dies suddenly when in apparent good health," R.C. 313.12—the coroner is notified so that an autopsy may be conducted. An autopsy is a "compelling public necessity" if it is needed to "protect[ ] against an immediate and substantial threat to the public health" or to assist law enforcement in conducting a murder investigation. R.C. 313.131.

{¶ 59} Although autopsy reports are sometimes relevant in criminal prosecutions, *Craig* rightly held that they are not created primarily for a prosecutorial purpose. Consistent with *Craig*, other courts have held that coroners are statutorily empowered to investigate unnatural deaths and authorized to perform autopsies in a number of

118

situations, only one of which is when a death is potentially a homicide. *People v. Leach*, 405 Ill.App.3d 297, 308–309, 345 Ill.Dec. 694, 939 N.E.2d 537 (2010), *aff'd*, 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570; *Dungo*, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442 (testimony by a chief medical examiner who did not prepare the decedent's autopsy report was admissible); *United States v. James*, 712 F.3d 79, 97 (2d Cir.2013) (autopsy report was to be considered on whether it was "prepared with the primary purpose of creating a record for use at a later trial").

{¶ 60} Ohio courts of appeals have also continued to uphold the admissibility of autopsy reports prepared by nontestifying medical examiners since *Melendez–Diaz*. *State v. Hardin*, 193 Ohio App.3d 666, 2010-Ohio-6304, 953 N.E.2d 847, ¶ 9–20 (4th Dist.) (autopsy report prepared by nontestifying medical examiner admissible as a nontestimonial business record, since it was not prepared for purposes of litigation); *State v. Zimmerman*, 8th Dist. Cuyahoga No. 96210, 2011-Ohio-6156, 2011 WL 5997588, ¶ 43–45 (admissibility of autopsy report prepared by nontestifying medical examiner does not conflict with *Bullcoming* ); *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2012-Ohio-2719, 2012 WL 2308131, ¶ 20, 26 (*Craig* still controls and autopsy report is nontestimonial evidence under *Crawford*, as it is not made solely at the behest of police in order to convict the particular defendant); *State v. Monroe*, 8th Dist. Cuyahoga No. 94768, 2011-Ohio-3045, 2011 WL 2476280 (*Craig* not in conflict with *Melendez–Diaz*).

{¶ 61} As a final matter, the admissibility of autopsy reports completed by a nontestifying medical examiner presents unique policy interests that are not present in other *Crawford*-related evidentiary matters. A medical examiner who conducted an autopsy may be unavailable or deceased when a trial begins. And unlike other forensic tests, a second autopsy may not be possible due to cremation of the victim's body or other loss of evidence with passage of time.

{¶ 62} Under R.C. 313.09, coroners are required to "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under [their] jurisdiction." Moreover, the scope of an examiner's duty is the same regardless of whether criminal activity is suspected or not. The Illinois Supreme Court has recognized that in some instances, police may compel the conducting of an autopsy during investigation of a cold case for later use at trial, and in that event the autopsy may play a testimonial role. *People v. Leach*, 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570, ¶ 133. The dissent rejects the primary-purpose test and would hold that whether a particular autopsy report is testimonial should be determined on a case-by-case basis. But generally, autopsy reports are neither (1) prepared for the primary purpose of accusing a targeted individual nor (2) prepared for the primary purpose of providing evidence in a criminal trial. For Sixth Amendment purposes, it is only the primary purpose of a document that determines whether it is testimonial or not.

{¶ 63} *Melendez–Diaz* and *Bullcoming*, on which Maxwell relies, are readily distinguishable here. In both cases, the forensic reports were made at the request of

119

police, for specific "evidentiary purposes" in order to aid in a police investigation. The record does not show that to be the case here. We hold that an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

{¶ 64} Finally, the state argues that any error in admitting Dr. Felo's testimony and the autopsy report constitutes harmless error beyond a reasonable doubt, an issue we must determine. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Even if there was error in admitting the coroner's testimony and the autopsy report, as discussed later in proposition XIII, overwhelming evidence was introduced that established Maxwell's guilt, and expert testimony was not crucial in proving the cause and manner of Nichole's death. Eyewitness testimony established that Maxwell shot Nichole in the head, and two .25–caliber shell casings were found inside the house after Maxwell fled the scene. Maxwell also admitted to Gregg that he shot Nichole twice. Finally, Michelle Kenney testified that Nichole died a short time after arriving at the hospital.

*Maxwell*, 9 N.E.3d at 944–52.

Maxwell argues that the Ohio Supreme Court unreasonably applied clearly established Supreme Court precedent in this decision. (*See* Doc. No. 15, at 107.) The Court disagrees. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The provision's "central concern . . . is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).

As the state court explained in its careful and thorough examination of this claim, the clearly established Supreme Court precedent on this issue begins with *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), which held that the Confrontation Clause prohibits the admission of testimonial statements of a witness who did not appear at trial unless the witness was unavailable and the defendant previously had the opportunity for cross-

examination. *Id.* at 53–54. Soon after deciding *Crawford*, the Supreme Court held that a statement is testimonial if its "primary purpose" is to prove past events that are potentially relevant to a later criminal trial. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). If a statement does not qualify as testimonial, its admissibility "is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant,* 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). The Court has applied the primary purpose test to prohibit the admission of certain testimonial forensic or scientific reports made for the purpose of police investigations through the in-court testimony of a witness who did not perform or observe the test or examination expressed in the report. *Bullcoming v. New Mexico*, 564 U.S. 647, 652, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

The Supreme Court has not, however, "clearly established" for purposes of § 2254(d)(1) that an autopsy report constitutes testimonial evidence triggering a defendant's confrontation rights. *See King v. Brown*, No. 20-2074, 2021 WL 3417921, at *2 (6th Cir. Apr. 20, 2021) (recognizing that "neither the Supreme Court nor this Court has held that an autopsy report . . . is testimonial for Sixth Amendment purposes"); *Mitchell v. Kelly*, 520 F. App'x 329, 331 (6th Cir. 2013) (finding "no Supreme Court precedent clearly established that an autopsy report constitutes testimonial evidence" and rejecting petitioner's Confrontation Clause claim under § 2254(d)(1) (citing *Vega v. Walsh*, 669 F.3d 123, 127–28 (2d Cir. 2012); *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011))).

Absent clearly established federal law on this point, Maxwell cannot demonstrate that the Ohio Supreme Court's decision rejecting his claim contravened or unreasonably applied clearly established Supreme Court precedent. *See Wright v. Van Patten*, 552 U.S. 120, 125, 128 S. Ct.

743, 169 L. Ed. 2d 583 (2008) (rejecting habeas relief because no Supreme Court decision had "squarely address[ed]" the issue or "clearly establish[ed]" that law developed in a different context applied to the facts of that case); *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (noting that a "habeas petitioner's challenge to an evidentiary ruling cannot satisfy § 2254(d)(1) unless the petitioner identifies 'a Supreme Court case establishing a due process right with regard to [the] *specific kind of evidence*' at issue") (quoting *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (emphasis added)); *Pouncy v. Palmer*, 846 F.3d 144, 161 (6th Cir. 2017) ("In conducting the 'clearly established' inquiry, lower courts must narrowly construe Supreme Court precedents and, as a consequence, 'clearly established' law 'consist[s] only of something akin to on-point holdings.'") (quoting *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008)).

Nevertheless, as noted above, state court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Egelhoff*, 518 U.S. at 43). But even so, the Court has cautioned that "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules . . . ." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983). Maxwell has identified nothing, and this Court can find nothing, fundamentally unfair in permitting Dr. Felo to testify. And as the Ohio Supreme Court reasonably concluded, even if Dr. Felo's testimony did constitute testimonial evidence, it was harmless error, as "overwhelming evidence was introduced that established Maxwell's guilt, and expert testimony was not crucial in proving the cause and manner of Nichole's death." *Maxwell*, 9 N.E.3d at 952 (¶ 64). This claim, therefore, is denied.

### 3.  Testimony of child witness

Maxwell also argues that the trial court violated his due process rights and Sixth Amendment confrontation rights by admitting the testimony of five-year-old C.M., Nichole and Maxwell's daughter, who witnessed her mother's murder. (Doc. No. 15, at 113–22.) As this claim was not litigated in state court, the Court reviews it *de novo*.

C.M. was five years old when she testified. (Doc. No. 9-1, at 817.) She was one day short of her fourth birthday when the murder occurred. (*Id*. at 819.) During the voir dire examination to determine her competency (*see id*. at 816–31), C.M. stated the name of her brother, sister, and preschool teacher. (*Id.* at 817–18.) She told the judge that her favorite television program was "Sponge Bob" and named and described some of the characters on the show. (*Id*. at 822–23.) C.M. also identified photographs of the different rooms in her house. (*Id*. at 820–21.) She testified that she did not know what an oath was (*id*. at 828), but she knew, "You will get in trouble" if you lie. (*Id*. at 819.) C.M. also was able to recount what happened the night her mother was killed. She testified that her "daddy" came to the house with a gun, that he was in her "Mommy room," and then the three of them went downstairs. (*Id*. at 825–26.) Asked what Maxwell did with the gun, she replied, "He shoot my mommy." (*Id*. at 826.) Once the voir dire was completed, the trial court concluded, "[C.M.] is capable of receiving just impressions, she understands the importance of telling the truth, and, therefore, the Court rules that she will be allowed to testify. She's competent as a witness in this case." (*Id.* at 831.)

Regarding Maxwell's due process claim, the Supreme Court has not established a definition of witness competence required by the Due Process Clause. *Moreland*, 699 F.3d at 923 (citing *Kentucky v. Stincer*, 482 U.S. 730, 741 n.11, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)).

123

And, as explained below, Maxwell cannot demonstrate fundamental unfairness in the admission of C.M.'s testimony.

Maxwell's Sixth Amendment confrontation claim is governed by *Craig*. In that case, the Supreme Court held that the Confrontation Clause did not prohibit a defendant's six-year-old accuser from testifying over a closed-circuit television rather than face-to-face, because other "elements of confrontation" were present: the child was competent to testify, the child testified under oath, the child was subject to contemporaneous cross-examination, and the judge, jury, and defendant were all able to observe the witness's demeanor. *Craig*, 497 U.S. at 851. These safeguards, the Court concluded, "ensure[d] that the [child's] testimony [was] both reliable and subject to vigorous adversarial testing . . . ." *Id*.

In *Haliym*, the Sixth Circuit similarly rejected a habeas petitioner's claim that the admission of a seven-year-old witness's testimony violated his confrontation rights because the child was incompetent and did not understand the oath. *Haliym*, 492 F.3d at 699. The court observed that "some minimum capacity for recording and relaying truthful information is a precondition to a meaningful oath to tell the truth, which is a necessary element of cross-examination." *Id*. at 703. It declined to define that minimum capacity, but "consider[ed] it satisfied for purposes of the Confrontation Clause if the witness is able to understand the concept of the truth and his duty to present truthful information to the court." *Id*. And it held that the Ohio Supreme Court's factual findings that the child witness exhibited an understanding of truth and falsity and appeared to appreciate his responsibility to be truthful were not clearly erroneous. *Id*. The child stated that he would tell the truth, that it was good to tell the truth, and that he would be punished if he lied. *Id*. He also was cross-examined and "generally responsive" to the cross-examination. *Id*.

124

Maxwell claims that C.M.'s testimony was unreliable because she did not know what it meant to take an oath. (Doc. No. 32, at 84.) But like the seven-year-old witness in *Haliym*, the record shows that C.M. understood her obligation to be truthful:

Q. And, [C.M.], do you know the difference between telling the truth and telling a lie?

A. Yes.

Q. And what's the difference?

A. The difference, when you don't tell the truth—

Q. Uh-huh?

A. —you could get in trouble.

Q. Okay. And if you tell the truth, what happens? Is it good to tell the truth?

A. Yes.

Q. Okay. What happens if you tell a lie?

A. You will get in trouble.

(Doc. No. 9-1, at 818–19.)

Maxwell argues that C.M. demonstrated her incompetency during the hearing with confused, contradictory, and inaccurate testimony. (Doc. No. 32, at 84–85.) He cites as examples her testimony that the night of the shooting her mother did not go out, when she had, and her cousin Brianna was in the house, when she was not. (*Id*. at 84 (citing Doc. No. 9-1, at 830–31).) This Court agrees that C.M.'s testimony at the end of the hearing was confused regarding the sequence of events and she did not recall her mother going out that night. But her testimony established that she remembered Maxwell arriving with a gun, him being in her mother's bedroom, and the three being downstairs when Maxwell shot her. And the judge reasonably found her "capable of receiving just impressions." (Doc. No. 9-1, at 831.) Maxwell further argues her testimony was

125

cumulative, immaterial, and prejudicial. (Doc. No. 32, at 85.) But it is hard to imagine a more material witness than the only eyewitness to a crime who is intimately familiar with both the shooter and the victim.

The record, therefore, supports the trial court's ruling that C.M. was competent to testify, and her testimony, along with other safeguards the Supreme Court identified in *Craig*, including vigorous cross-examination and the jury's ability to determine her credibility, did not violate Maxwell's confrontation rights or render his trial unfair at all, let alone so unfair that it violated his due process rights. This claim fails.

### 4. Maxwell's statements to police

Finally, Maxwell argues that the trial court's admission of statements he made to police shortly after his arrest violated his constitutional right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). (Doc. No. 15, at 122–24.) He raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits.

In rejecting this argument, the state court reasoned:

{¶ 109} Maxwell argues that the trial court erred in admitting his statements to police at the time of his arrest, because the police had failed to advise him of his *Miranda* rights before questioning him. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 110} Before trial, Maxwell moved to suppress statements that he made in response to police questioning about whether he was armed at the time of his arrest. During the suppression hearing, Agent Robert Riddlebarger testified that on December 16, 2005, he and six other members of the Cleveland/Cuyahoga County Fugitive/Gang Task Force went to a home on Jeffries Avenue in Cleveland to arrest Maxwell. Task-force members entered the house after knocking on the door and not receiving a response. According to Riddlebarger, the task force was "looking for persons, or * * * anything that might be used as a weapon against us." The team members searched the basement and the first-floor area and found nothing. The entire task force then went upstairs to clear the second floor. The team members separated and searched the two bedrooms on that floor.

126

{¶ 111} Team members cleared both bedrooms. In one bedroom, team members noticed a crawl-space door behind the bed. They moved the bed, opened the door, and found Maxwell. Riddlebarger and Det. Zickes pulled Maxwell out of the crawl space, placed him face down on the bed, and handcuffed him. Riddlebarger testified, "At about the same time as he's handcuffed, * * * Detective Zickes asked Mr. Maxwell whether or not he was armed." Maxwell responded that "he did not have a gun anymore." Riddlebarger then patted Maxwell down for weapons and searched his clothing to make sure that he did not have any weapons on him. During the pat-down, Maxwell stated that he "had gotten rid of the gun that he once had."

{¶ 112} The trial court overruled the defense motion to suppress Maxwell's statements. The court stated, "In this case, as in [*New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)], there was a public safety exception to the requirement that *Miranda* warnings be given before a subject's answers could be admitted into evidence * * *." Later, Riddlebarger testified during the state's case-in-chief regarding Maxwell's statements at the time of his arrest.

{¶ 113} Under *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." However, when officers ask "questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to elicit testimonial evidence from a suspect," they do not need to provide the warnings required by *Miranda*. *New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

{¶ 114} In *Quarles*, the police apprehended a rape suspect in a supermarket and discovered that he was wearing an empty shoulder holster. Before reading *Miranda* rights to the suspect, an officer asked the suspect where the gun was located. The suspect nodded toward some empty cartons and stated, "[T]he gun is over there." *Quarles* at 652, 104 S.Ct. 2626. In upholding the admissibility of the defendant's statement, the court stated:

> The police in this case * * * were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657, 104 S.Ct. 2626.

{¶ 115} Recognizing a narrow exception to the *Miranda* rule, *Quarles* reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs

127

the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id*. In so holding, the court stated:

> We decline to place officers * * * in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id*. at 657–658, 104 S.Ct. 2626. *Quarles* indicated that this limited exception will not be difficult for police officers to apply "because in each case it will be circumscribed by the exigency which justifies it." *Id*. at 658, 104 S.Ct. 2626.

{¶ 116} Maxwell argues that *Quarles* did not justify the police questioning him about whether he was armed without first advising him of his *Miranda* rights. Maxwell argues that he was handcuffed before he was asked about the weapon. He also argues that the public-safety exception does not apply, because he was arrested inside a private home that had been completely secured by the police.

{¶ 117} In *United States v. Williams*, 483 F.3d 425, 428 (6th Cir.2007), the United States Court of Appeals for the Sixth Circuit set forth the standard that the government must satisfy in order for custodial statements made before any *Miranda* warnings to be admissible under the *Quarles* public-safety exception. "For an officer to have a reasonable belief that he is in danger," and thus for the exception to apply, "he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id*. at 428. Williams stated that this evaluation of the applicability of the *Quarles* exception "takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." *Id*.

{¶ 118} In the present case, the first condition was satisfied because the members of the task force had a reasonable belief that Maxwell might possess a weapon. Evidence suggested that he possessed weapons and had recently shot Nichole. But the second condition was not met. When Maxwell was questioned, the task force had secured the premises, performed a sweep of the house, and determined that no one else was present. Maxwell was handcuffed and surrounded by several task-force members. The house was under full control of the agents during the questioning. These facts contrast with those of *Quarles*, in which a discarded gun in a supermarket presented a threat to public safety.

{¶ 119} Nevertheless, the state argues that Det. Zickes could ask Maxwell whether or not he was armed because an officer's safety is always at risk, especially when the arrest

128

occurs in the defendant's home. But the *Williams* test provides that in applying the *Quarles* exception, it is necessary to consider the facts and circumstances confronted by the police at the time of arrest, and here, nothing suggested that Maxwell might gain access to a weapon and inflict harm with it.

{¶ 120} In *United States v. Kellogg*, 306 Fed.Appx. 916 (6th Cir.2009), the court evaluated a similar fact situation involving the application of the public-safety exception. In *Kellogg*, the police asked the defendant, who was suspected of bank robbery, whether he had a gun or drugs on the premises before searching his home. *Id.* at 918. The court rejected claims that the public-safety exception allowed defendant's incriminating responses to be admitted at trial. The court stated that the suspicion that the defendant had recently committed a bank robbery satisfied the first prong of the *Williams* standard. *Id.* at 924. However, the court stated that the second prong of the *Williams* standard was not met:

> [S]ince the arresting officers had just ordered all of the occupants out of the duplex, handcuffed Kellogg and conducted a security sweep of the residence, there was no reason to believe that a weapon would be immediately accessible to individuals other than police. Thus, the immediate danger to the officers or the public was insufficient to justify the officers' failure to inform Kellogg of his rights prior to eliciting incriminating statements regarding the items in the duplex.

*Id. See also United States v. Brathwaite*, 458 F.3d 376, 382 (5th Cir.2006), fn. 8 (rejecting application of the public-safety exception where police secured the suspect and his coresidents, conducted two security sweeps, and gained control over the residence).

{¶ 121} Maxwell made two statements after Det. Zickes asked him whether he was armed. His first statement, that he did not have a gun anymore, was in direct response to Zickes's question. His second statement, that "he got rid of the gun that he once had," was made while Riddlebarger was patting him down. Riddlebarger testified that this was an unsolicited response and was not made in response to further questioning.

{¶ 122} The admissibility of Maxwell's second statement depends on whether it was a continuation of his response to police questioning about whether he was armed. In determining whether one statement is a continuation of the previous statement, a court should consider factors such as whether the content in the statements overlap, the timing and setting of each statement, and the continuity of personnel. *See State v. Clark*, 7th Dist. Mahoning No. 08MA15, 2009-Ohio-3328, 2009 WL 1915211, ¶ 24. Maxwell's second response was made seconds after his first response, addressed the same matter, and was made to the same officers in the room. Thus, we conclude that both statements were improperly obtained in violation of *Miranda*.

{¶ 123} Because Maxwell's statements were improperly admitted into evidence, we must determine whether the error was reversible or harmless. "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v.*

129

*Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We hold that the erroneous admission of Maxwell's statements was harmless beyond a reasonable doubt in view of the remaining evidence establishing Maxwell's guilt.

{¶ 124} Properly admitted evidence provided overwhelming evidence of Maxwell's guilt. Gregg testified that Maxwell was very upset after Nichole testified at the grand jury and that he said, "[T]he bitch is going to make me kill her." He also asked Gregg where he could get a gun. Four days later, Maxwell violated a temporary protection order and went to Nichole's house with a gun. Lauretta confronted Maxwell at the house, Maxwell fired shots, and she observed Maxwell standing over Nichole's body before he fled the scene. C.M. also witnessed Maxwell shooting her mother. Moreover, Maxwell called Gregg and admitted shooting Nichole that night.

{¶ 125} Based on the foregoing, we overrule proposition XIII.

*Maxwell*, 9 N.E.3d at 945–47 (footnote omitted).

Maxwell contends the Ohio Supreme Court's decision contravened or misapplied the Supreme Court precedent governing harmless error in AEDPA cases. (Doc. No. 32, at 92.) A state's improper use of a petitioner's statements to police in violation of *Miranda* is subject to harmless-error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). But the test for whether a federal constitutional error was harmless depends on the procedural posture of the case. *Davis v. Ayala*, 576 U.S. 257, 267, 135 S. Ct. 2187, 192 L. Ed. 2d 323 (2015). As the Ohio court indicated here, on direct appeal, before a federal constitutional error can be held harmless, the court must be able to find the error was harmless "beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). In federal habeas proceedings, however, "the test is different." *Davis*, 576 U.S. at 267. The Court has recognized that "[s]tate courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error." *Brecht*, 507 U.S. at 636. "For reasons of finality, comity, and federalism," therefore, "habeas petitioners 'are not entitled to habeas relief

130

based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis*, 576 U.S. at 267 (citing *Brecht*, 507 U.S. at 637). Actual prejudice exists where the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995).

The Supreme Court has clarified that because a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA, federal habeas courts must apply both the *Brecht* test and the standard governing AEDPA deferential review to determine whether a petitioner is entitled to relief. *Brown v. Davenport*, 596 U.S. 118, 122, 142 S. Ct. 1510, 212 L. Ed. 2d 463 (2022). Therefore, "where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Id.* at 136 (emphasis in original).

Maxwell has not satisfied either test. Regarding the *Brecht* test, this Court holds no "grave doubt" that the trial court's error in admitting Maxwell's statements to police regarding his gun did not have a "substantial and injurious effect or influence in determining the jury's verdict[.]" *O'Neal*, 513 U.S. at 436; *Brecht,* 507 U.S at 637 (quoting *Kotteakos*, 328 U.S. at 776). As in *Brecht*, the State's comments during trial regarding Maxwell's unwarned statements were minimal. They were not mentioned at all in the State's opening statement; appeared on just four pages of FBI agent Robert Riddlebarger's direct examination and one page of his cross-examination (Doc. No. 9-2, at 181–84, 196); and were noted in only two sentences in the State's

131

closing argument (*id*. at 861). *See Brecht*, 507 U.S. at 639 (finding error in admission of petitioner's statements to police harmless where "[t]he State's references to petitioner's post-*Miranda* silence were infrequent, comprising less than two pages of the 900–page trial transcript in this case"). As in *Brecht* and as the Ohio Supreme Court concluded here, the evidence of Maxwell's guilt was strong. *See id.* ("the State's evidence of guilt was, if not overwhelming, certainly weighty"). As for the AEDPA test, for the same reasons, not every fair-minded jurist would agree that the trial court's error was prejudicial, as required under AEDPA. This claim, therefore, lacks merit.

### VI.     Twentieth Ground for Relief: *Trial Court Error/Reference to Jury's "Recommendation" of Death Sentence*

| Trial Court Error/Reference to Jury's "Recommendation" of Death | |
|---|---|
| | **Habeas Grounds** |
| The trial court unconstitutionally diminished the jury's sense of responsibility for imposing a death sentence. | Habeas Ground Twenty |

Maxwell's twentieth ground for relief alleges that the trial court erred by characterizing the jury's sentencing decision as a "recommendation" during voir dire, which had the effect of unconstitutionally diminishing the jury's sense of responsibility for imposing a death sentence. (Doc. No. 15, at 192–95.)

#### A. Procedural Posture

As Shoop observes, Maxwell did not raise this claim in state court; he presented it only as the underlying claim to a claim of ineffective assistance of trial counsel for failing to object to the use of the term on direct appeal (Doc. No. 26, at 95–96), which the Ohio Supreme Court rejected on the merits. *Maxwell*, 9 N.E.3d at 955–56. Maxwell maintains the state court reviewed the merits of the alleged constitutional violation that supported his ineffective assistance of counsel claim. (Doc. No. 32, at 135.) The state court, however, reviewed only the raised ineffective-assistance

132

claim. Maxwell did not present to a state court this record-based claim, and it is therefore procedurally defaulted. Further, Maxwell asserts no cause for the default or prejudice resulting from it, and the Court rejects his assertion of actual innocence to excuse the default. *See infra* Section I.B.6.

### B. Merits Analysis

In *Caldwell v. Mississippi*, 472 U.S. 320, 325, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), the prosecuting attorney told the jury in his closing argument that defense counsel "would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision . . . . Your job is reviewable." The Supreme Court vacated the defendant's death sentence, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." *Id*. at 328–29. *Caldwell*, therefore, "stands for the proposition that the jury should not feel less responsible, or more free to err, because of a belief that its decision to impose death will not have effect unless others later confirm the decision." *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir. 2004).

But to establish a *Caldwell* violation, the Supreme Court has since clarified that a defendant "must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S. Ct. 1211, 103 L. Ed. 2d 435 (1989). "It is an accurate statement of Ohio law for a trial judge to instruct a jury that their finding that a death sentence is warranted is" in fact "a recommendation." *Buell v. Mitchell*, 274 F.3d 337, 352 (6th Cir. 2001) (citing Ohio Rev. Code § 2929.03(D)(2)). Because the jury was properly instructed under Ohio law, there was no *Caldwell* violation and this ground is unavailing.

133

### VII.    Twenty-First Ground for Relief: *Constitutionality of Death Penalty*

| Constitutionality of Death Penalty | |
|---|---|
| | **Habeas Grounds** |
| Maxwell's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. | Habeas Ground Twenty-one |

For his twenty-first ground for relief, Maxwell argues that Ohio's death penalty scheme violates the U.S. Constitution—including the Fourteenth Amendment's guarantee of equal protection and the Eighth Amendment's protection against cruel and unusual punishment—because Ohio allows the death penalty to be imposed in an arbitrary and discriminatory manner. (Doc. No. 32, at 138–40.) He raised this claim on direct appeal to the Ohio Supreme Court, which summarily rejected it on the merits. *Maxwell*, 9 N.E.3d at 981–82 (¶ 254). This claim is thus ripe for federal habeas review.

The state court's decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent on the constitutionality of the death penalty. The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip v. Gross*, 576 U.S. 863, 881, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). Moreover, the Sixth Circuit has repeatedly upheld the constitutionality of Ohio's death penalty scheme, rejecting many claims Maxwell asserts here. *See, e.g., Beuke*, 537 F.3d at 652–53 ("Beuke next challenges the constitutionality of Ohio's death penalty scheme. His arguments are entirely meritless and have been rejected by this court on numerous occasions. We therefore will afford them minimal attention."); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010); *Cooey v. Coyle,* 289 F.3d 882, 928 (6th Cir. 2002); *Buell*, 274 F.3d at 367–76; *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir.

134

2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Jamison v. Collins*, 100 F. Supp. 2d 647, 759–67 (S.D. Ohio 2000).

The Sixth Circuit has repeatedly rejected the argument advanced by Maxwell that Ohio's death penalty scheme violates the U.S. Constitution—including that the Fourteenth Amendment's guarantee of equal protection and the Eighth Amendment's protection against cruel and unusual punishment—because it allows the death penalty to be imposed in an arbitrary and discriminatory manner. (Doc. No. 32, at 138–40); s*ee, e.g.*, *Buell,* 274 F.3d at 367; *Byrd*, 209 F.3d at 539. In *Buell*, the Sixth Circuit explained:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 96 S.Ct. 2909. By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

*Buell*, 274 F.3d at 367. Accordingly, this claim fails.

### VIII.   Twenty-Third Ground for Relief: *Impartial Jury*

| Impartial Jury | |
|---|---|
| | **Habeas Grounds** |
| The state court denied Maxwell his right to a fair and impartial jury. | Habeas Ground Twenty-three |

For his twenty-third ground for relief, Maxwell argues that the trial court erred by not excusing a juror whom he challenged for cause as biased, requiring him to use a peremptory

135

challenge to remove her from the jury pool. (Doc. No. 15, at 203–06.) He raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits. The claim is therefore preserved for review. The Ohio high court reasoned:

{¶ 93} In proposition of law VI, Maxwell argues that the trial court erred in denying a defense challenge against juror Gibson because she was biased. Maxwell also argues that he suffered prejudice because he was forced to use a peremptory challenge against Gibson after the trial court denied the challenge for cause.

{¶ 94} A trial court has broad discretion in determining a prospective juror's ability to be impartial. *State v. White*, 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998). Former R.C. 2313.42(J) (now R.C. 2313.17(B)(9)) stated that good cause exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." Former R.C. 2313.43 (now R.C. 2313.17(D)); *see State v. Cornwell*, 86 Ohio St.3d 560, 563, 715 N.E.2d 1144 (1999). A trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion. *Id*.

{¶ 95} During voir dire, juror Gibson stated that she had been sexually assaulted about five years previously and that her assailant had been recently apprehended. Gibson did not have to testify against the defendant, because there was a plea bargain and he received a one-year sentence. Gibson stated that she had met with Carol Skutnik of the Cuyahoga County prosecutor's office once or twice before trial. As to her dealings with the prosecutor's office, Gibson stated, "They did everything the way they were supposed to I believe. I didn't have any issues with them." As a follow-up question, trial counsel asked Gibson about her experience with the prosecutor's office: "Do you think that's going to somehow possibly taint the way you view this case against my client?" Gibson responded, "Why would it? No, I don't. One has nothing to do with [the] other."

{¶ 96} Maxwell argues that juror Gibson should have been excused as a juror because she had been the victim of a sexual assault and her previous relationship with the prosecutor's office posed a risk that she would find the prosecutor's case against Maxwell more credible. Yet Gibson's answers showed that she would be a fair-minded juror. Nothing indicates that Gibson's experiences as a sexual-assault victim would cause her to be biased against Maxwell. Gibson also assured the court that her prior dealings with a different Cuyahoga County prosecutor would not influence her consideration of Maxwell's case. *See State v. Allen*, 73 Ohio St.3d 626, 629, 653 N.E.2d 675 (1995) (prospective juror whose brother was a homicide victim permitted to remain as capital juror after assuring the court that she could set that aside and remain impartial). Thus, we hold that the trial court did not abuse its discretion in rejecting this challenge for cause. We also reject Maxwell's contention that the defense was forced to use a peremptory challenge against Gibson.

*Maxwell*, 9 N.E.3d at 956–57.

Maxwell argues that the state court's decision that juror Gibson was not biased was based on an unreasonable determination of fact, and that its rejection of his argument that he was unduly prejudiced by being forced to use a peremptory challenge to excuse her contravened and unreasonably applied Supreme Court precedent. (Doc. No. 32, at 146.) The Sixth Amendment protects a defendant's right, "[i]n all criminal prosecutions," to a "trial, by an impartial jury." U.S. CONST. amend. VI. "The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'" *Murphy v. Florida,* 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)). "Due process means [trial by] a jury capable and willing to decide the case solely on the evidence before [him or her]." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). "[D]ue process does not[, however,] require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* at 217. "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy,* 421 U.S. at 799–800. The Supreme Court has explained:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723. But "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (quoting *Irvin*, 366 U.S. at 723).

137

When a juror's impartiality is at issue, the "ultimate question" is "whether the 'juror swore that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.'" *White*, 431 F.3d at 538 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)). Habeas courts must accord "special deference" to trial courts in determining a juror's credibility, as trial judges are in the best position to assess the demeanor and credibility of the jurors. *Patton*, 467 U.S. at 1038. Indeed, voir dire examination protects the defendant's right to an impartial jury:

> by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).

Maxwell challenges the state court's factual finding on one basis: that it "overlooked" juror Gibson's failure to disclose on her juror questionnaire her interaction with prosecutors regarding a sexual assault case. (Doc. No. 32, at 144.) Defense counsel specifically questioned the juror about why she answered "NA" (not applicable) to the form's question of whether she had ever been "affiliated with" county prosecutors when she had met with a prosecutor about the case. (Doc. No. 9-1, at 401 (quoting Doc. No. 10-8, at 56 (Juror Gibson Questionnaire)).) She readily admitted that she had made a "mistake." (*Id*.) Defense counsel then questioned her extensively about the assault case and her involvement with the prosecution, as accurately recounted by the state court. (*Id*. at 401–04.)

The trial court was thus aware of juror Gibson's omission on the questionnaire as well as the basic facts surrounding the sexual assault, the resulting criminal case, and her relationship with

the prosecution, providing it with the opportunity to evaluate both the defense's challenge to her impartiality and her credibility in assuring the court that she could be fair and follow the court's instructions. Maxwell has not demonstrated by clear and convincing evidence that the state court erred in finding that juror Gibson was not biased to require her removal from the jury pool for cause. *See Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000) (a finding of jury impartiality is a factual determination and therefore presumed correct on habeas review unless a petitioner presents clear and convincing evidence to the contrary).

Moreover, as Shoop correctly observes, in *Ross v. Oklahoma*, the Supreme Court clearly established that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." 487 U.S. 81, 88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *see also Skilling v. United States*, 561 U.S. 358, 395 n.31, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) ("'[I]f [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat,' we have held, 'he has not been deprived of any . . . constitutional right.'") (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 307, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000)).

Maxwell counters that he can "overcome" the Supreme Court's ruling in *Ross* by "analyzing the composition of the jury pool and pointing to at least one other juror that was biased and was seated on his jury." (Doc. No. 32, at 146.) But Maxwell provides no supporting analysis on this point. He further contends the Supreme Court "undercut" *Ross* in *Martinez-Salazar*. (*Id.*) But *Martinez-Salazar* held not that a defendant's voluntary assertion of a peremptory challenge after an alleged erroneous for-cause ruling results in a constitutional violation, but rather, that a defendant need not use a peremptory challenge to cure an erroneous ruling to remove a juror for

cause. *See generally id.* In fact, the Supreme Court in *Martinez-Salazar* made clear that peremptory challenges do not have a constitutional source. *Id*. at 311 (citing, among authority, *Ross*, 487 U.S. at 88). The Ohio Supreme Court's decision rejecting this claim did not contravene or misapply *Ross* or any other Supreme Court precedent. This claim lacks merit.

### IX.    Twenty-Fifth Ground for Relief: *Cumulative Error*

| Cumulative Error | |
|---|---|
| | **Habeas Grounds** |
| The cumulative effect of multiple errors in this case amounts to a due process violation. | Habeas Ground Twenty-five |

Maxwell claims in his twenty-fifth ground for relief that cumulative error at his trial violated his constitutional rights. (Doc. No. 15, at 208–11.) Shoop argues that this claim is procedurally defaulted, not cognizable on habeas, and meritless. (Doc. No. 26, at 101–03.) The Court need not reach procedural default or the merits of this claim, however, because it is unequivocally not cognizable on federal habeas review. *See Anderson*, 460 F.3d at 816 ("[T]he law of [the Sixth] Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."); *see also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (death penalty decision stating, "we have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"). This ground for relief is denied.

### X.    Maxwell's Motion for Discovery

Maxwell filed a motion to conduct discovery on eleven of his twenty-five grounds for relief. (Doc. No. 37.) This includes numerous grounds of ineffective assistance of trial counsel, including claims that counsel failed to: (1) present evidence undermining the State's theory that he feloniously assaulted Nichole and then murdered her in retaliation for testifying about the

140

assault (Ground One); (2) use State's Exhibit 121 to undermine the State's case (Ground Two); (3) ensure there was a complete record of the proceedings (Ground Eight); (4) provide competent representation during plea negotiations (Ground Fifteen); (5) effectively investigate and present mitigating evidence of the victim's domestic assault of Maxwell, and his traumatic brain injuries, low intellectual functioning, and delusional disorder (Ground Sixteen); (6) investigate, discover, and present evidence that Maxwell was intellectually disabled and thus ineligible for the death penalty (Ground Seventeen); (7) object to an improper argument at sentencing (Ground Eighteen); (8) protect Maxwell's right to be tried by an unbiased jury (Ground Twenty-two); and (9) protect Maxwell from a biased juror (Ground Twenty-four).

Maxwell also requests permission to factually develop his grounds that the State's evidence was insufficient to support his convictions for aggravated murder and the attached specifications (Ground Three) and that the prosecution improperly withheld exculpatory and impeaching evidence from the defense (Ground Five). He seeks to depose his trial attorney, John Luskin, and the mental health experts who assessed him before and during trial. (*Id.* at 9–10.) Additionally, he requests records of his, Nichole's, and Gregg's phone calls made around the time of the murder that are in the prosecution or law enforcement's possession, and any State record requests regarding those phone records; all records in the prosecution or law enforcement's possession regarding Gregg; and all police reports relating to the investigation of the assault charges against Maxwell. (*Id*. at 6–7.) Shoop opposes the motion. (Doc. No. 38.)

### A.  Discovery in Federal Habeas Cases

A federal habeas petitioner, "unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). Discovery in habeas cases is governed by Rule 6 of the Rules Governing Section 2254

Cases in the United States District Courts ("Habeas Rules"), which permits petitioners to initiate discovery available under the federal civil rules "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Habeas Rules 6(a). "Good cause" for discovery under Rule 6 exists only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969)).

The burden is on the petitioner to demonstrate the materiality of the information requested. *See Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). Habeas Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations," but requires "specific allegations of fact." *Id.* (internal quotation marks and citations omitted). When a habeas petitioner "offers nothing more than vague musings on how [the desired discovery] might . . . unfold[,]" a district court may correctly determine that he or she has "fail[ed] to satisfy the 'good cause' standard required to obtain habeas corpus discovery." *Stojetz v. Ishee*, 892 F.3d 175, 207 (6th Cir. 2018).

The Supreme Court further narrowed the availability of discovery in federal habeas proceedings in *Pinholster*. There, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.[19] Noting that § 2254(d)(1) review "focuses on what a state court knew and did," the Court in *Pinholster* reasoned that "[i]t would be strange to ask federal courts to

---

[19] By its express terms, review under § 2254(d)(2) is also limited to evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2) (limiting consideration of whether the state court adjudication was the result of an "unreasonable determination of the facts in light of the evidence *presented in the State Court proceeding*" (emphasis added)).

analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id*. at 182. "'Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Id*. at 186 (quoting *Taylor*, 529 U.S. at 427–29).

Under *Pinholster*, therefore, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *see also Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) (finding petitioner was not entitled to an evidentiary hearing because the state courts had adjudicated his claim on the merits and, under *Pinholster*, petitioner was "stuck with 'the record that was before the state court'"). The Sixth Circuit also has consistently held that *Pinholster* bars consideration of new evidence developed in federal habeas proceedings relating to claims adjudicated on the merits in state courts. *See, e.g.*, *Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014) ("Loza's selective prosecution claim was adjudicated on the merits in state court, and, therefore, *Pinholster* requires us to consider only the evidence that was before the state court when reviewing Loza's claim."); *Sheppard v. Bagley*, 657 F.3d 338, 344 (6th Cir. 2011) (refusing to consider evidence adduced at federal evidentiary hearing in light of *Pinholster*).

Similarly, the Sixth Circuit has held that a district court properly denied a habeas petitioner's motion for discovery in part because the claim to which it applied "was adjudicated on the merits in state court, [and the court's] review [was] limited to the record that was before the state court." *Guysinger v. Buchanan*, 2020 WL 5405892, at *2 (6th Cir. July 16, 2020). Indeed, the clear trend among district courts in this Circuit is to apply *Pinholster* to limit discovery in habeas proceedings and deny petitioners' requests for discovery of evidence that *Pinholster* would

143

bar from their review. *See, e.g.*, *Broom v. Bobby*, 1:10-cv-2058, 2018 WL 1621083, at *35 (N.D. Ohio Apr. 4, 2018); *Lang v. Bobby*, No. 5:12-cv-2923, 2014 WL 5393574, at *8 (N.D. Ohio Oct. 23, 2014); *Davis v. Bobby*, 2:10-cv-107, 2017 WL 2544083, at *4 (S.D. Ohio June 13, 2017) (collecting cases). As one district court observed, "It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholster*] but allow her to introduce the same factual information via discovery and expansion of the record." *Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D. Ky. 2012).

Federal habeas courts may consider new evidence when deciding whether there is cause and prejudice or actual innocence to excuse a procedurally defaulted claim. *House v. Bell*, 547 U.S. 518, 537–38, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006). But habeas courts have denied discovery requests related to procedurally defaulted claims where the petitioner did not show that discovery could produce evidence excusing the default. *See Bagley*, 380 F.3d at 975–76 (holding district court properly denied a habeas petitioner's discovery requests relating to procedurally defaulted ineffective-assistance claims because the petitioner had not shown that the requested discovery could "resolve any factual disputes that could entitle him to relief"); *Owens v. Guida*, No. 00-2765, 2002 WL 1398544, at *2 (W.D. Tenn. Jan. 9, 2002) ("Petitioner has not shown that she is entitled to conduct discovery because the information sought would not have established cause and prejudice for the asserted procedural default of her ineffective assistance of counsel claim.").

### B. Analysis

Shoop argues that Maxwell has not shown good cause for any of the discovery he seeks, because his requests are precluded under *Pinholster*, as the claims to which they relate were adjudicated on the merits in state court; would not yield relevant evidence where the claims are

procedurally defaulted; or would be futile because the claims are plainly meritless. (*See* Doc. No. 38, at 3.)

This Court agrees. First, discovery related to Grounds One, Three, Sixteen, Seventeen, and Eighteen is precluded under *Pinholster* because, as explained above, Maxwell raised those claims in state court, where they were adjudicated on the merits. Second, discovery is not warranted on Grounds Two, Eight, Thirteen, Fourteen, Fifteen, Twenty-two, and Twenty-four, because, as this Court has also concluded, these claims of ineffective assistance of trial counsel are both procedurally defaulted and meritless. In addition, the appellate counsel ineffective-assistance claims asserted as cause for the default of Grounds Two and Eight are themselves either procedurally defaulted or meritless and therefore cannot constitute cause for the defaults. Further, the ineffective assistance of post-conviction counsel asserted as cause for Ground Fifteen's default is not cause as applied in this case. Accordingly, Maxwell has not demonstrated good cause for discovery on these unequivocally procedurally defaulted claims or on any ineffective assistance of counsel asserted as cause for those defaulted claims. Third, Maxwell has not shown good cause for his request for discovery related to Ground Five (prosecutorial suppression of exculpatory evidence), because, as this Court's prior discussion of the claim's merits indicates, his allegations do not show that, even if the facts were fully developed, he may be able to demonstrate that he is entitled to relief. *Bracy*, 520 U.S. at 908–09. Maxwell's motion for discovery, therefore, is denied.

## CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Maxwell's grounds for relief. The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should

separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483– 84, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a

146

valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for Ground Three, Ground Ten, Ground Twelve, Grounds Sixteen through Eighteen, Ground Nineteen, Ground Eighteen, Ground Twenty-one, and Ground Twenty-three. No jurist of reason would debate the Court's conclusions on these claims. Additionally, no COA will issue for Ground One, Ground Two, Grounds Four through Nine, Ground Eleven, Grounds Thirteen through Fifteen, Ground Twenty, Ground Twenty-two, and Ground Twenty-four, because they are unequivocally procedurally defaulted. No jurist of reason would debate the Court's procedural rulings on these claims. Finally, no COA will issue for Ground Twenty-five, because it is not cognizable on federal habeas review.

### CONCLUSION

For the foregoing reasons, this Court denies Maxwell's petition for writ of habeas corpus. The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**

Dated: March 21, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

147